EXHIBIT 2

**LIBERTY & FREEDOM**
**LEGAL GROUP**
Empowering YOUR Voice through Civil Rights Advocacy

July 2, 2024

**Sent Via E-Mail: (IHOQUEST@SCHOOLS.NYC.GOV)**

Impartial Hearing Office
New York City Department of Education
131 Livingston Street, Room 201
Brooklyn, NY 11201

### DUE PROCESS COMPLAINT - SCHOOL YEAR 2024-2025

Student:
NYC ID#:
DOB:
Parent/Guardian:        Shantel Talley
Home Address:
School:                 International Academy for the Brain ("iBRAIN")

To Whom It May Concern:

The Liberty and Freedom Legal Group, Ltd. ("Counsel"), represents the above-named student ("Student" or "          and his Parent/Legal Guardian, Shantel Talley (hereinafter referred to as "Parent")(collectively "Clients"), in matters pertaining to the classification, program, placement, and implementation of special education and related services for the Student for the 2024-2025 extended school year ("24/25 ESY").

The New York City Department of Education ("DOE") has procedurally and substantively denied the Student a Free Appropriate Public Education ("FAPE") as mandated by federal and state law, for the 24/25 ESY. Accordingly, we write to request an impartial hearing pursuant to Section 1415 of the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq. ("IDEA"), Article 89 of the New York State Education Law, and Part 200.5 of the Regulations of the New York State Commissioner of Education.

Please note, as per 34 C.F.R. §300.510(a)(1), and consistent with 20 U.S.C. §1415(f)(1)(B)(i), within fifteen (15) days of receiving notice of the Parent's Due Process Complaint ("DPC") and prior to the initiation of an impartial due process hearing under 34 C.F.R. §300.511, the DOE must convene a meeting with the Parent and the relevant members of the IEP Team who have specific knowledge of the facts identified herein. The Parent requests an immediate Resolution Meeting. In the event DOE fails to hold the Resolution Meeting within fifteen (15) days of receipt of the Parent's DPC or fails to participate in the Resolution Meeting, then Parent is requesting the Impartial Hearing Officer ("IHO") start the impartial hearing timeline immediately as per 34 C.F.R. §300.510(b)(5) and 8 N.Y.C.R.R. §200.5(j)(2)(vi)(b). The Parent also requests that the Impartial Hearing Office expedite this DPC by scheduling a pre-hearing conference immediately to address the ongoing violations of state and federal law as

Address:
300 East 95th Street
Suite 130
New York, NY 10128

Phone:
646-850-5035

outlined below. Our Clients request that any Impartial Hearing be open to the public as per 34 C.F.R. §300.512(c).

## PENDENCY

Our Clients request an interim order of pendency pursuant to federal and state special education law. Specifically, the IDEA and New York Education Law both contain "stay-put" provisions which give the child the right to remain in his or her current educational placement at public expense during the pendency of any administrative or judicial proceedings. 20 U.S.C. §1415(j); N.Y. Educ. Law 4404(4). Thus, the law allows the Student to remain in his "last-agreed-upon placement" until the impartial hearing process (including all appeals) is complete, unless the Parent and the DOE otherwise agree in writing.

As per 20 U.S.C. §1415(j), the Student's pendency entitlements are automatic and are required to be implemented by the DOE as a matter of law without the necessity of any application, motion, or other showing by Student's counsel, until there is a final order.

The DOE was put on notice through the Ten-Day Notice filed by the Parent (see Exhibit A) that the Parent is asserting their "stay-put" rights. While not required, attached is a Pendency Form based on the DOE's previous forms outlining the basis for pendency and the pendency program (see Exhibit B). The legal basis for pendency for this Student is attached as Exhibit C. The DOE has not responded to the Parent's Ten-Day Notice regarding Pendency, nor have they made any indication that they will begin implementing the Student's Pendency Placement.

Due to the DOE's history of failing to automatically implement the Student's pendency in previous school years, we respectfully request an immediate pendency hearing so an Interim Order on Pendency can be issued by the Impartial Hearing Officer ("IHO"). Without the implementation and honoring of the statutory entitlement of pendency, the Student will suffer from the lack of funding for the services and program at iBRAIN. We are providing a Draft Interim Order on Pendency (see Exhibit D), which includes:

- Funding for the cost of tuition, and supplemental services, where applicable, to be paid directly to the International Academy for the Brain ("iBRAIN") pursuant to the enrollment agreement between the Parent-Petitioner and iBRAIN (see Exhibit E) as outlined in Petitioner's Due Process Complaint;

- Funding for transportation services, as well as all services necessary to said transportation, to be paid directly to the transportation provider, pursuant to the transportation contract between the Parent-Petitioner and the transportation company (see Exhibit F) as outlined in Petitioner's Due Process Complaint; and,

- Funding for nursing services to be paid directly to the nursing provider, pursuant to the nursing contract between the Parent-Petitioner and the nursing services provider (see Exhibit G) as outlined in Petitioner's Due Process Complaint.

2

**DISPUTED ISSUES**

This DPC includes three sections: (I) a description of ███ educational needs and abilities; (II) an enumeration of the ways by which DOE failed to meet its obligation to provide ███ with a FAPE; and, (III) a proposal for how this failure may be remedied.

## I.    STUDENT'S EDUCATIONAL NEEDS AND ABILITIES

███ suffers from a brain injury resulting in severe impairments in the following areas: cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual and motor abilities, psychosocial behavior, physical functions, information processing and speech. ███ has several medical diagnoses that include cerebral palsy, localization related focal epilepsy with complex partial seizures, hypotonia, microcephaly, chronic lung disease, hearing and visual impairments. His visual conditions include myopia (nearsightedness), optic atrophy, chronic conjunctivitis of both eyes, retinopathy of prematurity bilateral, and cortical visual impairment (CVI). These impairments adversely affect ███ educational skills and performance.

Due to the severe nature of his brain injury, ███ is non-verbal and non-ambulatory, with highly intensive management needs requiring a high degree of individualized attention and intervention throughout the school day. He requires a modified environment to minimize extraneous auditory and visual stimulation, as well as the use of assistive technology. ███ primarily uses an eye-gaze device to communicate. He has difficulties with self-care tasks, grasping and manipulating objects, coordination and movement, and has decreased safety awareness and attention span. ███ requires assistance in all activities of daily living. Furthermore, ███ needs his oxygen levels monitored and occasionally needs oxygen administered to him. He also requires medical intervention and close monitoring for his asthma and seizure activity. During these times, ███ requires additional support and intervention from his 1:1 nurse to maintain his active participation in his classroom or related service sessions.

Accordingly, ███ requires a small, structured classroom offering an educational program delivered via a 1:1 direct instruction model, with a full-time 1:1 paraprofessional during the school day and while in transit to and from school to assist with all classroom activities, related services, and activities of daily living, and a 1:1 nurse that assists him with his medical/health needs. ███ requires a modified environment which reduces visual and sound distractions. He also requires a two-person transfer to and from his wheelchair or other repositioning. In addition, periodic breaks, additional processing time for tasks, and purposeful repetition of tasks during therapy sessions and educational instruction are required to accommodate ███ highly intensive needs for him to receive educational benefits and to make progress.

███ also requires an extensive regimen of related services, delivered in 60-minute sessions, including occupational therapy (OT), physical therapy (PT), speech and language therapy (SL), assistive technology (AT), vision education services (VES), and music therapy

(MT) to benefit from special education instruction. Because of the extensive services that ▮ requires, it is necessary for ▮ to attend a program which operates on an extended school day as part of an extended school year program. ▮ also requires an extended school day to accommodate the intensive level of care required to prepare him for the school day upon arrival, and to prepare him for dismissal at the end of the day.

## EDUCATIONAL PROGRAM HISTORY

Prior to attending iBRAIN, ▮ was a student at PS 186X Walter J. Damrosch School ("Damrosch"), a District 75 public school. At Damrosch, ▮ received related services in only 30-minute increments. Parent often expressed disagreement with the frequency and duration of related services as insufficient to meet ▮ needs.

▮ began attending iBRAIN during the 2022-2023 school year. At iBRAIN, ▮ received an appropriate educational program that addressed all of his health and educational needs. Since ▮ enrollment at iBRAIN, he has received all of his related services and academic instruction, as well as additional support, 1:1 nursing, and special transportation, at iBRAIN.

As stated herein, DOE has denied the Student a FAPE by failing to offer or provide an Individualized Education Program ("IEP") and placement reasonably calculated to provide ▮ with educational benefits and to make progress. First, there were significant Procedural Violations of the IDEA for all of the IEPs DOE created for this Student which (a) impeded the Student's right to a FAPE; (b) significantly impeded the Parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the Student; and (c) caused a deprivation of educational benefits.

These Procedural Violations include, but are not are not limited to, a failure to: (1) Provide Procedural Safeguards Notice; (2) Conduct an evaluation or reevaluation (at least every 3 years); (3) Provide Parent with mandated notices, such as, Meeting Notices, PWNs, IEPs, and Evaluations; (4) Provide Parent with information on how to request an IEE at public expense; (5) Acknowledge/listen to/accommodate Parent's concerns at the IEP meeting; (6) Provide appropriate PWN for each change or refusal to change proposed program; (7) Place Student in the least restrictive environment (LRE); (8) Develop an IEP for each school year at issue; (9) Include appropriate present levels of performance in the IEP; (10) Identifying Student's needs; (11) Include goals to match each of the Student's needs that are objectively written with a baseline of performance (Objective means of measuring progress on a regular basis); (12) Include a section in the IEP regarding the Parent's concerns, or failure to include Parent's concerns and failure to inform Parent about this option; (13) Include or address assistive technology (AT) needs; (14) Include or identify all Student's management needs; (15) Clearly identify all services provided including Location, Frequency, and Duration; (16) Explain whether Student is to be educated with non-disabled peers, and when; (17) IEP meeting notice and meeting failed to include mandated members of the CSE team and therefore failure to convene a

properly composed CSE team without the Student's Special Education Teacher, Related Service Providers, Parent Member, among others; (18) Failure to follow proper procedures in developing an IEP; (19) Critical decisions made outside of IEP team and CSE meeting; (20) Critical decisions pre-determined; (21) Timely and/or actually conduct an annual CSE review and develop an IEP; and, (22) Timely or actually provide an appropriate school location notice.

In addition, there are many Substantive Violations of the IDEA which the DOE committed in the development of the IEP for ▇▇▇▇ including, but not limited to: (1) the Student's disability and unique needs from that disability are not identified in the IEP; (2) there were no current or appropriate evaluations done prior to the development of the IEP; (3) an IEE should have been conducted; (4) the IEP does not fully explain the academic instruction or each related service the Student will receive and whether the teachers and providers are properly trained; (5) the IEP does not provide training for (a) assistive technology, (b) two-person transfers, (c) seizures and other health and medical needs of the Student; (6) many of the goals are not measurable or appropriate, or repeat year after year; (7) the IEP does not reflect meaningful progress nor does the level of progress correctly reflect the Student's potential; (8) there are not appropriate accommodations on the IEP; (9) it is not clear how classwork, testing, and curriculum are modified for this Student; (10) the Student is not educated with non-disabled peers; (11) the Student will not attend an appropriate class size or be educated with peers who have similar management, behavioral, physical, social/emotional, or academic needs; and (12) the Parent's concerns are not included nor addressed.

## 2024-2025 School Year

On May 28, 2024, DOE convened a Committee on Special Education ("CSE") to develop ▇▇▇▇ IEP ("May 2024 IEP") for the 24/25 ESY. The CSE recommended a 12:1+(3:1) class in a District 75 public school. At the IEP meeting, the CSE also recommended the following related services:

> Occupational therapy (OT): 5 times per week for 60 minutes, individually;
> Physical therapy (PT): 5 times per week for 60 minutes, individually;
> Speech-language therapy (SL): 4 times per week for 60 minutes, individually, and 1 time per week for 60 minutes, in a group;
> Vision education services (VES): 2 times per week for 60 minutes, individually; and,
> Assistive technology services (AT): 2 times per week for 60 minutes, individually.

The CSE also recommended a 1:1 paraprofessional, but failed to recommend a 1:1 nurse. For special transportation accommodations, the CSE recommended a 1:1 travel nurse, a lift bus to accommodate a regular-size wheelchair, limited travel time, a route with fewer students, and climate control. However, the CSE also failed to consider, much less recommend, an extended school day.

At the CSE meeting, the Parent expressed, and ▇▇▇▇ teachers and service providers agreed, that a 12:1+(3:1) class size in a District 75 public school program would be too large for

the Student and would fail to address ███ highly intensive management needs. There is no evidence that ███ would succeed in a class larger than a 6:1:1 setting, since a larger class would not allow him to attend and learn effectively or receive educational benefits. Moreover, ███ school staff noted that he requires a very specialized environment for safety reasons, as his medical and health needs warrant a placement with staff appropriately trained for his unique needs, including his respiratory issues. Also, the lack of provision of music therapy by a board-certified music therapist would only serve a recreational and not a therapeutic purpose. The Parent and school also expressed their disagreement with the CSE's decision not to recommend hearing education services. The Parent also expressed her disagreement with the CSE's failure to recommend a 1:1 nurse for ███ a critical service which he needs to safely attend school. This was especially concerning to the Parent because the CSE clearly recognized ███ need for a 1:1 travel nurse on the bus, and recommended this service, but failed to recommend a 1:1 nurse during school.

Despite her concerns, Parent remains willing to investigate a DOE-recommended placement for ███ However, to date, DOE has not sent a Prior Written Notice ("PWN") or a School Location Letter ("SLL") for ███ for the 24/25 ESY. Essentially, DOE offered no school location for ███ Given the circumstances and ███ conditions, Parent had no choice but to evaluate alternative options.

As a result of the issues noted above, Parent decided to re-enroll ███ at iBRAIN and informed DOE of this decision via a Ten-Day Notice on June 14, 2024, seeking DOE funding of ███ program at iBRAIN.

At iBRAIN, ███ attends a 6:1:1 class, with direct and small group instruction, and receives the following related services:

> OT: 5 times per week for 60 minutes, individually;
> PT: 5 times per week for 60 minutes, individually;
> SL: 4 times per week for 60 minutes, individually, and 1 time
> per week for 60 minutes, in a group;
> VES: 2 times per week for 60 minutes, individually;
> Hearing education services (HES): 1 time per week for 60 minutes, individually;
> Music therapy (MT): 2 times per week for 60 minutes, individually, and 1 time
> per week for 60 minutes, in a group; and
> AT: 2 times per week for 60 minutes, individually.

███ related services are provided on a push-in/pull-out basis to allow him to generalize skills in multiple environments.

At iBRAIN, ███ also utilizes an AT device and receives support from a 1:1 paraprofessional for all activities of daily living and in his academic and related services. ███ also receives support from a 1:1 nurse to manage his highly complex medical and health needs, administer medication, and monitor seizures. Furthermore, he also receives transportation services, which include: a 1:1 travel nurse, a lift bus/wheelchair ramp, air conditioning, oxygen, and limited travel time.

## II.    DOE FAILED TO PROVIDE A FAPE TO STUDENT

The Parent contends that DOE failed to offer or provide ███ with a FAPE because DOE failed to recommend a program and placement uniquely tailored to meet ███ needs for the 24/25 ESY. The DOE's Committee on Special Education ("CSE") met on May 28, 2024, to develop an Individualized Education Program ("IEP") for ███ for the 24/25 ESY. In this regard, the CSE recommended ███ attend a 12:1+(3:1) class with related services of OT, PT, SL, VES, and AT, to be provided at a District 75 public school. The CSE also recommended a 1:1 paraprofessional for ███ however, the CSE failed to recommend MT, HES, a 1:1 nurse, and the recommended special transportation services that did not offer critical oxygen for ███ safety.

Notably, and to date, the DOE has failed to provide the Parent with a Prior Written Notice ("PWN") or a School Location Letter ("SLL"). These failures constitute a denial of a FAPE for the 24/25 ESY. Thus, the Parent has been unable to review a recommended school placement, being there have been none recommended or otherwise provided.

The Parent additionally challenges herein any and all IEPs offered to ███ for the 24/25 ESY. This request is based on the following factors which have procedurally and substantively denied ███ a FAPE, including but not limited to:

### A.    DOE FAILED TO RECOMMEND AN APPROPRIATE SCHOOL LOCATION

a. DOE failed to recommend an appropriate school location for ███ for the 24-25 ESY, thereby denying him a FAPE.

b. To date, the DOE has failed to provide the Parent with a SLL, leaving ███ with no school to attend.

c. The recommended 12:1+(3:1) in a District 75 public school does not provide ███ with the quiet, distraction-free environment he needs to receive educational benefits and make progress.

d. The proposed 12:1+(3:1) classroom in a District 75 public school is not appropriate.

   i. Pursuant to the Commissioner's Regulation §200.6, the size and composition of proposed classes shall be based on the "similarity of the individual needs of the students according to: (i) levels of academic or educational achievement and learning characteristics; (ii) levels of social development; (iii) levels of physical development; and (iv) the management needs of the students in the classroom."

   ii. The majority of the students in District 75 12:1+(3:1) classes are ambulatory, which indicates that ███ will <u>not</u> be placed with students who have similar needs and abilities, which is his entitlement under 8 N.Y.C.R.R. § 200.6(h)(3).

   iii. There is a wide range of academic, social, emotional, behavioral, physical, and developmental needs in the proposed District 75 12:1+(3:1) class.

   iv. The recommended classroom presents safety risks to ███ because a majority of the students in 12:1+(3:1) classes are ambulatory.

e. DOE failed to recommend an appropriate school location where the May 2024 IEP could be implemented by its failure to recommend an extended school day. There are simply not enough hours in the regular school day to provide ███ with the

7

program recommended by the proposed February 2024 IEP. Thus, DOE's failure to recommend an extended school day constitutes a denial of FAPE.

**B. DOE FAILED TO EVALUATE ██████ IN ALL AREAS OF HIS SUSPECTED DISABILITY**

    a. DOE failed to conduct updated psychoeducational or neuropsychological testing prior to the 24/25 ESY.

    b. DOE failed to conduct updated evaluations in OT, PT, and SL prior to the 24/25 ESY.

    c. DOE denied the Parent's request for music therapy without conducting its own evaluation.

    d. DOE failed to conduct any evaluations on ████ in advance of the 24-25 ESY.

    e. DOE's evaluations failed to thoroughly assess ████ in all areas of his suspected disability.

    f. DOE failed to adequately address the Parent's request to consider an NYSED-approved Non-Public School (NPS), by, inter alia, failing to conduct evaluations in connection with an NPS placement, which is violative of the DOE's Standard Operating Procedures Manual ("SOPM").

    g. DOE failed to conduct a psychological assessment completed within three years or, if the school psychologist determined that this was unnecessary, a written report by the psychologists indicating the reasons the assessment was not needed before the February 2024 IEP meeting.

    h. DOE failed to assess ████ specific educational needs for the last six months.

    i. DOE failed to recommend an NPS program that would be appropriate for ████ given that there was no appropriate DOE program.

    j. The Parent hereby disagrees with the DOE's evaluations, or lack thereof, and formally requests an order directing DOE to fund independent educational evaluation ("IEE") in the form of an independent neuropsychological evaluation to be conducted by a qualified provider of the Parent's choosing at a reasonable market rate.

**C. DOE FAILED TO RECOMMEND APPROPRIATE RELATED SERVICES**

    a. Due to his complex medical history and diagnoses, ████ requires a 1:1 nurse all day to address his health and medical needs which would increase his participation in classroom activities. ████ needs a trained medical professional to assist with feeding, breathing/suctioning, monitor for seizures and respond immediately, and to ensure that ████ remains on schedule for all required medications. Without a skilled nurse, ████ will not make any meaningful progress under the DOE's proposed IEP. The DOE's failure to address ████ need for 1:1 skilled nursing is a denial of FAPE. The DOE's proposed IEP also acknowledges ████ health and medical conditions and his Parent's concerns expressed at the meeting regarding the CSE failing to recommend a 1:1 skilled nurse to address his acute needs. Yet, again, the DOE leaves out these essential and potentially life-saving services out of its recommendations with no meaningful justification.

    b. DOE failed to recommend MT, a related service provided by a licensed music therapist, that enables ▊▊▊ to receive access to his special education instruction.

    c. DOE failed to recommend appropriate medical support for ▊▊▊

    d. DOE failed to recommend appropriate transportation accommodations for ▊▊▊ including but not limited to, a failure to recommend oxygen.

**D. DOE DENIED PARENT MEANINGFUL PARTICIPATION IN THE IEP PROCESS**

    a. By failing to timely notify the Parent of its final recommended placement for ▊▊▊ for the 24/25 ESY through a Prior Written Notice and/or a School Location Letter, DOE has impeded the Parent's ability to investigate the proposed educational program and placement.

**E. DOE PREDETERMINED THE OUTCOME OF STUDENT'S IEP**

    a. Despite the clear, unequivocal recommendations of ▊▊▊ teacher and service providers that ▊▊▊ be placed in a small class so that he can benefit from instruction with minimal distractions, as well as the Parent's statements of concern that ▊▊▊ would regress in a placement that included a larger sized classroom, DOE went ahead and recommended what they intended to do.

**iBRAIN IS APPROPRIATE FOR ▊▊▊ AND THE EQUITIES FAVOR THE PARENT'S CLAIMS**

    The educational program ▊▊▊ currently receives at iBRAIN continues to be appropriate. ▊▊▊ attends a 6:1:1 special class with direct instruction, which minimizes distractions and enables ▊▊▊ to attend, receive educational benefits, and make progress. ▊▊▊ receives an intensive regimen of related services, including OT, PT, SL, AT, VES, HES, and MT, all delivered in 60-minute sessions. This past school year, ▊▊▊ has made considerable progress in all domains at iBRAIN. It is incontrovertible that at iBRAIN, ▊▊▊ is receiving special education instruction, including related services, designed to meet his unique needs.

    The Parent has always made ▊▊▊ available for evaluations, observations, and assessments by DOE. The Parent attended the May 2024 IEP meeting and actively participated in the meeting. The Parent disagreed with DOE's recommended IEP and placement recommendation at the meeting. And the Parent timely sent DOE a 10-Day Notice. Accordingly, equitable considerations favor a full award of tuition and related services, including special transportation and nursing, for ▊▊▊ at iBRAIN.

**III.    PROPOSED RESOLUTION FOR DOE'S FAILURES**

    In light of the above, DOE has failed to offer ▊▊▊ a FAPE for the 24/25 ESY. Furthermore, ▊▊▊ placement at iBRAIN for the 24/25 ESY is appropriate to address

academic, physical, and social/emotional needs, and is reasonably calculated to confer educational benefits upon ▮▮▮▮▮    Additionally, there are no equitable considerations which would bar direct/prospective payment for all costs associated with ▮▮▮▮▮ placement at iBRAIN, as, at all relevant times, our Clients have cooperated in the CSE/IEP review, development, and placement process.

Our Clients hereby reserve the right to raise any other procedural or substantive issues that may come to their attention during the pendency of the litigation of this matter, including, but not limited to: (1) challenging the qualifications of any of the DOE's proposed supervisors, teachers, paraprofessionals, and/or any other service provider who might have been assigned to work with Student; (2) challenging the appropriateness of DOE's recommended placement by claiming that it cannot or will not maintain an appropriate student-to-staff ratio for the entirety of the school day and that the Student's IEP can be implemented as drafted without an extended school day; and (3) challenging the appropriateness of DOE's recommended placement by claiming that it will not or cannot provide ▮▮▮▮▮ with all of the related services he needs to make meaningful progress.

In an effort to avoid prolonged litigation of this matter, Parent proposes the terms of a settlement discussed below:

a.  An Interim Order of Pendency, as per the attached, for the Student at iBRAIN.

b.  An Order declaring that DOE denied Student a FAPE during the 24/25 ESY;

c.  A determination that iBRAIN is an appropriate placement for ▮▮▮▮▮

d.  An Order directing payment by DOE directy to iBRAIN for the cost of Full Tuition for the 24/25 ESY, including the cost of related services, and a 1:1 paraprofessional;

e.  Direct payment/prospective funding of special education transportation with limited travel time, a 1:1 transportation nurse and/or paraprofessional, air conditioning, a lift bus, a regular-sized wheelchair, and oxygen, as per the transportation contract between the Parent-Petitioner and the transportation company;

f.  Direct payment/prospective funding of 1:1 nursing services, as per the nursing contract between the Parent-Petitioner and nursing services provider;

g.  Reconvene a new IEP meeting to address changes if necessary; and,

h.  An Order directing DOE to fund an independent neuropsychological evaluation.

Should this matter proceed to litigation and Parent is a prevailing party on any substantial issue, then we will additionally seek an award of attorneys' fees and the recovery of all related fees and disbursements as permitted by relevant statute.

Respectfully submitted,

/s/  Peter G. Albert
Peter G. Albert, Esq.
*Attorneys for the Petitioner*
Liberty and Freedom Legal Group, Ltd.
300 E. 95th Street, #130
New York, New York 10128
Email: hearings@pabilaw.org

**LIBERTY & FREEDOM**
**L E G A L   G R O U P**
Empowering YOUR Voice through Civil Rights Advocacy

June 14, 2024

**Sent Via Electronic Mail: (10daynoticecse9@schools.nyc.gov)**
New York City Department of Education
Committee on Special Education 9
333 Seventh Avenue, 4th Floor
New York, New York 10001

<u>**TEN-DAY NOTICE**</u>

Student Name:                     ████ ████████
NYC OSIS ID Number:        ████████
Date of birth:                       █████████
Parent(s)/Guardian(s):         Shantel Talley
Home Address:                     ████████████████████████

To Whom It May Concern:

The Liberty and Freedom Legal Group, Ltd. ("Counsel"), represents the above-named student ("Student" or "████████ and their parent(s)/guardian(s) ("Parent") (collectively "Clients"), in matters pertaining to the classification, program, placement, and implementation of special education and related services for the Student.

Pursuant to 20 U.S.C. §1412 (a)(10)(C)(iii) and 34 C.F.R. §300.148 (d)(1)), and on behalf of our Clients, we are providing the New York City Department of Education, the Student's local educational agency ("DOE"), ten (10) business days' notice of the Parent's rejection of the most recent proposed DOE Individualized Education Program ("IEP"), recommended program and school placement, for the 2024-2025 extended school year ("ESY") because of the DOE's failure to offer or provide the Student with a Free Appropriate Public Education ("FAPE") and maintain the Student at their last agreed upon educational placement, the International Academy for the Brain, d/b/a iBRAIN, Ltd. ("iBRAIN"), while seeking public funding for the Student's placement. iBRAIN is located at 403 East 91st Street, New York, NY 10128, and is a specialized educational program designed to educate students, like the Student, who suffer from a brain injury or brain-based disorder.  Also, no school location letter for the 2024-2025 ESY has been issued. If DOE recommends the same District 75 public school as last year, please note the Parent has previously rejected that location because it was not appropriate for the Student.

The Parent is requesting the DOE to maintain this status quo during the pending impartial hearing process and any appeals, through the "stay-put" provision pursuant to 20 U.S.C. §1415 (j) and have included the DOE Pendency Form already pre-populated with this Ten-Day Notice, as Exhibit A. In order to maintain the Student in their pendency program, please be prepared to fully implement this pendency placement at the start of the extended school year.

This notice is sent in addition to the Parents having expressed their concerns, disagreements, and rejection of the Committee on Special Education's ("CSE") recommendations at the most recent

Address:

300 East 95th Street
Suite 130
New York, NY 10128

Phone:

646-850-5035

A - 1

Individualized Education Program ("IEP") meeting.  The Parent continues to request Independent Education Evaluations (IEEs) of the Student; to be conducted at public expense, in order to appropriately assess the Student in all areas related to their suspected disabilities, including, but not limited to neuropsychological, physical therapy, occupational therapy, speech-language therapy, special education and assistive technology assessments due to the lack of proper assessments conducted by the DOE prior to the development of the most recent IEP meeting.

The Student is a child who suffers from a brain-based injury and the Student's educational needs are multifaceted and complex, and the DOE's recommended program and placement will not appropriately address their educational needs for the 2024-2025 extended school year.

Based on the Parent's review of the proposed recommended program and placement for the Student, the proposed IEP to be implemented during the 2024-2025 extended school year is not designed to enable the Student to receive appropriate educational benefits or receive appropriate related services. The proposed District 75 public school placement recommendations cannot be implemented, as proposed in the IEP, during the regular school day. The Parent is also concerned about the appropriateness of the recommended placement for reasons including, but not limited to, class functional and academic grouping, staffing, accessibility, availability of adequate resources, and the lack of individualized attention and support. Further, the Parent is concerned the physical structure and facility of a District 75 school location is not appropriate to address the Student's individual needs.

Our Clients remain willing and ready to entertain an appropriate public or approved non-public school placement that can provide the required intensive academic and related services program the Student requires. Accordingly, the Parent requests the CSE reconvene for this purpose once the IEEs have been completed in order to develop an appropriate IEP. At this time, however, the Parent has no choice other than to re-enroll the Student in iBRAIN, which is an appropriate placement for the Student and is the last agreed-upon placement between the Parent and the DOE.

Very truly yours,

/s/ Peter Albert
Peter Albert, Esq.
Liberty and Freedom Legal Group, Ltd.
Attorneys for Parents


cc:    Shantel Talley, ilovemyson13013@gmail.com

# **Pendency Implementation Form**

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

| Student Name | OSIS Number | DPC Number |
|---|---|---|
| ███ ████ | ████ | |

1. The basis for pendency is:    Unappealed FOFD IHO No. 246205, 10/06/2023

2. The pendency program consists of the following:

| Tuition | | |
|---|---|---|
| **School Name** | **10- or 12-Month Program** | **Other Notes** |
| International Academy for the Brain (iBRAIN) | 12-month program | Direct payment of Full Tuition to iBRAIN as per the terms of the enrollment contract between iBRAIN and parent |

| Services | | | | |
|---|---|---|---|---|
| **Service or Item** | **Ratio and Frequency** | **10- or 12-Month Program** | **DOE or Private Provider** | **Private Provider Name and Rate** |
| Special Transportation services | Daily; Round-trip for all school days | 12-month | Private | Direct payment to Sisters Travel and Transportation Services, LLC as per the terms of the transportation agreement with the parent |
| Individual Nursing Services | Daily; for all school days | 12-month | Private | Direct payment to Park Avenue Home Care as per the terms of the nursing agreement with the parent |

Form submitted by: Peter Albert, July 2, 2024, Parents' Counsel

---

For DOE use only:

The above program should be implemented as pendency

Pendency starts on: July 2, 2024
The date the DPC was filed: July 2, 2024

_____        _____
DOE Reviewer        Date

B - 1

## FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case Number: | 246205 |
| Student's Name: | STUDENT |
| School District: | SCHOOL DISTRICT |
| Impartial Hearing Officer: | Michele Host |
| Date of Filing: | February 24, 2023 |
| Hearing Requested by: | PARENT |
| Dates of Hearing: | August 10, 2023 |
| | August 28, 2023 |
| | September 5, 2023 |
| | September 7, 2023 |
| | September 22, 2023 |
| Record Close Date: | October 5, 2023 |
| Time Sensitive: | No |
| Date of Decision: | October 6, 2023 |

Findings of Fact and Decision
Case No. 246205

**NAMES AND TITLES OF PERSONS WHO APPEARED ON AUGUST 10, 2023:**

For the Student:

REDACTED (Parent's Counsel)

For the District:

REDACTED (DOE Counsel)

**NAMES AND TITLES OF PERSONS WHO APPEARED ON AUGUST 28, 2023:**

For the Student:

Parent's Counsel
REDACTED (Parent's Counsel 2)
REDACTED (Parent)

For the District:

DOE Counsel 2

**NAMES AND TITLES OF PERSONS WHO APPEARED ON SEPTEMBER 5, 2023:**

For the Student:

Parent's Counsel
REDACTED (Director)

For the District:

DOE Counsel

**NAMES AND TITLES OF PERSONS WHO APPEARED ON SEPTEMBER 7, 2023:**

For the Student:

Parent's Counsel
Director

For the District:

DOE Counsel

C - 2

Findings of Fact and Decision
Case No. 246205

**<u>NAMES AND TITLES OF PERSONS WHO APPEARED ON SEPTEMBER 22, 2023:</u>**

<u>For the Student:</u>

Parent's Counsel
Parent's Counsel 2
Parent

<u>For the District:</u>

DOE Counsel

C - 3

Findings of Fact and Decision
Case No. 246205

---

## <u>INTRODUCTION AND PROCEDURAL HISTORY</u>

This matter concerns the Student, a student classified as a student with a disability under the Individuals with Disabilities Education Act ("IDEA"). The Student's eligibility for special education supports and services is not in dispute.

This matter comes before me on the Parent's due process complaint, originally filed on or about February 24, 2023. The Parent filed an amended due process complaint on April 7, 2023. In the Parent's amended due process complaint, the Parent alleged that the DOE failed to provide the Student with a free and appropriate public education ("FAPE") for the 2021-2022 and 2022-2023 extended school years. In the Parent's amended due process complaint, the Parent indicated that the Parent would seek the following relief: direct payment of the Student's 2022-2023 tuition at the private school ("Private School") where the Student was unilaterally placed for the 2022-2023 school year, in addition to the costs of related services, 1:1 private duty nursing services, and a 1:1 paraprofessional; direct payment of special education transportation; compensatory education to put the Student in the place the Student would have been in if the Student had received an appropriate education during the 2021-2022 school year; an order directing the DOE to convene an IEP meeting for the Student; and an order directing the DOE to fund an independent neuropsychological evaluation. (P-A, pp. 6-7) The Parent also wrote that if the matter proceeded to hearing, the Parent would seek attorneys' fees. (P-A, p. 7)

I was appointed to this matter on February 27, 2023, and held a pre-hearing conference on March 31, 2023, before the due process complaint was amended. I then held a status conference on May 23, 2023. During that conference, Parent's Counsel stated that the Parent was not seeking a pendency hearing and wished to schedule a due process hearing. (5/23/2023

4

Tr., p. 7)  DOE Counsel stated that she had submitted a subpoena for documents.  I informed her

that I had not received it, and I asked her to resubmit it, which she said she would do.  I then

scheduled the matter for a due process hearing on June 20 and a subpoena hearing on June 5.

(5/23/2023 Tr., pp. 10-12)

On May 30, 2023 I emailed the parties and informed them that I still had not received the

subpoenas that the DOE referred to during our status conference on May 23.  DOE Counsel

responded and stated that she would send the subpoenas to me that day.  (IHO-II)

As of the date of the scheduled subpoena hearing, June 5, 2023, I still had not received

the DOE's proposed subpoena.  (IHO-III)  On the date of the subpoena hearing, DOE Counsel

emailed Parent's Counsel and me and sought a "brief adjournment" because she was at the

emergency room.  (IHO-III)  I adjourned the subpoena hearing and directed the DOE to submit

her subpoena via email.  (Id.)  On June 7, 2023, I still had not received the subpoena, and

emailed the parties; DOE Counsel responded that she had sent the subpoenas to an incorrect

email address.  (Id.)  The DOE submitted its subpoena on June 8, and Parent's Counsel

submitted objections to the DOE's subpoena on June 12.  I reviewed Parent's Counsel's

objections and provided the signed subpoena to the parties on June 13.  To provide the DOE with

time to serve its subpoena and allow for time for compliance with the subpoena, I  rescheduled

the due process hearing.  I originally rescheduled the hearing for June 29, 2023.  On the morning

of June 29, 2023, DOE Counsel emailed Parent's Counsel and me stating that she needed an

adjournment because of a death in the family.  Parent's Counsel agreed to adjourn the hearing to

July 25, 2023, but then sought an adjournment because of a personal matter.  Ultimately, I

rescheduled the case to be heard on August 10 and 28, 2023.  Both parties agreed to the new

dates.  (IHO-IV)

C - 5

The impartial hearing began on August 10, 2023.  DOE Counsel requested an adjournment due to witness unavailability.  (Tr. 5-7)  Parent's Counsel opposed DOE Counsel's request.  (Tr. 7-9)  I denied DOE Counsel's request, noting the repeated delays, the harm further delay would cause to the Student and Parent, and the fact that I emailed DOE Counsel on July 31 and August 9 regarding the due process hearing in this case and the DOE did not respond with any concerns regarding the DOE's witnesses.  (Tr. 11-12)

The DOE had disclosed proposed exhibits 1 through 10 in advance of the hearing. Parent's Counsel objected to proposed exhibit 9, and the DOE withdrew that proposed exhibit. (Tr. 15)  I admitted the DOE's exhibits 1-8 and 10 into evidence without further objection.[1]  (Tr. 15)  Parent's Counsel had disclosed proposed exhibits A through I in advance of the hearing. The DOE objected to proposed exhibit C, and I overruled the DOE's objection and admitted the document into evidence.  (Tr. 17-19)  Parent's Counsel withdrew proposed exhibit B as duplicative of DOE exhibit 2.

Both parties made opening statements, and the DOE rested.  (Tr. 20-25)  The matter then adjourned until August 28, 2023, as previously scheduled.

On August 28, 2023, over email, the DOE asked for an adjournment of the second day of the due process hearing because DOE Counsel had a medical emergency.  (Tr. 34)  I directed the DOE to have someone appear for the continued hearing, and DOE Counsel 2 appeared on behalf of the DOE.  Once the hearing began, DOE Counsel 2 reiterated the DOE's request for an adjournment.  For the reasons set forth in the record, including the fact that the Parent had appeared for cross-examination on August 28, 2023 and has difficulties making herself available

---

[1] The DOE's exhibits are cited as "D" followed by a letter, the Parent's exhibits are cited as "P" followed by a letter, and IHO exhibits are cited as "IHO" followed by a roman numeral.  The due process hearing transcript is cited by "Tr." followed by a page number.  Transcripts from conferences are cited using their dates followed by "Tr."

due to the Student's complex medical needs, I denied the DOE's request for an adjournment.

See 34 C.F.R. § 300.515(d); (Tr. 38-39)  I did, however, pause the proceedings to allow DOE

Counsel 2 time to review the Parent's affidavit, and I agreed to adjourn the matter immediately

after the Parent's cross-examination so that DOE Counsel could appear for the Director's cross-

examination and closing arguments.  (Tr. 39-40)  DOE Counsel 2 stated that this was "an

appropriate way of sort of balancing the two competing interests in this case."  (Tr. 40)

Accordingly, after a brief recess, DOE Counsel 2 conducted cross-examination of the Parent,

Parent's Counsel asked some questions on redirect, and I asked several clarifying questions.  (Tr.

80-88)  DOE Counsel 2 then asked several questions on re-cross.  (Tr. 89)  I then adjourned the

matter to September 5.  (Tr. 97)

On August 29, 2023, Parent's Counsel submitted two additional proposed exhibits over

email, and DOE Counsel 2 objected over email.  (IHO-V)  On September 5, 2023, both parties

appeared for the continued due process hearing and made arguments on the record regarding the

additional exhibits.  (Tr. 106-107)  Ultimately, I entered Parent's exhibit J and K into the record

to ensure a complete hearing record.  See *Application of a Child with a Disability*, Appeal No.

22-105 (Oct. 3, 2022) ("[C]ourts have not enforced absolute adherence to the five-day rule for

disclosure but have upheld the discretion of administrative hearing officers who consider factors

such as the conditions resulting in the untimely disclosure, the need for a minimally adequate

record upon which to base a decision, the effect upon the parties' right to due process, and the

effect upon the timely, efficient and fair conduct of the hearing.").  To mitigate any prejudice to

the DOE, I paused the proceeding to allow the DOE to review Parent's J and K before cross-

examining the Director, and I told the parties that we would need to re-call the Parent so that the

DOE could cross-examine the Parent regarding Parent's J and K.  While the parties were off the

record, Parent's Counsel also communicated with the Parent and re-confirmed that the Parent

consented to Parent's Counsel proceeding in her absence.  (Tr. 116-117)  DOE Counsel then

began her cross-examination of the Director.  DOE Counsel did not complete her cross-

examination that day, so I adjourned the hearing to September 7, 2023.

On September 7, 2023, DOE Counsel continued her cross-examination of the Director,

followed by redirect from Parent's Counsel.  I asked several clarifying questions, and counsel

asked questions based on my questions.  I then noted that we needed to schedule a final date for

the Parent to be crossed regarding Parent's exhibits J and K, and the parties scheduled the final

date of hearing for September 22.  (Tr. 230-232)  I granted the parties an extension of the

timeline based on the factors contained in 8 N.Y.C.R.R. § 200.5(j)(5).  The parties and I also

discussed closing statements, and we agreed that the parties would submit 15-page closing

statements on or before October 4, 2023.  (Tr. 232)

On September 22, 2023, the DOE cross-examined the Parent regarding Parent's exhibits J

and K, and Parent's Counsel conducted redirect.  I asked several clarifying questions, and the

Parent rested.  (Tr. 250)

On October 4, 2023, Parent's Counsel submitted the Parent's closing brief.  DOE

Counsel emailed Parent's Counsel and me at 12:09 a.m. on October 5, 2023, asking for

confirmation that I had received her brief.  I had not, and I informed her so via email later on the

morning of October 5, 2023.  DOE Counsel submitted the DOE's brief at 9:06 a.m. on October

5, 2023, and I closed the record.  A list of the documentary evidence in this proceeding is

appended to this decision.

## JURISDICTION

The due process hearing was held, and a decision in this matter is being rendered, pursuant to the Individuals with Disabilities Education Act (hereinafter, "IDEA"), 20 U.S.C. § 1400 *et seq*., and its implementing regulations, 34 C.F.R. § 300 *et seq*., and the New York State Education Law, Educ Law Art 89 § 4404 *et seq*., and its implementing regulations, 8 N.Y.C.R.R. Part 200.

## FINDINGS OF FACT

After considering all the evidence, as well as the closing briefs of both parties, my findings of fact are as follows:

The Student is currently ten years old and is classified by the DOE as a Student with Multiple Disabilities.  (D-2, p. 1; P-H, ¶ 2)  The Student has a complex medical profile with diagnoses including but not limited to cerebral palsy, hypotonia, delay in development, and chronic respiratory disease.  (D-2, p. 7)  The Student is non-verbal and uses a wheelchair.  The Student has limited ability to control the Student's arm and leg movements, and also has limited ability to maintain antigravity head and trunk postures.  (Id.)  The Student is nonverbal and requires assistance from an adult for all activities of daily living, including toileting, dressing, and feeding (using a tube).  (D-2, pp. 4, 7)

On December 21, 2021, the DOE convened a Committee on Special Education ("CSE") and held an IEP meeting for the Student's 2021-2022 school year.  (D-2; P-H, ¶ 4)  At the time of the IEP meeting, the Student attended a District 75 public school.  (P-H, ¶ 8)  The IEP referred to an assessment conducted of the Student using the Student Annual Needs Determination Inventory in October 2020, which found that the Student's reading, writing, math, and communication skills were "at the target skills of a pre-kindergarten level."  (D-2, p. 2)  The IEP

contained an entry from the Student's speech-language therapy ("SLT") provider that stated the provider had not yet had time to properly assess and get to know the Student.  (D-2, p. 4)

The IEP recommended that the Student be placed in a 12:1+(3:1) special class in a DOE specialized school on a 12-month basis.  (D-2, pp. 25-26)  The IEP recommended occupational therapy ("OT") twice a week for 30 minutes; physical therapy ("PT") twice a week for 30 minutes; SLT twice a week for 30 minutes; and vision education services twice a week for 30 minutes, all on an individual basis.  The IEP also recommended parent counseling and training ("PCAT") four times per year for 40 minutes.  (D-2, p. 25)  The IEP notes that the Student needed special transportation accommodations/services, including a 1:1 paraprofessional, 1:1 nursing services, and a lift bus with air conditioning.  (D-2, p. 30)  Oddly, although the IEP states in its recommendations section that the Student should receive SLT twice a week for 30 minutes, in the IEP's section labeled "Other Options Considered," the IEP states:

> [The Student's] speech mandate was changed from 2x30:3 back to 3x30:3 as it was reduced during remote learning.  Parent agreed to the change in mandate. Psychologist discussed the fact that while [the Student] is mandated for PT services a provider was not available because [the Student] was dropped from the original provider's caseload due to absenteeism at the beginning of the school year and when [the Student] returned to in person learning all the provider's caseloads were full.

Also, although the IEP does not clearly mandate a 1:1 nurse during the school day, in the section on "Other Options Considered," the IEP states that "this meeting was held to add the nurse which was finally approved by OHS after months of waiting."  (D-2, p. 33)  The Parent testified that she disagreed with the December 2021 IEP because she believed the Student "needed more therapy, like three times a week instead of the two times a week."  (Tr. 73)

The Parent testified that the Student was not provided with an IEP for the 2022-2023 school year. (P-H, ¶ 10) The Parent also testified that she did not receive a prior written notice or school location letter for the Student's 2022-2023 school year. (P-H, ¶ 10)

On September 2, 2022, the law firm representing the Parent sent a ten-day notice letter to the DOE. (P-D) The ten-day notice letter states that the Parent intends to place the Student at the Private School because of the DOE's failure to offer the Student a FAPE for the 2022-2023 school year. Also, the ten-day notice letter states that as of September 2, 2022, the Parent had not received a school location letter for the Student, and the Parent was dissatisfied with the public school the Student had attended for the past four years because the Parent requested longer and more frequent related services sessions for the Student, and when the Parent voiced her concerns, she was told the school could not offer more than 30 minute sessions. (P-D, p. 2)

The Student enrolled in the Private School on September 19, 2022. The Director testified about the Private School, generally, as well as the Student's educational program there. (P-I) The Director has a master's degree in teaching and is New York State-licensed for Students with Disabilities grades 1-6 as well as Childhood Education. (P-I, ¶ 3) The Director has been employed in the Director's current position since June 2018, and in her position, she is responsible for overseeing the educational components of the Private School's program and the supervision and training of teachers. (P-I, ¶ 1) The Director also participates in the intake of new students. (Id.)

The Director testified that the Private School is a:

[P]rivate, not-for-profit, and highly specialized special education program in New York City created for children who suffer from brain injuries or brain-based disorders. [The Private School] operates on an extended 12-month school year calendar and offers all services during its extended school day, which runs from 8:30 a.m. to 5:00 p.m. [The Private School] is an interdisciplinary program with

11

students, many of whom are non-verbal and non-ambulatory. Every student at
[the Private School] requires a 1:1 paraprofessional to assist with activities of
daily living and to have access to and benefit form the educational program.
Many students require a 1:1 nurse to attend to the student's medical needs.

(P-I, ¶ 5)

The Director testified that most of the Private School's students have traumatic brain
injuries. At the time of the Director's testimony, the Private School had seven 6:1:1 classes and
three 8:1:1 classes operating on two campuses, one in Manhattan and one in Brooklyn.

The Director testified in her affidavit that the Student attended a 6:1:1 class during the
2022-2023 school year, where the Student received 1:1 instruction on a daily basis. During
cross-examination of the Parent and the Director, however, it was revealed that the Student's
classroom did not have a full-time lead teacher for between four and eight months of the 2022-
2023 school year. (Tr. 62-63; 213-215; 223-224) The Director testified that during that time
period, the Student's assistant teacher largely assumed the role of lead teacher, although the
Private School "had other teachers who were coming in . . . to provide support with one-to-one
academics, as well as assisting with, you know, we had people who were assisting with, making
sure, you know, reports were complete." (Tr. 214)

The Private School provides its students with the Private School's version of an IEP, and
the Student's Private School IEP dated June 4, 2023 is in the record as Parent's exhibit C. The
Private School IEP has a projected service date of June 12, 2023, but when read in conjunction
with the Director's testimony, it is clear that the Student was receiving rigorous related services
during the 2022-2023 school year. (P-C; I) The Student received OT, PT, SLT, and vision
education ("VE"). The Student was supported by a 1:1 paraprofessional and a 1:1 nurse. (P-C,

pp. 61-62)  The Student also received weekly 60-minute sessions of assistive technology training ("AT") from a certified AT provider.  (Tr. 194)

The Private School IEP contains an introduction and background section that discusses the Student's diagnosis and preferences.  (P-C, p. 1)  The Private School IEP notes that the Student "is non-verbal; however, [the Student] was able to use visual eye gaze and facial expression to show interest and awareness."  (Id.)

The Private School IEP then presents information regarding the Student's present level of performance.  The section on academic performance contains teacher observations regarding the Student's ability to request preferred items, identify colors, respond to the Student's name, attend to activities, and respond to questions about activities and texts.  (Id. at p. 2)  The section discussing the Student's SLT is extremely detailed, and contains information about the Student's communication history, the Student's behavior in SLT sessions, and the Student's performance on various SLT assessments.  (Id. at pp. 3-4)  The IEP states that the Student "is making slow, steady progress towards [the Student's] speech and language-based goals."  (Id. at p. 4)  The Private School IEP discusses the Student's expressive language, receptive language, and oral motor goals, noting that the Student's performance and support is generally varied "based upon levels of arousal and interest/motivation when the session begins/ends."  (Id. p. 4) The Student received SLT five times a week, four times per week for 60-minute individual sessions, and once a week in a group.  (Id. at pp. 3, 62)

The Private School IEP also contains a section describing the Student's physical abilities and limitations.  The Student is not able to get dressed without assistance, and the Student requires "total assistance" for managing fasteners and diapering.  (Id. at p. 10)  The Student is unable to maintain a grasp for more than 10 seconds and does not demonstrate independent

Findings of Fact and Decision
Case No. 246205

finger movements.  (P-C, p. 11)  The Student "requires a 1:1 paraprofessional throughout the school day for navigation of [the Student's] environment, completion of ADLs, assistance with attention and sensory input as needed, motor control, access to and use of assistive technology/equipment, managing orthotics, transfers, positioning, and overall safety."  (Id. at p. 12)  The Private School IEP refers to the Student's October 2022 PT assessment, which was performed when the Student began attending the Private School, and also contains a description of the Student's 60-minute PT sessions, which occurred five times per week.  (Id. at pp. 17, 61)

The Student received OT five times per week for 60 minutes via a push-in and pull-out model.  (P-C, p. 61)  The Private School IEP describes the Student's OT sessions in detail, noting that the Student needs 60-minute sessions to "allot for time to receive direct instruction, preparatory activities, 2-person transfers, positional changes, environmental set-up, repetition of tasks for skill development, increased processing time, redirection to activities, transferring to and from different therapeutic spaces, and rest breaks due to decreased muscle endurance."  (Id. at p. 29)

The Private School IEP also contains information regarding the AT and VE that the Student receives at the Private School.  The Student received AT once a week for 60 minutes, and VE twice a week on an individual basis for 60 minute sessions.  (P-C, p. 62)  Although the Parent's Enrollment Contract with the Private School states that the Student would receive individual music therapy twice a week for 60 minutes and group music therapy once a week for 60 minutes, the Private School IEP contains no narrative regarding the Student's music therapy sessions, no music therapy goals, and no recommendation regarding the amount of the Student's supposed music therapy.  (P-C)  In addition, no music therapist is listed with the Student's other related service providers.  (P-C, p. 63)

The Parent's Enrollment Contract with the Private School separates the amount owed by the Parent into two amounts: a base tuition fee of $137,774.65 for the 2022-2023 school year, and a supplemental tuition fee of $81,020.80 covering the Student's "supplementary services," namely, OT, PT, SLT, VE, AT, music therapy, and PCAT for the Parent.  (P-F, pp. 1-2)  The Parent entered into a separate agreement for the Student's transportation services with a private transportation provider ("Transportation Provider").  (P-G)  The agreement specifically references the Private School as the Student's drop-off location in the morning and pick-up location in the afternoon, and states that the vehicle will have air conditioning and regular-size wheelchair accessibility.  (P-G, p. 2)  Under the agreement, each morning and afternoon trip was billed as a flat rate of $345.00, and the fees were based on school days whether or not the Student used the Transportation Provider's services, unless the Transportation Provider was at fault.  (P-G)

The Parent entered into an additional separate agreement with a private nursing service provider ("Nursing Service Provider") for a 1:1 private transportation nurse for the Student, as well as a 1:1 private duty nurse to accompany the Student during school hours.  (P-J)  The agreement states that all services would be billed on a monthly basis at a flat rate of $113.00 per hour.  (P-J, p. 2)

The Parent testified that she cannot afford to pay the cost of the Student's tuition at the Private School.  (P-H, ¶ 17)

## CONCLUSIONS OF LAW AND ANALYSIS

The IDEA establishes a "substantive right to a 'free appropriate public education'" for children with disabilities.  *Endrew F. v. Douglas Co. School Dist*, 137 S. Ct. 988, 993 (2017) (quoting *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458

U.S. 176 (1982)). The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE. *See* 20 U.S.C. § 1415(f)(3)(E)(i). Under the IDEA and New York law, where there is a procedural violation resulting in a deprivation of educational benefits to a student or the student's right to a free appropriate public education is significantly impeded, a hearing officer may find that a child did not receive a FAPE. See 20 U.S.C. § 1415 (f)(3)(E)(ii); 8 N.Y.C.R.R. § 200.5(j)(4)(ii).

A FAPE is offered to a student when: (a) the DOE complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits. *Rowley*, 458 U.S. at 206-07; *Cerra v. Pawling Cent. Sch. Dist*., 427 F.3d 186, 192 (2d Cir. 2005). "Not every procedural error will render an IEP legally inadequate." *M.H. v. New York City Dep't of Educ.*, 685 F. 3d 217, 245 (2d Cir. 2012) (citation omitted). If a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2); *Matrejek v. Brewster Cent. Sch. Dist.,* 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007).

In general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the student received a FAPE. 20 U.S.C. § 1415(f)(3)(E)(i). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley,* 458 U.S. at 203. School districts are not required to "maximize" the potential of students with disabilities,

but must provide "an IEP that is 'likely to produce progress, not regression,' and ... affords the student with an opportunity greater than mere 'trivial advancement.'"  *Cerra,* 427 F.3d at 195, quoting *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 130 (2d Cir. 1998); see also *Rowley,* 458 U.S. at 199; *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 379 (2d Cir. 2003). The IEP must be "reasonably calculated to provide some 'meaningful' benefit." *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1120 (2d Cir. 1997); see *Rowley,* 458 U.S. at 192.

Throughout the hearing process, a school district bears the burden to show that it (1) complied with the IDEA's procedural requirements; and (2) designed an IEP reasonably calculated to confer educational benefit on the student.  *C.B. ex rel W.B. v. N.Y. City Dep't of Educ.*, 2005 U.S. Dist. LEXIS 15215, *37 (E.D.N.Y. June 10, 2005); 20 U.S.C. 1415(i)(2)(C)(iii); see also *Walczak,* 142 F.3d 119.  However, "a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement."  N.Y. Educ. § 4404(1)(c).

Under the three-prong test established by the Supreme Court in *Sch. Comm. of Burlington, Mass, v. Dep't of Educ. of Mass*, 471 U.S. 359 (1985) and *Florence County. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993), parents who unilaterally place their children in private school are entitled to reimbursement from the school district if the services offered by the school district were inadequate or inappropriate, the services selected by the parent(s) were appropriate, and equitable considerations support the parent's claim. See also *Frank G. and Dianne G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006), cert. denied, *Board of Educ. of Hyde Park Cent. School Dist. v. Frank G.,* 2007 U.S. LEXIS 11520 (Oct. 15, 2007). The first prong of the

*Burlington-Carter* test requires an examination of whether the student's IEP provided a FAPE. *Brock v. Dutton*, 2015 U.S. Dist. LEXIS 44254, *14 (S.D.N.Y. March 31, 2015).

The Parent has the burden of proving that the unilateral placement was appropriate. To meet this burden, the Parent must establish, by a preponderance of the evidence, that the unilateral placement provides "educational instruction specifically designed to meet the unique needs of a handicapped child." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d. Cir. 2007) (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d at 364-65). The private school placement "need not meet the IDEA definition of a free and appropriate public education" or "state education standards or requirements." *Frank G. v. Bd. of Educ.*, 459 F.3d at 364.

The final prong of the *Burlington-Carter* test involves the balancing of the equities. 20 U.S.C. § 1412(a)(10)(C)(iii). Reimbursement may be limited or denied if the parent failed to act reasonably, did not cooperate with the DOE's attempts to evaluate the student, or failed to provide proper notice of the parent's rejection of the Student's placement. See 20 U.S.C. § 1412(a)(10)(C)(iii). When considering whether the parent has shown that the equities weigh in the parent's favor, it is important to consider "whether the [parent] cooperated with the district in its efforts to meet its obligations under the IDEA." *C.L v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840 (2d Cir. 2014).

### *Burlington-Carter* Test Prong One

As to Prong I of the *Burlington-Carter* test, the DOE failed to meet its burden at hearing. The Supreme Court has found a reviewing court may expect school district staff "to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F. v. Douglas County School District*, 137 S.Ct. 988, 1002 (2017). In this matter,

although the DOE entered nine documents into evidence, the DOE did not support its case with

any witness testimony explaining its decisions regarding either the 2021-2022 or the 2022-2023

school years.

Regarding the 2021-2022 school year, absent witness testimony to put it in context, the

December 21, 2021 IEP failed to demonstrate that the Student was offered a FAPE.  Given the

extent of this Student's educational needs, the IEP's related services recommendations are

extremely light—and the "Other Options Considered" section makes clear that the DOE was not

providing the Student with any PT at all.  (D-2, p. 33)

Regarding the 2022-2023 school year, it is uncontested that the DOE failed to have an

IEP in effect for the Student by the beginning of the 2022-2023 school year in accordance with

34 C.F.R. § 300.323.  The DOE also never provided the Parent with a school location letter for

the 2022-2023 school year.  School districts must ensure that an IEP is in effect by the start of

the school year. *Davis v. Wappingers Cent. Sch. Dist.*, 772 F. Supp. 2d 500, 508 (S.D.N.Y. 2010)

(citing 34 C.F.R. § 300.323(a) ("At the beginning of each school year, each public agency must

have in effect, for each child with a disability within its jurisdiction, an IEP....").  Failure to

provide the parents with an IEP before the start of the school year is a procedural violation of the

IDEA. *C.U. v. N.Y.C. Dep't of Educ.*, 23 F.Supp.3d 210, 225 (S.D.N.Y. 2014). Moreover, to

carry its burden under Prong One, the DOE must prove that it timely offered the Student a

placement.  Failure to do so constitutes a procedural violation that significantly impedes the

parent's ability to participate in the decision-making process regarding the provision of a FAPE.

*V.A. v. City of N.Y.*, 2022 U.S. Dist. LEXIS 84556, *28 (E.D.N.Y. May 10, 2022).

For the reasons set forth above, I cannot find that the DOE offered the Student a FAPE

for either the 2021-2022 or the 2022-2023 school year.

Findings of Fact and Decision
Case No. 246205

***Burlington-Carter* Test Prong Two: The Appropriateness of the Parent's Unilateral Placement**

A unilateral private school placement must be reasonably calculated to enable the child to receive educational benefits, and must be likely to produce progress, not regression. The relevant standard to apply is whether "the unilateral private placement . . . provides educational instruction specifically designed to meet the unique needs of a handicapped child." *Gagliardo*, 489 F.3d at 115 (quotations omitted). No single factor is dispositive in this analysis. *Id.* The private placement does not necessarily need to provide certified special education teachers or every special service that could assist in maximizing the Student's potential. *Bd. of Educ. of the Wappingers Cent. Sch. Dist. v. D.M.*, 2020 U.S. Dist. LEXIS 16007 (S.D.N.Y. 2020), aff'd 2020 U.S. App. LEXIS 39739 (2d Cir. 2020) (citation omitted). Moreover, parental placements are not subject to the same mainstreaming requirements as a school district placement. *Frank G. v. Bd. of Educ.*, 459 F. 3d at 364.

In this case, the Parent submitted an IEP prepared by the Private School dated June 4, 2023, in addition to the testimonial affidavits of the Director and the Parent. In multiple places, the Private School IEP contains statements showing that the Student's 2022-2023 educational program at the Private School was strategically designed to meet the Student's unique educational needs and produced meaningful academic benefit. In SLT, the Student was described as making "slow, steady progress towards [the Student's] speech and language-based goals." (P-C, p. 4) The Student was working towards developing the ability to name items, use specific words or gestures to direct or request action, and talk about feelings. (P-C, p. 6) In PT, the Student was making slow and steady progress towards an annual goal of crawling forward 5 feet, with head extended and with support at the Student's pelvis and shoulders. (P-C, p. 15)

C - 20

In AT, the Student was using a trial device that worked well for the Student.  The device increased the Student's overall access to vocabulary and increased participation in more advanced academic tasks.  (P-C, p. 20)

The IEP states that in the Student's OT, the Student began "to demonstrate progress across all areas of functional performance" and demonstrated "great" progress in the Student's ability to extend the Student's arms through the Student's sleeves with decreased cues.  The IEP further states that "in the area of academics, [the Student] has significantly improved in [the Student's] sustained attention."  (P-C, p. 28)

The Director and the Parent both testified regarding the Student's program and progress at the Private School.  The Director emphasized that the Student received OT, PT, and SL "on a daily basis and in 60-minute sessions to allow for repetition, rest, transitioning, and reinforcement of skills.  (P-I, ¶ 11)  The Director testified that the Student "made progress in skills across all academic and related service domains in [the Student's] educational program at [the Private School]."  (P-I, ¶ 13)

The Parent also testified that at the Private School, the Student "receives more time for related services, as well as additional activities like walks."  (P-H, ¶ 12)  The Parent testified that she "noticed a lot of improvement with [the Student's] communication, movement and mood at home since [the Student] started attending school at [the Private School]."  (P-H, ¶ 16)

Both the Director and the Parent testified credibly.  Although the Director did not disclose that the Student's classroom was lacking a lead teacher for several months of the 2022-2023 school year in her affidavit, she was truthful when asked about it on cross-examination.

The DOE argues that the absence of a lead teacher from the Student's classroom for much of the 2022-2023 school year renders the Student's placement at the Private School

Findings of Fact and Decision
Case No. 246205

inappropriate.  (District Closing Brief at pp. 5-7)  I am extremely concerned about this issue, especially in light of the Student's complex educational and medical needs.  Both the Director and the Parent testified in detail about the extraordinary support provided by the classroom's assistant teacher, however.  The Director testified that the assistant teacher was "like Superman" and "learned techniques from . . . several teachers that he's worked with.  And . . . goes to the teachers' meetings, the training.  So he did really a phenomenal job."  (Tr. 220-221)  The Parent testified that the assistant teacher "was on point with everything, making sure all his students were fine, making sure that all the programs they were supposed to do were fine.  He was on top of everything.  He was great with the kids."  (Tr. 65)  The Parent testified that the Student did not miss any of the Student's related services.  (Tr. 82)  The Parent also testified that under the supervision of the assistant teacher, the Student made progress in terms of the Student's focus and attention span.  (Tr. 83)  Moreover, during the period when the Student's classroom did not have a lead teacher, the Student was always supported by the Student's 1:1 paraprofessional and private nurse, and the other students in the classroom also had individual paraprofessionals.  (Tr. 66)

The DOE also argued that the Parent did not provide evidence regarding the qualifications of the Student's teachers and related services providers.  (DOE Closing Brief at p. 6)  This assertion is simply incorrect; the Director testified on cross regarding the educational qualifications of the Student's new lead teacher, as well about as the qualification of the assistant teacher who filled in when the Student's classroom had no lead teacher.  (Tr. 148-49)  The Student's related service providers are named in the Private School IEP, and their certifications are listed (i.e., after the SLT Provider's name, the Private School IEP lists her certifications as "MS, CCC-SLP, ATP").

DOE Counsel also argues that the Private School "provides limited academic instruction" and that "this Student, and all other students at [the Private School] only receive 30 minutes per day of academic instruction." (DOE Closing Brief at p. 6) DOE Counsel cites nothing in the record in support of these assertions, and the Private School IEP emphasizes that due to the Student's disability, the Student's curriculum requires "a high-level degree of individualization." (P-C, p. 34) Moreover, the record makes clear that the Student's related services incorporated academic instruction. For example, the portion of the Private School IEP addressing the Student's occupational therapy states that the Student should receive "skilled occupational therapy services, individually 5x per week for 60 minutes via a push-in and pull-out model to address areas of academics, play/leisure/ and self-care skills." (P-C, p. 27) The reference to "academics" highlights that the Student's related services incorporated academic instruction.

I find that the Parent has met her burden to prove that the private program offers an educational program that met the Student's needs under Prong Two of the *Burlington/Carter* standard. When determining whether a unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether the placement is "reasonably calculated to enable the child to receive educational benefits." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006). "[Parents] need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). In this matter, although the Student did not have a lead teacher in the classroom for much of the 2022-2023 school year, the Student received 60-minute sessions of OT, PT, and SLT on a daily basis, in addition to VE and AT. The record shows that the Student made meaningful progress, and the Student was supported by both a 1:1

paraprofessional and a private nurse.  Given the Student's unique needs, the weight of the

evidence establishes that the Student's individual special education needs were addressed by the

Private School.

### *Burlington-Carter* **Test Prong Three: Equitable Factors**

Equitable factors are relevant to fashioning relief under the IDEA. *Burlington*, 471 U.S. at

374; *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826 (2d Cir., 2014); *M.C. v. Voluntown Bd.*

*of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000) (citations omitted); see also *Carter*, 510 U.S. at 16

("Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors,

including the appropriate and reasonable level of reimbursement that should be required. Total

reimbursement will not be appropriate if the court determines that the cost of the private education

was unreasonable"). Reimbursement of private school tuition may be reduced or denied when

parents fail to challenge the appropriateness of an IEP in a timely manner, fail to make their child

available for evaluation by the district, or upon a finding of unreasonableness with respect to the

actions taken by the parents.  20 U.S.C. § 1412(a)(10)(C)(iii); 34 C.F.R. § 300.148(d); see *S.W. v.*

*New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 362-64 (S.D.N.Y. 2009); *Thies v. New York*

*City Bd. of Educ.*, 2008 U.S. Dist. LEXIS 11354 (S.D.N.Y. Feb. 4, 2008); *Werner v. Clarkstown*

*Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 660-61 (S.D.N.Y. 2005).

The IDEA allows that reimbursement may be reduced or denied if parents do not provide

notice of the unilateral placement either at the most recent CSE meeting prior to removing the

student from public school, or by written notice ten business days before such removal, "that they

were rejecting the placement proposed by the public agency to provide [FAPE] to their child,

including stating their concerns and their intent to enroll their child in a private school at public

expense." 20 U.S.C. § 1412(a)(10)(C)(iii)(I); see 34 C.F.R. § 300.148(d)(1).   This statutory

requirement "serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools." *Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir. 2004).

In this case, the record does not establish that the Parent "acted with the requisite level of unreasonableness or misconduct that reimbursement should be denied on equitable grounds." *Jennifer D. ex rel. Travis D. v. New York City Dept. of Educ.*, 550 F. Supp 2d 420, 437 (S.D.N.Y. 2008). There is nothing in the hearing record to suggest, let alone demonstrate, that the Parent interfered in any manner with the CSE's evaluation of the Student or prevented it from providing the Student with a FAPE for either of the school years at issue in this case. Furthermore, the DOE has raised no argument that the equities would not weigh in favor of the Parent. The record supports a finding that the Parent cooperated fully with the DOE and timely sent the requisite ten-day notice to the DOE in advance of the commencement of the 2022-2023 school year. (P-D)

In addition, the record clearly establishes that the Parent incurred an obligation to pay the Attending School $137.774.65 for the Student's 2022-2023 base tuition. Because it appears from the Private School IEP that the Student did not, in fact, receive music therapy, I will not award the full amount of supplementary tuition described in the Enrollment Contract. I have calculated the cost of the Student's music therapy mandate described in the contract (individual music therapy x 60 minutes x 2 times per week at $112 per hour, group music therapy x 60 minutes x 1 time per week at $56 per hour) over the 39 weeks and 4 days covered by the contract, and I will deduct $11,032.00 from the amount of supplemental tuition billed in the contract.

Direct tuition funding is relief encompassed by the equitable remedial powers inherent in the IDEA. See, e.g., *Mr. and Mrs. A. v. New York City Dep't of Educ.*, 769 F. Supp. 2d 403, 406

C - 25

(S.D.N.Y. 2011).  Given my finding that the Private School is the appropriate placement for the Student, the Student is entitled to an award for tuition funding for the Student's attendance at the Private School for the 2022-2023 school year, to be paid directly to the Private School.  See *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 453-54 (2d Cir. 2013) ("direct payment fits comfortably within the *Burlington-Carter* framework: like reimbursement, direct payment to the private school that provided the required educational program 'merely requires [the school district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP.'") (quoting *Burlington*, 471 U.S. at 370-71).

While the amount of tuition at the Private School is not insignificant, I do not find that the tuition costs are excessive or unreasonable, given the Private School's educational program for the Student.  *Carter*, 510 U.S. 7, 15-16.  After considering the entire record presented at hearing, I find that the equities support the Parent's claim for direct funding, except for the Parent's claim for the costs of music therapy, which the Student does not appear to have received.

## OTHER RELIEF SOUGHT

In addition to tuition funding for the Student's attendance at the Attending School, the Parent seeks additional relief that I will discuss below.

Transportation

The IDEA requires that a school district must provide transportation for a child with a disability if that service is necessary for a disabled child 'to benefit from special education." *Donald B. v. Board of Sch. Comm'rs*, 117 F.3d 1371, 1374 (11th Cir. 1997) (citing 20 U.S.C. § 1401(a)(17); see also N.Y. Educ. Law §§ 4401(4), 4402(4)(d).  Transportation may be deemed necessary "if in its absence a disabled child in private school would be denied 'a genuine

opportunity for equitable participation in [a special education program]', . . . or special education

program benefits "comparable in quality, scope, and opportunity for participation . . . [to those

provided for] students enrolled in public schools'" *Donald B.*, 117 F.3d at 1375 (internal citations

omitted).

In addition, New York law defines special education as "specially designed instruction . .

. and transportation, provided at no cost to the parents to meet the unique needs of a child with a

disability," and requires school districts to provide disabled students with "suitable transportation

to and from special classes or programs."  Education Law §§ 4401(1), 4402(4)(a); see also

Education Law § 4401(2); 8 N.Y.C.R.R. § 200.1(ww).

The due process complaint seeks funding for the Student's placement at the Private School

for the 2022-2023 school year and transportation to and from this placement.  In the DOE's Closing

Brief, the DOE cites two cases in support of its argument that I should issue a reduced

transportation award in this matter.[2]  Neither case controls here.  Moreover, to the extent DOE

Counsel is arguing that DOE should only be responsible for paying for transportation services

actually provided to the Student, regardless of the terms of the Transportation Agreement, the State

Review Office has explicitly rejected that argument.  See *Application of a Student with a*

*Disability,* Appeal No. 22-138 (January 5, 2023).  Citing a recent Southern District of New York

decision, the SRO wrote:

> The district does not dispute that this student required special education services
> and would have received such services through the district had it offered a FAPE.
> Further, during the impartial hearing, the district did not offer any evidence that
> other transportation options were available, which would have resulted in a more
> reasonable cost or identify any other company with whom the parents could have
> contracted that would not have charged for the days when the student did not utilize
> the services.  Indeed, if the district had provided special transportation to the

---

[2] The DOE provided only the Southern District's civil docket numbers for these cases, rather than proper citations.

student, it is unlikely that the district would incur no transportation expenses on the school days that the student was unable to attend school.

*Id.,* at p. 9.

In this case, like in Appeal No. 22-138, the DOE presented no evidence regarding possible alternative transportation options for the Student. Accordingly, as I am finding the Private School to be the appropriate placement, I will order that the DOE pay for the Student's transportation to and from the Private School for the 2022-2023 school year in accordance with the agreement between the Parent and the Transportation Company. See, e.g., *Donohue v. Banks*, 2023 U.S. Dist. LEXIS 176574, **26-27 (S.D.N.Y. Sept. 30, 2023).

Nursing Services

The DOE has a duty to provide students with disabilities with a FAPE, including the related services that are necessary to assist students with disabilities to benefit from special education. 20 U.S.C. § 1401(a)(17); 34 C.F.R. § 300.34. The Supreme Court has held that if a student cannot attend school without private nursing services, the school district must fund the student's private nursing services to help guarantee that students with disabilities "are integrated into the public schools." *Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, 526 U.S. 66, 79 (U.S. 1999).

In this matter, the record shows that the Student could not attend school without the services of a private nurse. As the Director testified, the Student is non-verbal, non-ambulatory, requires adult assistance in all activities of daily living, and is fed via a g-tube. (P-H, ¶ 3) The Director testified that the Student's one-to-one private nurse has been "absolutely critical for [the Student] to be able to attend school safely. [The Student] does have seizure activity during

school.  [The Student] does have respiratory concerns during school."  (Tr. 207)  The Director

further testified:

> [T]he level of nursing services that [the Student] requires would be way more
> intensive than what the school nurse could do while maintaining her
> responsibilities toward the remainder of our students.  The school nurse has been
> available to assist in any kind of emergencies with the one-to-one nurse.  You
> know, there have been times when [the Student's] oxygen levels have been very
> low, particularly after seizures or if [the Student's] getting a little bit of a cold or
> something.  And our school nurse is able to, you know, assist so that the one-on-
> one nurse can tend to [the Student] and can—they can be kind of a supportive
> helping hand in those kind of situations.  But in terms of the intensive monitoring
> of [the Student's] ongoing health condition, our school nurse would then be
> neglecting the other 41 kids at the Manhattan campus.

(Tr. 205)

The DOE cites one case in support of its argument that the DOE should not be

responsible for the Student's one-on-one nursing services: *Crosley v. Banks*, 2023 U.S. Dist.

LEXIS 144938 (S.D.N.Y. Aug. 16, 2023)  That case is inapplicable here.  In *Crosley*, the parents

sought enforcement of an IHO's order directing the DOE to pay for tuition and related services

in district court.  *Id*. at 8.  In that case, the IHO ordered the DOE to pay the student's tuition and

related services in specific amounts, and the parents then argued that additional payment for the

Student's skilled nursing services was required under the umbrella of "related services."  Noting

that there were "scant references to nursing services in the underlying administrative record," the

Southern District held against the parents because the IHO's order clearly did "not require full

and separate payment for nursing services."  *Id.* at 9.

In this matter, as discussed above, there is ample information in the record regarding the

Student's need for skilled nursing services, and there is no issue regarding an underlying prior

order.  Accordingly, I will order the DOE to pay for the Student's 1:1 nursing services provided

Findings of Fact and Decision
Case No. 246205

during the 2022-2023 school year, at a flat rate of $113.00 per hour, in accordance with the

Parent's Nursing Services Agreement, and upon receipt of appropriate invoices.  (P-J, p. 2)

Attorneys' Fees

The Parent also requested attorneys' fees and expenses in the Parent's amended due

process complaint. (P-A, p. 11)  The IDEA does not authorize an administrative officer to award

attorneys' fees or other costs to a prevailing party, and entitlement, if any, to costs must be

determined by a court of competent jurisdiction.  20 U.S.C. § 1415(i)(3)(B); *Murphy v. Arlington*

*Cent. Sch. Dist. Bd. of Educ.*, 402 F.3d 332 (2d Cir. 2005); see also *Application of a Student with*

*a Disability,* Appeal No. 08-008 (March 31, 2008); *Application of a Child with a Disability*,

Appeal No. 06-109 (Oct. 27, 2006).  Only a court can determine if a party is entitled to attorneys'

fees and I would be exceeding the scope of my authority by determining that the Parent is the

prevailing party entitled to costs.  Therefore, to the extent that the Parent is seeking

reimbursement and/or payment of attorneys' fees and costs, the Parent's request is denied.

IEP Meeting and Additional Requests for Relief

In the amended due process complaint and the Parent's opening statement, the Parent

requested a new IEP meeting for the Student.  (Tr. 24-25)  Given that the DOE did not hold an

IEP meeting for the 2022-2023 school year, and given that I am denying the Parent's request for

a neuropsychological evaluation, as set out below, I will order that the DOE convene a CSE for

the Student, hold a new IEP meeting, and discuss whether any new evaluations of the Student are

necessary at this time.

I have reviewed the parties' remaining contentions and find them to be either unnecessary

to this decision, without merit, beyond my jurisdiction, or without sufficient basis in the record

for a finding.  Notably, Parent's Counsel did not clearly articulate what compensatory relief the

Parent is seeking as relief for the DOE's denial of FAPE for the 2021-2022 school year, or why the Student needs a neuropsychological evaluation at this time.  When I asked the Parent what she was seeking in term of compensatory education, she testified that she would "love for [the Student] to learn more, explore more, working more on [the Student's] all [the Student's] ability to walk or talk or do anything that is possible." (Tr. 86)  Similarly, although the Parent requested a neuropsychological evaluation of the Student in the Parent's amended due process complaint, in the Parent's opening statement, and in Parent's closing brief, the Parent presented no evidence regarding why a neuropsychological evaluation of the Student is necessary, and there is evidence in the record showing that the Parent waived the Student's triennial evaluation in 2021.  (D-5)  I asked the Parent if the Student should be re-evaluated, and the Parent testified that it would be nice to have an evaluation on record, but did not provide any information regarding a clinical or educational need for a neuropsychological evaluation.  (Tr. 86; Parent's Closing Brief, pp. 4, 15)

Without any specific information regarding the type or amount of compensatory education that is required to put the Student in the position the Student would have been in but for the 2021-2022 denial of a FAPE, I cannot craft an appropriate compensatory education award.  See, e.g., *Doe v. East Lyme Bd. Of Educ.*, 790 F.3d at 454.   Furthermore, the award of tuition at the Private School for the 2022-2023 school year should contribute to remedying the denial of FAPE for the 2021-2022 school year, given the extensive related services the Student received.   Likewise, without any evidence regarding the Student's current need for a neuropsychological evaluation, I will not order one.

Accordingly, any relief not specifically discussed in this decision is denied, and all the Parent's remaining claims not discussed herein are dismissed with prejudice.

Findings of Fact and Decision
Case No. 246205

## **ORDER**

Based above the above findings of fact, it is hereby:

1. **ORDERED**, that the DOE shall directly fund the Student's base tuition fee for the 2022-2023 extended school year at the Private School, in the amount of $137.774.65; it is further

2. **ORDERED,** that the DOE shall directly fund the Student's supplemental tuition for the 2022-2023 extended school year at the Private School, in the amount of $69,998.80; it is further

3. **ORDERED**, that the DOE shall fund the Student's transportation to and from the Private School for the 2022-2023 school year, in accordance with the Parent's agreement with the Transportation Provider, and pay up to $345.00 for each morning and afternoon trip the Student took/was scheduled to take using the Transportation Provider upon the receipt of appropriate invoices; it is further

4. **ORDERED,** that the DOE shall fund the Student's 1:1 private nursing services for the 2022-2023 extended school year, at a flat rate of $113.00 per hour, in accordance with the Nursing Services Agreement, upon the receipt of appropriate invoices; it is further

5. **ORDERED,** that the DOE shall convene a CSE for the Student and hold an IEP meeting within 45 days of this order, during which the CSE members shall address what, if any, evaluations are necessary and appropriate for the Student.

**SO ORDERED.**

DATED:  October 6, 2023

*Michele Host* (signed electronically)

Impartial Hearing Officer
Michele Host

32

C - 32

Findings of Fact and Decision
Case No. 246205

# <u>NOTICE OF RIGHT TO APPEAL</u>

Within 40 days of the date of this decision, the parent and/or the Public School District has a right to appeal the decision to a State Review Officer (SRO) of the New York State Education Department under section 4404 of the Education Law and the Individuals with Disabilities Education Act.

If either party plans to appeal the decision, a notice of intention to seek review shall be personally served upon the opposing party no later than 25 days after the date of the decision sought to be reviewed.

An appealing party's request for review shall be personally served upon the opposing party within 40 days from the date of the decision sought to be reviewed. An appealing party shall file the notice of intention to seek review, notice of request for review, request for review, and proof of service with the Office of State Review of the State Education Department within two days after service of the request for review is complete. The rules of procedure for appeals before an SRO are found in Part 279 of the Regulations of the Commissioner of Education. A copy of the rules in Part 279 and model forms are available at: http://www.sro.nysed.gov.

C - 33

# APPENDIX A – ADMITTED EXHIBITS

## DISTRICT'S EVIDENCE

| Exhibit | Title | Date | Pages |
|---|---|---|---|
| 1 | Notice of IEP | 12/20/2021 | 3 |
| 3 | Accommodations Request Documents | Various | 6 |
| 4 | Prior Written Notice | 12/26/2021 | 11 |
| 5 | 3 Year Evaluation Letter and Signed Waiver | 3/18/2021 | 3 |
| 6 | Parent Notification Additional Services | 2/12/2019 | 3 |
| 7 | Recovery Services Letter | 11/4/2021 | 3 |
| 8 | Recovery Services Letter | 12/8/2021 | 3 |
| 9 | IEP | 6/6/2023 | 57 |
| 10 | Events and Notes re: Parental Placement | | |

## PARENT'S EVIDENCE

| Exhibit | Title | Date | Pages |
|---|---|---|---|
| A | Amended Due Process Complaint | 4/7/2023 | 7 |
| C | Private School IEP | 6/4/2023 | 64 |
| D | Ten Day Notice | 9/2/2022 | 2 |
| E | DOE Determination Report | 9/26/2022 | 1 |
| F | Private School Enrollment Agreement | 9/12/2022 | 7 |
| G | Transportation Agreement | 9/19/2022 | 5 |
| H | Affidavit of Parent | 6/12/2023 | 3 |
| I | Affidavit of Director of Special Education | 6/12/2023 | 5 |
| J | Nursing Service Agreement | Effective from 9/15/22-6/23/23 | 6 |
| K | Medical Provider Treatment & Accommodation Forms | Various | 23 |
| | | | |

## IMPARTIAL HEARING OFFICER'S EVIDENCE

| Exhibit | Title | Date | Pages |
|---|---|---|---|
| I | Emails re: Student, Case No. 246205, Adjournment/Subpoena | 6/13/2023 | 9 |
| II | Emails re: Case No. 246205, Student, Status/DPH | 5/31/2023 | 2 |
| III | Emails re: Student, Case No. 246205, Adjournment/Subpoena | 6/9/2023 | 7 |
| IV | Re: Urgent – Emergency – Death in Family/New DPH Date | 7/13/2023 | 13 |
| V | Re: 246205 Student Updated Disclosures | 8/29/2023 | 2 |

C - 34

Findings of Fact and Decision
Case No. 246205

## APPENDIX B – PERSONALLY IDENTIFIABLE INFORMATION

| Redacted Information | Term Used In FOFD |
|---|---|
| ███████ | Student |
| Shantel Talley | Parent |
| Jenna Hebert | DOE Counsel |
| Brian Gauthier | DOE Counsel 2 |
| Angelo Lagman | Parent's Counsel |
| Elizabeth Fuller | Parent's Counsel 2 |
| iBrain | Private School |
| Tiffany Semm | Director of Special Education |
| Sisters Travel and Transportation Services, LLC | Transportation Provider |
|  |  |

C - 35

NEW YORK CITY OFFICE OF ADMINISTRATIVE
TRIALS AND HEARINGS (OATH)
SPECIAL EDUCATION HEARINGS DIVISION
-------------------------------------------------------------------X
In the Matter of the Due Process Complaint of
Shantel Talley ("Parent"), as Parent/Guardian of

A.C-T ("Student"), and Individually;

                          Petitioners,                              **ORDER OF PENDENCY**

     -against-

                                                        **IHO Case No.**

 **THE NEW YORK CITY DEPARTMENT
OF EDUCATION,**                               **IHO**

                    Respondent.
-------------------------------------------------------------------X

      This Order addresses a Student with disabilities whose Parent challenges the Individualized Educational Program ("IEP") and placement proposed for the 2024-2025 extended school year by Respondent The New York City Department of Education ("DOE"). Through this Order, the Parent seeks to enforce the Student's pendency rights under § 1415(j) of the Individuals with Disabilities Education Act ("IDEA") and Section 4404(4) of the New York State Education Law, which entitle the Student to remain in his/her current educational placement, at public expense, during the pendency of their administrative and/or judicial proceeding.

      Under IDEA, the pendency inquiry identifies the Student's then-current educational program/placement. *Mackey v. Bd. of Educ., Arlington C.S.D.*, 386 F.3d 158 (2d Cir. 2004), *supplemented*, 112 F. App'x 89 (2d Cir. 2004). Although not defined by statute, the phrase "then current educational placement" has been found to mean the last agreed-upon placement at the moment when the due process proceeding is commenced. *Murphy v. Arlington C.S.D.*, 86 F. Supp. 2d 354 (S.D.N.Y. 2000), *aff'd,* 297 F.3d 195 (2d Cir. 2002).

      The Student's "last agreed upon placement" is at the International Academy for the Brain ("iBRAIN"). This placement is based upon Unappealed FOFD IHO No. 246205, 10/06/2023 which found that: 1) DOE denied Student a FAPE; 2) iBRAIN was appropriate for Student; and, 3) equitable considerations supported a full award of direct payment of tuition and related services, including special transportation and nursing services, for Student at iBRAIN.

      Unless otherwise excluded, Pendency includes all costs of special education and related

services, including transportation. Under the IDEA, "related services" include transportation, and under N.Y. Educ. Law, "special education" includes transportation. When a student receives special education services, an order on pendency– without transportation—would render the award meaningless.

For the preceding reasons, it is hereby ORDERED that effective July 2, 2024, and during the pendency of all Due Process Proceedings relative to IHO Case No.           , the 2024-2025 Extended School Year, and all administrative and judicial proceedings thereafter, the DOE shall fund the Student's placement at iBRAIN. This placement includes the following:

- Funding for the cost of Full Tuition to be paid directly to the International Academy for the Brain ("iBRAIN") pursuant to the enrollment agreement between the Parent-Petitioner and iBRAIN (see Exhibit E in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint; and
- Funding for transportation services, as well as all services necessary to said transportation, to be paid directly to the transportation provider pursuant to the transportation contract between the Parent-Petitioner and the transportation company (see Exhibit F in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint; and
- Funding for nursing services to be paid directly to the nursing service provider pursuant to the nursing contract between the Parent-Petitioner and nursing services provider (see Exhibit G in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint.

Dated: _____          So Ordered: _____

                                          IHO :



Phone - 646-315-1548
Email - info@iBrainNYC.org
Web - www.iBrainNYC.org

## ANNUAL ENROLLMENT CONTRACT

**This is a contract ("Enrollment Contract" or "Agreement") between Shantel T. Talley ("Parent(s)/Guardian(s)") and The International Academy for the Brain, dba iBRAIN Ltd ("iBrain") for the enrollment of ▆▆▆ ▆▆▆▆▆▆▆▆▆▆ ("Student") for the 2024 - 2025 school year ("School Year"). The parties hereby agree to the following terms:**

### Enrollment Period

1. *i*Brain offers enrollment to Student for the extended school year ("School Year"), starting on July 2, 2024, and ending on June 27, 2025, subject to the terms and conditions set forth below.

### Academic Program, Related and Other Services

2. Parent(s)/Guardian(s) attests they have reviewed the curriculum program for *i*Brain's educational and related services programs and certain related materials.

3. Parent(s)/Guardian(s) understands the academic and related service programs for Student for the School Year will be provided as follows:

   a. *i*Brain will provide the academic and related service programming as outlined in: (i) Student's most recent Individualized Education Program ("IEP") issued by the Student's local school district; or (ii) recommend an academic program that will be outlined in Student's *i*Brain IEP if the local school district's IEP has not been updated or if *i*Brain and Parent(s)/Guardian(s) disagree with the proposed academic program recommendation in Student's IEP issued by the local school district for the academic year. Where *i*Brain recommends changes to the Student's recent IEP, *i*Brain assumes all responsibility to defend against all challenges to the appropriateness of the changes it makes to Student's academic programming as reflected on the most recent IEP.

### Tuition, Deposit and Related Service Fees

4. **Deposit:** Parent(s) agrees to pay an initial, non-refundable deposit of $100 ("Deposit") made payable to "International Academy for the Brain" for the 2024-2025 school year. The Deposit will be applied against the Full Tuition as outlined in Sections 7 and will be due the first day of school.

5. **Base Tuition Fees:** Base Tuition Fee for the *i*Brain program is **$213,000** for the School Year starting on July 2, 2024 and ending on June 27, 2025. The Base Tuition includes the cost of an individual paraprofessional, and school nurse as well as the academic programming outlined in Section 3.

6. **Supplemental Tuition Fees:** The Base Tuition cost does not include the cost of related services, transportation paraprofessional, any individual nursing services or assistive technology devices and

Manhattan: 403 East 91st Street
New York, NY 10128
Brooklyn: 213 48th Street
Brooklyn, NY 11220

E - 1

equipment. Supplemental Tuition includes the cost of the Student's related services programming such as physical therapy, occupational therapy, speech-language therapy, vision education services, assistive technology services, music therapy, hearing education services and parent counseling and training as outlined in Section 3. The total Supplementary Tuition Fees for the 2024-2025 school year is **$133,088.80.**

7. **Full Tuition:** Full Tuition for the 2024-2025 academic year is inclusive of Base Tuition Fees as described in Section 5 and Supplemental Tuition Fees as described in Section 6. The Full Tuition is **$346,088.80** shall be paid in three installments with the first payment of **$58,974.77** due by July 2, 2024, the second installment payment of **$110,189.71** due by September 5, 2024, and the third payment of **$176,924.32** due by January 2, 2025.

**Payment Terms**

8. **Payment Obligation**:  It is understood and agreed the enrollment of Student is for the full academic year and the obligation to pay tuition cannot be apportioned or mitigated except as expressly provided for herein. *i*Brain will not make any deductions, omissions, or refunds for excused or unexcused absences, withdrawal, suspension, or for any other reason, except as outlined in Sections 10 and 11.

   It is understood Parent(s)/Guardian(s) may seek public funding from their local school district to pay for Student's Full Tuition due to *i*Brain for the School Year by asserting Student's due process rights.  In the event Parent(s)/Guardian(s) is required to file a due process complaint against the local school district seeking an Order on Pendency and/or Findings of Fact and Decision for funding, the tuition payment obligations will be suspended, except those obligations outlined in sections 8(a) and 8(b), until a final determination/decision is issued by an impartial hearing officer, state review officer, or state or federal court, and then all monies then-due will become immediately due within thirty (30) days of the final adjudication.

   a.  **Pendency Placement - Payment Obligations**: It is understood Parent(s)/Guardian(s) may seek public funding from the local school district to pay for Student's Full Tuition due to *i*Brain for the School Year by asserting Student's Due Process Rights under 20 U.S.C. § 1415[j], whereby the local school district is required to maintain Student in his/her last-agreed upon placement during the pendency of any impartial hearing proceedings ("Stay-put") which is automatic upon filing a Due Process Complaint ("DPC"). Upon filing the DPC and asserting the Stay-put provision ("DPC Date"), the payments obligations as outlined in this Enrollment Contract shall be due within 30 days of DPC Date, according to the terms herein. Payment obligations shall remain in effect until the Stay-put rights are no longer active.

   In the event the local school district does not comply with the Stay-put rights of Student and fails to make the payment obligations as outlined in this Enrollment Agreement, Parent(s) /Guardian(s): (1) may seek immediate enforcement of the Stay-put rights in state or federal court and MUST provide a payment schedule within two weeks of such enforcement action; (2), if Parent(s)/Guardian(s) does not seek enforcement within 14 days of the payment obligations becoming due, Parent(s)/Guardian(s) will be required to execute a payment schedule while the Student remains at iBRAIN; or, (3) Parent(s)/Guardian(s) will be required to establish payment plan and may withdraw Student by terminating contract per section 11.

   b.  **Order on Pendency Denied - Payment Obligations:**  It is understood Parent(s)/Guardian(s) may seek public funding from the local school district to pay for Student's Full Tuition due iBrain for the School Year by asserting Student's Due Process Rights under 20 U.S.C. § 1415[j], whereby the

E - 2

Document Ref: 9RQX6-WAWKD-ZK6RT-HF3SX

local school district is required to maintain Student in his/her last-agreed upon placement during the pendency of any impartial hearing proceedings ("Stay-put") is automatic upon filing a Due Process Complaint ("DPC"). In the event Parent(s)/Guardian(s) seeks and is denied an Order on Pendency by an Impartial Hearing Officer, State Review Officer, or a state or federal court, for all or part of the Full Tuition funding from the local school district due under this Enrollment Contract, Parent(s)/Guardian(s) will be permitted to immediately withdraw Student from iBrain by terminating this contract per Section 11 within 30 days of receipt of the Order on Pendency. Parent(s)/Guardian(s) will be required to execute a payment schedule to comply with the contractual obligations based upon the financial need of Parent(s)/Guardian(s) for any balances due to *i*Brain on the date of withdrawal.

c. Late Payment Penalty. Upon the failure to pay in full any payment obligation due based on the terms of this Enrollment Contract ("Amount Outstanding") within seven (7) business days of the due date for such payment, a late payment penalty of ten percent (10.0%) of the Amount Outstanding (the "Late Payment Amount") shall immediately be added to the Amount Outstanding. The imposition of the Late Payment Amount shall be in addition to any other rights and remedies of iBRAIN under this Agreement. Any balances of any amount which remains unpaid, i.e., Amount Outstanding, including any Late Payment Amount, more than thirty (30) days after it is due shall accrue interest until paid at the rate equal to the lesser of two percent (2.0%) per calendar month or the maximum amount allowed under Applicable Law. However, in no event shall this interest provision be construed as a grant of permission for payment delays.

9. **Failure to Secure Tuition Funding:** In the event Parent(s)/Guardian(s) seeks a Findings of Fact and Decision, but is denied all or part of the Full Tuition funding from the local school district due under this Enrollment Contract by a final administrative or judicial decision, including all state and federal appeals resolving the claim for such funding, Parent(s)/Guardian(s) will be permitted to immediately withdraw Student from *i*Brain by terminating this contract per Section 11.

## Contract Release and Termination

10. **Release:**  Parent(s)/Guardian(s) acknowledges that Parent(s)/Guardian(s) will be released from this Enrollment Contract without financial penalty or continuing responsibility for tuition payments outlined in this Enrollment Contract should the local school district offer a free appropriate public education to Student by the first day of the School Year as indicated in Section 1 and the Parent(s)/Guardian(s) provides notice as outlined in Section 11 prior to the first day of the School Year. Parent(s)/Guardian(s) may be released from this Enrollment Contract if the Student relocates outside of the local school district, or, if due to health reasons, Student is no longer able to attend *i*Brain, and Parent(s)/Guardian(s) provides notice as outlined in Section 11.

11. **Termination:**  Parent(s)/Guardian(s) may terminate this Enrollment Contract by submitting a written Termination Notice per Section 25. The Termination Notice must, (a) be in writing, (b) dated, (c) state Student's name and (d) provide Parent(s)/Guardian(s)'s reasons for terminating the Enrollment Contract. The Termination Notice may be sent through the U.S. Postal Service via certified mail, return receipt, or Federal Express delivery service or by courier. If submitted through the U.S. Postal Service by First Class Mail, the Termination Notice shall be deemed received by *i*Brain five business days after the date that the Termination Notice is postmarked, consistent with Section 25.

If Parent(s)/Guardian(s) terminates this Enrollment Agreement, Parent(s)/Guardian(s) will forfeit Student's non- refundable Tuition Deposit set forth in Section 4 in its entirety and any other payments made per the

E - 3

Document Ref: 9RQX6-WAWKD-ZK6RT-HF3SX

terms of this Enrollment Agreement.

Applicable tuition refunds, if any, shall be determined as follows:

A. All pre-paid tuition fees will be refunded **if and only if** the written Termination Notice in the form stated above was RECEIVED on or before the first day of attendance by Student.

B. If written Termination Notice is received after the Student's first day of attendance, Parent(s) /Guardian(s) will be responsible for paying all tuition fees for the calendar month in which Termination Notice is received on a *pro rata* basis. Parent(s)/Guardian(s) also will be responsible for paying all outstanding tuition and fees then due and owing, if any, for all months prior to the month in which Termination Notice is received. All such fees shall be paid within ten (10) calendar days after Termination Notice is received by *i*Brain.

## School/Family Cooperation

12. **Parent(s)/Guardian(s) Must Cooperate with School District:**  In the event Parent(s)/Guardian(s) decides to seek direct funding from their local school district for the Student's placement and related services at *i*Brain, Parent(s)/Guardian(s) agrees to take all necessary steps to secure funding and to cooperate fully in the process required to secure such funding. In the event that Parent(s)/Guardian(s) does not cooperate with the process, *i*Brain may elect, upon 60 days' notice, to terminate Student's enrollment at *i*Brain.

## Conditions of Enrollment

13. Parent(s)/Guardian(s) hereby authorizes *i*Brain to conduct any interviews, medical examinations, psycho-educational evaluations, and/or related service evaluations necessary for the continued assessment related to Student; and Parent(s)/Guardian(s) authorizes *i*Brain to make necessary information regarding Student available to its staff and/or other paid or unpaid individuals working for or on behalf *i*Brain, including medical and dental consultants and other health care or educational professionals.

14. Parent(s)/Guardian(s) understands that *i*Brain will provide clinical and training services for the community and hereby authorize and consent to the provision of such services, including without limitation, observation, information sharing and trainee participation to the extent *i*Brain deems necessary for training students and staff of other agencies, as well as volunteers, and *i*Brain agrees to use discretion in selecting trainees and sharing information related to Student and to ensure that staff are made aware of the confidentiality of these matters.

15. **Compliance with Local School District Requirements**:  Parent(s)/Guardian(s) and *i*Brain agree to cooperate with respect to their interaction with the New York State Education Department and/or their local school district to ensure compliance with applicable laws, regulations and rules.

16. **Medical Releases**:  Parent(s)/Guardian(s) agrees to promptly sign a Health Insurance Portability and Accountability Act ("HIPAA") release form and a Family Educational Rights and Privacy Act ("FERPA") release form for the purpose of allowing *i*Brain to communicate with Student's related service therapists and medical providers and have access to Student's medical and therapy providers' records. Parent(s)/Guardian(s) agrees to inform *i*Brain if there are any changes to Student's medical conditions and/or changes to Student's medication regimen. Parent(s)/Guardian(s) further agrees that such information obtained or developed by *i*Brain may be used for research and published accordingly.

E - 4

Document Ref: 9RQX6-WAWKD-ZK6RT-HF3SX

17. **Physical Restraint**:  Parent(s)/Guardian(s) authorizes *i*Brain to use the amount of passive physical restraint believed to be reasonable under the circumstances (and endeavor to use the least amount of such restraint), and utilize environmental time out and/or apply a protective device as necessary to ensure the safety of the Student,  staff, and any individual working with the Student in the event Student may cause or reasonably demonstrate a threat of causing injury to self or others, or serious damage to property.

18. Parent(s)/Guardian(s) authorizes *i*Brain to include names, address, telephone number and email addresses in the Family and Staff Membership List to facilitate reasonable communication among families and area support groups for the families.

19. **Consent to Photograph, Video, Record and Interview**:  Parent(s)/Guardian(s) understands Student may be filmed by *i*Brain in individual or group sessions, during recreational activities and/or during community outings; and Parent(s)/Guardian(s) agrees to promptly sign a Communications Release granting *i*Brain all rights to publicly exhibit or display photographs and/or photographic slide projections and/or video of Student and/or to permit use thereof by or in any media, including, but not limited to copyright status (or common law copyright) and, staff members may photograph or film Student for the purpose of keeping personal mementos of their time together with Student.

20. Parent(s)/Guardian(s) authorizes *i*Brain to display or enter Student's artwork or original creation(s) in appropriate competitions including public and private exhibitions; and Parent(s)/Guardian(s) authorizes Student to attend trips and events outside of the school setting with appropriate staff support.

21. **Access to Student's Records**:  Parent(s)/Guardian(s) has the legal right to inspect and review any educational records relating to Student as well as a legal right to a copy of Student's school files, and Parent(s)/Guardian(s) agrees to reimburse *i*Brain for reasonable copying costs associated with such request.

## Miscellaneous Terms

22. **Assignment**:  Parent(s)/Guardian(s) agrees this Enrollment Contract may be assigned or transferred by *i*Brain and it will be binding upon and inure to the benefit of the successors and assigns of *i*Brain.
    a. Assignment of Right to Sue. In the event the local school district, or another entity ("Obligor"), is obligated by administrative or court order to make payment(s) to iBRAIN on behalf of the Parent(s)/Guardian(s) ("Assignor") under the terms of this Agreement and fails to make such payment(s) within thirty-five (35) days upon becoming due ("Outstanding Financial Obligation"), at the written request of iBRAIN, the Parent(s)/Guardian(s) shall assign and transfer to iBRAIN ("Assignee") the title and ownership to such claim and cause of action that exists in Parent(s)/Guardian(s) favor against any such entity and thereby authorize iBRAIN to prosecute said action to resolve said claim at iBRAIN's discretion. Assignor understands that whatever amounts Assignee does not collect from Obligor (whether it be all or part of what is due) shall be paid by Assignor as per the terms of the Agreement.

23. **Severability**:  *i*Brain and Parent(s)/Guardian(s) agree in the event any provision of this Enrollment Contract shall become invalid or unenforceable, in whole or in part, for any reason whatsoever, the remaining provisions shall, nevertheless, be valid and binding as if such invalid or unenforceable provision had not been contained in this Enrollment Contract.

24. **Governing Law**:  This Enrollment Contract shall be governed by, construed and enforced in accordance

E - 5

Document Ref: 9RQX6-WAWKD-ZK6RT-HF3SX

with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. New York State shall be the jurisdiction and venue for any dispute involving this Enrollment Contract. The Enrollment Contract may be executed in counterpart with facsimile or electronic copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

25. **Notice**:  By executing this Enrollment Contract, each party agrees hereto to the terms set forth above and all notices required under this Enrollment Contract shall be delivered via the U.S. Postal Service via certified mail, return receipt, or Federal Express delivery service, or by courier to the following parties at the address set forth below:

International Academy for the Brain
ATTN: Mr. Kieran Lavin
55 West 116th Street, #159
New York, New York 10026

26. **Merger**:  This Enrollment Contract contains the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. The express terms herein control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Enrollment Contract may not be modified or amended other than by an agreement in writing, duly signed by all parties.

By signing below, Parent(s)/Guardians acknowledges that he/she/they have read this Enrollment Contract, understand(s) the terms and conditions, and agree(s) to the conditions outlined in this Enrollment Contract. It is further understood that any questions concerning these conditions have been discussed.

Parent(s)/Guardian(s) signature below signifies that he/she/they have read and understand all aspects of this Enrollment Contract and recognize the legal responsibilities in regard to this Enrollment Contract.

**International Academy for the Brain**            **Parent/Guardian**

X_*Kieran Lavin*_____            X_*Shantel T. Talley*_____

By: Kieran Lavin                                    Name(s): _____Shantel T. Talley_____

International Academy for the Brain              Parent(s)/Guardian(s) of:_██████ ██_

Date:_2024-06-21_____                       Date:_____2024-06-20_____

E - 6

Document Ref: 9RQX6-WAWKD-ZK6RT-HF3SX

# Signature Certificate

Reference number: 9RQX6-WAWKD-ZK6RT-HF3SX

| Signer | Timestamp | Signature |
|--------|-----------|-----------|

**Shantel T. Talley**
Email: ilovemyson13013@gmail.com
Shared via link

| | | |
|--|--|--|
| Sent: | 17 Jun 2024 14:47:55 UTC | |
| Viewed: | 20 Jun 2024 20:53:20 UTC | IP address: 161.188.186.96 |
| Signed: | 20 Jun 2024 20:53:49 UTC | Location: New York, United States |

**Kieran Lavin**
Email: kieran@kieranlavin.com

| | | |
|--|--|--|
| Sent: | 17 Jun 2024 14:47:55 UTC | |
| Viewed: | 21 Jun 2024 14:46:59 UTC | |
| Signed: | 21 Jun 2024 14:47:10 UTC | |

**Recipient Verification:**

| | | |
|--|--|--|
| ✔ Email verified | 21 Jun 2024 14:46:59 UTC | IP address: 163.116.135.119 |
| | | Location: New York, United States |

Document completed by all parties on:
21 Jun 2024 14:47:10 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.



E - 7

## SCHOOL TRANSPORTATION ANNUAL SERVICE AGREEMENT

This annual agreement, hereinafter referred to as "AGREEMENT", is made and entered into by and between SHANTEL T. TALLEY hereinafter referred to as "CLIENT", Parent(s)/Guardian(s) of ███████ ███████ hereinafter referred to as "STUDENT" residing at ███████ ███████, hereinafter referred to as "HOME" and Sisters Travel and Transportation Services, LLC, a New York State limited liability corporation, hereinafter referred to as "PROVIDER", located at 2585 Broadway #240, New York, NY 10025.

### 1.  TERM

This annual AGREEMENT shall be effective from July 2, 2024, through June 27, 2025, hereinafter referred to as "TERM", and cannot be terminated except as provided in Section 7.

The STUDENT attends a private school, the International Academy for the Brain ("iBRAIN"), located at 403 East 91st Street, New York, NY 10128 (iBRAIN-Manhattan), or at 213 48th Street, Brooklyn, NY 11220 (iBRAIN-Brooklyn) hereinafter referred to as "SCHOOL".

STUDENT attends SCHOOL year-round for approximately 223 days based on SCHOOL's, 12-month 2024-2025 School Year calendar, hereinafter referred to as "SCHOOL DAYS."

### 2.  PURPOSE OF THIS AGREEMENT

The purpose of this AGREEMENT is to establish responsibilities between PROVIDER and CLIENT, hereinafter referred to as "PARTIES", related to the provision of special school transportation services, hereinafter referred to as "SERVICES", for STUDENT during the TERM from HOME to SCHOOL and SCHOOL to HOME during SCHOOL DAYS.

### 3.  SCHEDULE OF SERVICE

The pick-up location each SCHOOL DAY morning will be HOME and the drop-off location will be SCHOOL, hereinafter referred to as "AM TRIP."

The pick-up location each SCHOOL DAY in the afternoon will be SCHOOL and the drop-off location will be HOME, hereinafter referred to as "PM TRIP."

The AM TRIP and PM TRIP will be no more than 90 minutes each way.

The timing of the AM TRIP and PM TRIP will be determined at least seven (7) days prior to the first day of SCHOOL DAYS. There will be a 15-minute grace period for STUDENT to be ready for AM TRIP and PM TRIP, hereinafter referred to as "FLEXIBLE PICK-UP / DROP-OFF TIMES."

In addition, the CLIENT has the right to change the AM TRIP or PM TRIP times or locations, within New York City, with 72 hours notification to PROVIDER, hereinafter referred to as "CHANGE TO TRIP." The CLIENT must receive written email confirmation from PROVIDER of the request of CHANGE TO TRIP to guarantee modification to the AM TRIP or PM TRIP.

*INCLEMENT WEATHER*
PROVIDER will follow the decisions of the SCHOOL, for all Inclement Weather school delays or cancellations. Transportation will be provided for delayed opening and early dismissals according to SCHOOL's weather-related changes. PROVIDER reserves the right to make a decision to adjust pickup times as necessary when it is determined to be in the best interest of STUDENT, this information will be communicated to each CLIENT via email and/or phone call.

### 4.  PROVIDER RESPONSIBILITES

1

F - 1

Document ID: 558effb5-7854-47e4-9ef9-f0943fbb2ee0

PROVIDER shall provide the vehicles, drivers and dispatching necessary to provide the SERVICES in accordance with the terms of this AGREEMENT.

The PROVIDER agrees to use safe and clean equipment and properly trained and licensed drivers employed by or under contract with the PROVIDER.

The vehicle providing SERVICES for CLIENT shall meet any and all standards required by federal and state law. The vehicle will also maintain the following conditions: Air conditioning, regular-size wheelchair accessibility (e.g., lift-bus/wheelchair ramp), and sitting space to accommodate a person to travel with STUDENT, as needed. If STUDENT requires additional equipment for transportation (i.e., oxygen tanks), the vehicle will accommodate these additional needs of STUDENT

## 5.    INSURANCE

PROVIDER shall obtain and keep in force during the TERM of this AGREEMENT the following insurance coverages:

Workmen's Compensation Insurance in compliance with the laws of the State of New York covering all employees who perform for PROVIDER under this AGREEMENT.

Comprehensive Auto Liability Insurance on all vehicles used in connection with this AGREEMENT whether owned, non-owned, or hired; and

Comprehensive General Liability Insurance with limits for bodily injury or death.

## 6.    FEES and PAYMENT FOR SERVICES

The PARTIES agree all SERVICES will be billed at an annual rate of $191,111.00, hereinafter referred to as "FEES". CLIENT shall pay FEES with three payment installments: Payment 1: $31,851.25 due on July 2, 2024, Payment 2: $63,704.25 due on September 1, 2024, and a final payment, Payment 3 $95,555.50 due on January 1, 2025.

CLIENT understands and accepts FEES will be based on SCHOOL DAYS, whether STUDENT used SERVICES or not, unless PROVIDER was at fault for STUDENT not utilizing SERVICES. All of the FEES described above are considered "PROVIDED SERVICES". CLIENT warrants STUDENT will be enrolled in SCHOOL for the TERM and obligation to pay FEES is unconditional and cannot be apportioned or mitigated, except as explained above. PROVIDER will not take any deductions, omissions, or refunds for unexcused absences, withdrawal, suspension or for any other reason except as outlined in Section 7.

PROVIDER understands and accepts CLIENT will be seeking third party payments for SERVICES from the local school district (e.g., New York City Department of Education) ("THIRD PARTY") through either a Stipulation Agreement or through an impartial hearing process. PROVIDER agrees to suspend payment obligations until an interim or final administrative or judicial decision is made obligating THIRD PARTY to pay all or part of FEES and those payment obligations will become immediately due as per the terms of this AGREEMENT, and shall be paid within thirty (30) days of the interim or final decision or execution of a Stipulation Agreement. In the event an administrative or court decision is not in the CLIENT's favor for payment, payment will be suspended until the CLIENT has exhausted all legal remedies available to them to secure third party funding, when all payments will immediately become due.

Late Payment Penalty. Upon the failure to pay in full any payment obligation due based on the terms of this AGREEMENT ("Amount Outstanding") within seven (7) business days of the due date for such payment, a late payment penalty of ten percent (10.0%) of the Amount Outstanding (the "Late Payment Amount") shall immediately be added to the Amount Outstanding. The imposition of the Late Payment Amount shall be in addition to any other rights and remedies of PROVIDER under this AGREEMENT. Any balances of any

2

F - 2

amount which remains unpaid, i.e., Amount Outstanding, including any Late Payment Amount, more than thirty (30) days after it is due shall accrue interest until paid at the rate equal to the lesser of two percent (2.0%) per calendar month or the maximum amount allowed under Applicable Law. However, in no event shall this interest provision be construed as a grant of permission for payment delays.

## 7. TERMINATION

Termination for Cause.  If PROVIDER or CLIENT fails to perform in the manner called for in this AGREEMENT, or if PROVIDER or CLIENT fails to comply with any other provisions of the AGREEMENT and fails to correct such noncompliance within five (5) business days written notice thereof, CLIENT or PROVIDER may terminate this AGREEMENT for cause.

Termination shall be effected by serving a written notice of termination on PROVIDER or CLIENT setting forth the manner in which PROVIDER or CLIENT is in default.

The CLIENT may terminate the AGREEMENT if STUDENT relocates outside of local school district or due to health reasons STUDENT is no longer requiring special school transportation services.  Termination shall be effected by serving a written notice of termination on PROVIDER setting forth the conditions for termination.

In the event, CLIENT has exhausted all legal remedies available to them to secure third party funding, the CLIENT may terminate the AGREEMENT in writing, but will remain responsible for any balance due to PROVIDER on the date of such termination.

## 8. INDEPENDENT CONTRACTOR RELATIONSHIP

The PARTIES acknowledge and agree the SERVICES performed by the PROVIDER, its employees, agents or sub-contractors shall be as an independent contractor and nothing in this AGREEMENT shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the PARTIES.

## 9. COMPLIANCE WITH LAWS

PROVIDER, in the performance of this AGREEMENT, shall comply with all applicable federal, state and local laws and ordinances, including regulations for licensing, certification and operation of facilities, programs, accreditation, and licensing of individuals, and any other standards or criteria as described in this AGREEMENT to assure quality of services.

## 10. NONDISCRIMINATION POLICY

PROVIDER is an equal opportunity employer.

Nondiscrimination in Employment.  In the performance of this AGREEMENT, PROVIDER will not discriminate against any employee or applicant for employment on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap; provided that the prohibition against discrimination in employment because of handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. PROVIDER shall ensure that applicants are employed, and that employees are treated during their employment, without regard to their race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following:  employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay, or other forms of compensation; and selection for training, including apprenticeships.

Nondiscrimination in Services.  PROVIDER will not discriminate against any recipient of any services or benefits provided for in this AGREEMENT on the grounds of race, creed, color, natural origin, sex, marital

F - 3

Document ID: 558effb5-7854-47e4-9ef9-f0943fbb2ee0

status, age or the presence of any sensory, mental or physical handicap.

If any assignment and/or subcontracting by PROVIDER, said assignment or subcontract shall include appropriate safeguards against discrimination. PROVIDER shall take such action as may be required to ensure full compliance with the provisions in the immediately preceding paragraphs herein.

**11. ASSIGNMENT/SUBCONTRACTING**

PROVIDER may assign or subcontract its performance under this AGREEMENT or any portion of this AGREEMENT and it will be binding upon and inure to the benefit of the successors and assigns of PROVIDER.

In the event THIRD PARTY, or another entity ("Obligor"), is obligated by administrative or court order to make payment(s) to PROVIDER on behalf of CLIENT ("Assignor") under the terms of this AGREEMENT and fails to make such payment(s) within thirty-five (35) days upon becoming due ("Outstanding Financial Obligation"), at the written request of PROVIDER, CLIENT shall assign and transfer to PROVIDER ("Assignee") the title and ownership to such claim and cause of action that exists in CLIENT's favor against any such entity and thereby authorize PROVIDER to prosecute said action to resolve said claim at PROVIDER's discretion. Assignor understands that whatever amounts Assignee does not collect from Obligor (whether it be all or part of what is due) shall be paid by Assignor as per the terms of the AGREEMENT.

**12. CONSENT TO COLLATERAL ASSIGNMENT**

CLIENT hereby consents to the collateral assignment by the PROVIDER of all of its right, title and interest in, to and under this AGREEMENT to a collateral agent pursuant to any security agreement the PROVIDER may enter into. The PARTIES agree the collateral agent (or its designee or assignee) shall be entitled to enforce this AGREEMENT in its own name and to exercise any and all rights of the PROVIDER under this AGREEMENT in accordance with the terms hereof (either in its own name or in the name of the PROVIDER, as the collateral agent may elect), and the PARTIES agree to comply and cooperate in all respects with such exercise. Without limiting the generality of the foregoing, the collateral agent (or its designee or assignee), shall have the full right and power to enforce directly against the CLIENT all obligations of the CLIENT under this AGREEMENT and otherwise to exercise all remedies available to the PROVIDER hereunder, and to make all demands and give all notices and make all requests (either in its own name or in the name of the PROVIDER, as the collateral agent may elect) required or permitted to be made or given by the PROVIDER under this AGREEMENT, and the CLIENT acknowledges and agrees that any such action taken by the collateral agent shall be deemed effective for all purposes of this AGREEMENT to the same extent as if such action had been taken directly by the PROVIDER. If the CLIENT shall receive inconsistent directions under this AGREEMENT from the PROVIDER and the collateral agent, the directions of the collateral agent shall be deemed the superseding directions (so long as such directions are consistent with the provisions of this AGREEMENT) and the CLIENT shall accordingly comply with such directions of the collateral agent.

**13. MODIFICATIONS**

Either party may request modifications/amendments to this AGREEMENT, however, no change or addition to this AGREEMENT shall be valid or binding upon either party unless such change or addition be in writing and signed by both PARTIES. Such amendments shall be attached to and made a part of this AGREEMENT.

**14. NOTICE**

By executing the AGREEMENT, the PARTIES agree to the terms set forth above and all notices required for in the AGREEMENT shall be sent by certified mail, return receipt or overnight delivery with signature to the addresses designated for the PARTIES on the first page of this AGREEMENT.

F - 4

Document ID: 558effb5-7854-47e4-9ef9-f0943fbb2ee0

### 15. **ATTORNEY'S FEES AND COSTS**

If any legal proceeding is brought for the enforcement of this AGREEMENT, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this AGREEMENT, the prevailing party shall be entitled to recover from the other party, in addition to any other relief to which such party may be entitled, reasonable attorney's fees and others costs incurred in such action or proceeding.

### 16. **JURISDICTION**

This AGREEMENT has been and shall be construed as having been made and delivered within New York State, and it is agreed by the PARTIES hereto this AGREEMENT shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. Any action of law, suit in equity, or judicial proceeding for the enforcement of this AGREEMENT or any provisions thereof, shall be instituted and maintained only in any of the courts of competent jurisdiction in New York County, New York State.

### 17. **SEVERABILITY**

It is understood and agreed by the parties hereto that if any part, term or provision of this AGREEMENT is held by the courts of the United States to be illegal, the validity of the remaining provisions shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the AGREEMENT did not contain the particular provision held to be invalid.

If it should appear that any provision hereof is in conflict with any statutory provision of New York State, said provision which may conflict therewith shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to such statutory provision.

### 18. **ENTIRE CONTRACT**

The PARTIES agree this AGREEMENT is the complete expression of the terms hereto and any oral representations or understandings not incorporated herein are excluded. Further, any modification of this AGREEMENT shall be in writing and signed by both PARTIES. Failure to comply with any of the provisions stated herein shall constitute material breach of contract and cause for termination. It is also agreed by the PARTIES the forgiveness of the nonperformance of any provision of this AGREEMENT does not constitute a waiver of the provisions of this AGREEMENT.

### 19. **EXECUTION OF AGREEMENT**

The AGREEMENT may be executed in counterpart with facsimile copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

F - 5

Document ID: 558effb5-7854-47e4-9ef9-f0943fbb2ee0

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed.

**CLIENT:**

_____
DATE

███████ ████████████
STUDENT NAME

<u>SHANTEL T. TALLEY</u>
CLIENT NAME

*Shantel T. Talley*
_____
CLIENT SIGNATURE

**PROVIDER:**

*Peter Lam*
_____
Account Manager/Authorized Signature

<u>Peter Lam</u>
Account Manager/Authorized Signatory Name
Sisters Travel and Transportation Services, LLC
2585 Broadway #240, New York, NY 10025

6

F - 6



Completed Document Audit Report
Completed with SignWell.com

Title: ███████ CARMICHAEL 24-25 AGREEMENT

Document ID: 558effb5-7854-47e4-9ef9-f0943fbb2ee0

Time Zone: (GMT+00:00) Coordinated Universal Time

---

## Files

 CARMICHAEL 24-25 AGREEMENT.docx                     Jun 15, 2024 18:21:04 UTC

## Activity

| | | |
|---|---|---|
| 📄 **Sisters Travel and Transportation Services**<br>IP: 108.29.32.84 | created the document | Jun 15, 2024 18:21:24 UTC |
| ✈ **Sisters Travel and Transportation Services**<br>IP: 108.29.32.84 | sent the document to sisterstravelllc@gmail.com and ilovemyson13013@gmail.com | Jun 15, 2024 18:44:21 UTC |
| 👁 **Shantel T. Talley**<br>IP: 69.121.22.64 | first viewed document | Jun 15, 2024 23:36:57 UTC |
| ✔ **Shantel T. Talley**<br>IP: 69.121.22.64 | signed the document | Jun 19, 2024 11:28:37 UTC |
| 👁 **Sisters Travel and Transportation Services**<br>IP: 184.153.75.82 | first viewed document | Jun 20, 2024 14:18:04 UTC |
| ✔ **Sisters Travel and Transportation Services**<br>IP: 184.153.75.82 | signed the document | Jun 20, 2024 14:19:27 UTC |

F - 7

## NURSING SERVICE AGREEMENT

This agreement, hereinafter referred to as "AGREEMENT", is made and entered into by and between Shantel Talley, hereinafter referred to as "CLIENT", Parent of ████████, hereinafter referred to as "STUDENT" residing at █████████████, hereinafter referred to as "HOME" and B&H Health Care Services, Inc. - DBA Park Avenue Home Care, a New York State limited liability corporation, hereinafter referred to as "PROVIDER", located at 175 South 9th Street, Brooklyn, NY 11211.

### 1. TERM

This annual AGREEMENT shall be effective from July 2, 2024, through June 27, 2025, hereinafter referred to as "TERM", and cannot be terminated except as provided in SECTION 7.

The STUDENT attends a private school, the International Academy for the Brain ("iBRAIN", "SCHOOL"), located at 403 East 91st Street, New York, NY 10128 (iBRAIN-Manhattan), or at 213 48th Street, Brooklyn, NY 11220 (iBRAIN-Brooklyn) hereinafter referred to as "SCHOOL".

STUDENT attends SCHOOL year-round for approximately 223 days based on the SCHOOL 12-month 2024-2025 School Year calendar, hereinafter referred to as "SCHOOL DAYS." The hours of operation for the STUDENT at the SCHOOL are typically 8:30AM to 4:30PM, with
slight variations depending on the unique needs of the STUDENT, hereinafter referred to as "SCHOOL HOURS."

### 2. PURPOSE OF THIS AGREEMENT

The purpose of this AGREEMENT is to establish responsibilities between PROVIDER and CLIENT, hereinafter referred to as "PARTIES", related to the provision of 1:1 Private Duty Nursing services during the school day and/or a 1:1 Transportation Nurse, hereinafter referred to as "SERVICES", for STUDENT during the TERM during SCHOOL DAYS as outlined in section 3 below.

### 3. SCHEDULE OF SERVICE

TRANSPORTATION NURSE SCHEDULE
PROVIDER shall provide a 1:1 Transportation Nurse for STUDENT
- The pick-up location each SCHOOL DAY morning will be HOME and the drop-off location will be SCHOOL, hereinafter referred to as "AM TRIP."
- The pick-up location each SCHOOL DAY in the afternoon will be SCHOOL and the drop-off location will be HOME, hereinafter referred to as "PM TRIP."
- The AM TRIP and PM TRIP will be no more than 90 minutes each way.
- There will be a 15-minute grace period for STUDENT to be ready for AM TRIP and PM TRIP, hereinafter referred to as "FLEXIBLE PICK-UP / DROP-OFF TIMES."
- In addition, the CLIENT has the right to change the AM TRIP or PM TRIP times

G - 1

or locations, within New York City, with 72 hours notification to PROVIDER, hereinafter referred to as "CHANGE TO TRIP." The CLIENT must receive written email confirmation from PROVIDER of the request of CHANGE TO TRIP to guarantee modification to the AM TRIP or PM TRIP.

SCHOOL NURSE
- PROVIDER shall provide a 1:1 Private Duty Nurse for STUDENT during the SCHOOL HOURS.

INCLEMENT WEATHER
- PROVIDER will follow the decisions of the SCHOOL, for all Inclement Weather school delays or cancellations.  SERVICES will be provided for delayed opening and early dismissals according to SCHOOL's weather-related changes.  PROVIDER reserves the right to make a decision to adjust pickup times as necessary when it is determined to be in the best interest of STUDENT, this information will be communicated to each CLIENT via email and/or phone call.

**4. PROVIDER RESPONSIBILITES**
PROVIDER shall provide the SERVICES in accordance with the terms of this AGREEMENT. The PROVIDER agrees to use properly trained and licensed nurses employed by or under contract with the PROVIDER.

PROVIDER is not responsible for providing additional medical or health equipment needed for STUDENT, such as, but not limited to, food, medicines, oxygen equipment, gastrostomy tube equipment, or tracheostomy tube equipment.

**5. INSURANCE**
PROVIDER shall obtain and keep in force during the TERM of this AGREEMENT proper insurance coverages for the SERVICES performed, including, but not limited to:
- Workmen's Compensation Insurance in compliance with the laws of the State of New York covering all employees who perform for PROVIDER under this AGREEMENT; and
- General Liability Insurance for all SERVICES in connection with this AGREEMENT.

**6. FEES and PAYMENT FOR SERVICES**
The PARTIES agree all SERVICES will be billed at an annual rate of $333,608, hereinafter referred to as "FEES". CLIENT shall pay FEES with three payment installments: Payment 1: $56,848.00 due on July 2, 2024, Payment 2: $106,216.00 due on September 5, 2024, and a final payment, Payment 3: $170,544.00 due on January 2, 2025.

CLIENT understands and accepts FEES will be based on SCHOOL DAYS, whether STUDENT used SERVICES or not, unless PROVIDER was at fault for STUDENT not utilizing SERVICES. CLIENT warrants STUDENT will be enrolled in SCHOOL for the TERM and obligation to pay FEES is unconditional and cannot be apportioned or mitigated, except as explained above. PROVIDER will not take any deductions, omissions, or refunds for unexcused

G - 2

absences, withdrawal, suspension or for any other reason except as outlined in Section 7. PROVIDER understands and accepts CLIENT will be seeking third party payments for SERVICES from the local school district (e.g., New York City Department of Education) through either an agreement or through an impartial hearing process. PROVIDER agrees to suspend payment obligations until either an agreement or a final administrative or judicial decision is made and then payment will become immediately due within thirty (30) days of the final adjudication or execution of an agreement with the local school district.

In the event Parent is denied all or part of the funding due under this Agreement by a final administrative or judicial decision, including all state and federal appeals resolving the claim for such funding, Parent will be permitted to immediately terminate this contract per Section 7 below. Upon termination, Parent will be required to execute a payment schedule to comply with the contractual obligations based upon the financial need of Parent for any balances due to PROVIDER on the date of withdrawal.

## 7. __TERMINATION__
Termination for Cause. If PROVIDER or CLIENT fails to perform in the manner called for in this AGREEMENT, or if PROVIDER or CLIENT fails to comply with any other provisions of the AGREEMENT and fails to correct such noncompliance within five (5) business days written notice thereof, CLIENT or PROVIDER may terminate this AGREEMENT for cause.

Termination shall be affected by serving a notice of termination on PROVIDER or CLIENT setting forth the manner in which PROVIDER or CLIENT is in default.

The CLIENT may terminate the AGREEMENT if STUDENT relocates outside of local school district or due to health reasons STUDENT is no longer requiring SERVICES.

In the event, CLIENT has exhausted all legal remedies available to them to secure third party funding, the CLIENT may terminate the AGREEMENT in writing, but will remain responsible for any balance due to PROVIDER on the date of such termination

## 8. __INDEPENDENT CONTRACTOR RELATIONSHIP__
The PARTIES acknowledge and agree the SERVICES performed by the PROVIDER, its employees, agents or sub-contractors shall be as an independent contractor and nothing in this AGREEMENT shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the PARTIES.

## 9. __COMPLIANCE WITH LAWS__
PROVIDER, in the performance of this AGREEMENT, shall comply with all applicable federal, state and local laws and ordinances, including regulations for licensing, certification and operation of facilities, programs, accreditation, and licensing of individuals, and any other standards or criteria as described in this AGREEMENT to assure quality of services.

## 10. __NONDISCRIMINATION POLICY__
PROVIDER is an equal opportunity employer.

G - 3

<u>Nondiscrimination in Employment</u>. In the performance of this AGREEMENT, PROVIDER will not discriminate against any employee or applicant for employment on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap; provided that the prohibition against discrimination in employment because of handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. PROVIDER shall ensure that applicants are employed, and that employees are treated during their employment, without regard to their race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay, or other forms of compensation; and selection for training, including apprenticeships.

<u>Nondiscrimination in Services.</u> PROVIDER will not discriminate against any recipient of any services or benefits provided for in this AGREEMENT on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap.

If any assignment and/or subcontracting by PROVIDER, said assignment or subcontract shall include appropriate safeguards against discrimination. PROVIDER shall take such action as may be required to ensure full compliance with the provisions in the immediately preceding paragraphs herein.

**11. ASSIGNMENT/SUBCONTRACTING**
PROVIDER may assign or subcontract its performance under this AGREEMENT or any portion of this AGREEMENT and it will be binding upon and insure to the benefit of the successors and assigns of PROVIDER.

**12. CONSENT TO COLLATERAL ASSIGNMENT**
CLIENT hereby consents to the collateral assignment by the PROVIDER of all of its right, title and interest in, to and under this AGREEMENT to a collateral agent pursuant to any security agreement the PROVIDER may enter into. The PARTIES agree the collateral agent (or its designee or assignee) shall be entitled to enforce this AGREEMENT in its own name and to exercise any and all rights of the PROVIDER under this AGREEMENT in accordance with the terms hereof (either in its own name or in the name of the PROVIDER, as the collateral agent may elect), and the PARTIES agree to comply and cooperate in all respects with such exercise. Without limiting the generality of the foregoing, the collateral agent (or its designee or assignee), shall have the full right and power to enforce directly against the CLIENT all obligations of the CLIENT under this AGREEMENT and otherwise to exercise all remedies available to the PROVIDER hereunder, and to make all demands and give all notices and make all requests (either in its own name or in the name of the PROVIDER, as the collateral agent may elect) required or permitted to be made or given by the PROVIDER under this AGREEMENT, and the CLIENT acknowledges and agrees that any such action taken by the collateral agent shall be deemed effective for all purposes of this AGREEMENT to the same extent as if such action had been taken directly by the PROVIDER. If the CLIENT shall receive inconsistent directions under this AGREEMENT from the PROVIDER and the collateral agent, the directions of the collateral agent shall be deemed the superseding directions (so long as such

directions are consistent with the provisions of this AGREEMENT) and the CLIENT shall accordingly comply with such directions of the collateral agent.

## 13. MODIFICATIONS

Either party may request modifications/amendments to this AGREEMENT, however, no change or addition to this AGREEMENT shall be valid or binding upon either party unless such change or addition be in writing and signed by both PARTIES. Such amendments shall be attached to and made a part of this AGREEMENT.

## 14. NOTICE

By executing the AGREEMENT, the PARTIES agree to the terms set forth above and all notices required for in the AGREEMENT shall be sent by certified mail, return receipt or overnight delivery with signature to the addresses designated for the PARTIES on the first page of this AGREEMENT.

## 15. ATTORNEY'S FEES AND COSTS

If any legal proceeding is brought for the enforcement of this AGREEMENT, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this AGREEMENT, the prevailing party shall be entitled to recover from the other party, in addition to any other relief to which such party may be entitled, reasonable attorney's fees and others costs incurred in such action or proceeding.

## 16. JURISDICTION

This AGREEMENT has been and shall be construed as having been made and delivered within New York State, and it is agreed by the PARTIES hereto this AGREEMENT shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. Any action of law, suit in equity, or judicial proceeding for the enforcement of this AGREEMENT or any provisions thereof, shall be instituted and maintained only in any of the courts of competent jurisdiction in New York County, New York State.

## 17. SEVERABILITY

It is understood and agreed by the parties hereto that if any part, term or provision of this AGREEMENT is held by the courts of the United States to be illegal, the validity of the remaining provisions shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the AGREEMENT did not contain the particular provision held to be invalid.

If it should appear that any provision hereof is in conflict with any statutory provision of New York State, said provision which may conflict therewith shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to such statutory provision.

## 18. ENTIRE CONTRACT

The PARTIES agree this AGREEMENT is the complete expression of the terms hereto and any oral representations or understandings not incorporated herein are excluded. Further, any

G - 5

modification of this AGREEMENT shall be in writing and signed by both PARTIES. Failure to comply with any of the provisions stated herein shall constitute material breach of contract and cause for termination. It is also agreed by the PARTIES the forgiveness of the nonperformance of any provision of this AGREEMENT does not constitute a waiver of the provisions of this AGREEMENT.

## 19. EXECUTION OF AGREEMENT

The AGREEMENT may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," "signed," "signature," and words of like import in this AGREEMENT or in any other certificate, agreement or document related to this AGREEMENT, shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

G - 6

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed.

**STUDENT:** ██████ ████████████

**CLIENT: Shantel Talley**

*Shantel T Talley*
—————————————————
CLIENT SIGNATURE


**PROVIDER**:

—————————————————
Account Manager/Authorized Signature
266 Broadway #302, Brooklyn, NY 11211


**DATE:** 6/18/24
—————————————
(or via Electronic Date Stamp)

G - 7



Completed Document Audit Report
Completed with SignWell.com

## Title: Annual Nursing Contract for 2024-2025 School Year ███████████ ████

Document ID: 1032a3b3-cdd9-4a62-8997-0e018003f3ae

Time Zone: (GMT+00:00) Coordinated Universal Time

### Files

Annual Nursing Contract for 2024-2025 School Year .pdf    Jun 18, 2024 15:09:51 UTC

### Activity

| | | |
|---|---|---|
| **Susan Friedman**<br>IP: 98.116.5.178 | created the document | Jun 18, 2024<br>15:10:00 UTC |
| **Susan Friedman**<br>IP: 98.116.5.178 | sent the document to cj@nursingpersonnel.com and ilovemyson13013@gmail.com | Jun 18, 2024<br>15:10:25 UTC |
| **[Email ID]**<br>IP: 98.116.5.178 | **cj@nursingpersonnel.com** - first viewed document | Jun 18, 2024<br>16:07:14 UTC |
| **[Email ID]**<br>IP: 98.116.5.178 | **cj@nursingpersonnel.com** - signed the document | Jun 18, 2024<br>16:07:38 UTC |
| **[Email ID]**<br>IP: 161.188.186.106 | **ilovemyson13013@gmail.com** - first viewed document | Jun 20, 2024<br>19:27:25 UTC |
| **[Email ID]**<br>IP: 161.188.186.106 | **ilovemyson13013@gmail.com** - signed the document | Jun 20, 2024<br>19:28:03 UTC |