# EXHIBIT 4

**LIBERTY & FREEDOM**
**L E G A L   G R O U P**
Empowering YOUR Voice through Civil Rights Advocacy

July 2, 2024

**Sent Via E-Mail: (IHOQUEST@SCHOOLS.NYC.GOV)**

New York City Department of Education
Impartial Hearing Office
131 Livingston Street, Room 201
Brooklyn, New York 11201

## DUE PROCESS COMPLAINT - SCHOOL YEAR 2024-2025

| | |
|---|---|
| Student: | ███████ |
| NYC ID#: | ███████ |
| DOB: | |
| Parent(s)/Guardian(s): | Linda Larach-Cohen |
| Home Address: | ████████████████ |
| School: | International Academy for the Brain ("iBRAIN") |

To Whom It May Concern:

The Liberty and Freedom Legal Group, Ltd. ("Counsel"), represents the above-named student ("Student" or "████" and their parent/guardian ("Parent") (collectively "Clients"), in matters pertaining to the classification, program, placement, and implementation of special education and related services for Student for the 2024-2025 extended school year ("24-25 ESY").

The New York City Department of Education ("DOE") has procedurally and substantively denied the Student a Free Appropriate Public Education ("FAPE") as mandated by federal and state law, for the 24/25 ESY. Accordingly, we write to request an impartial hearing pursuant to Section 1415 of the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq. ("IDEA"), Article 89 of the New York State Education Law, and Part 200.5 of the Regulations of the New York State Commissioner of Education.

Please note, as per 34 C.F.R. §300.510(a)(1), consistent with 20 U.S.C. §1415(f)(1)(B)(i), within fifteen (15) days of receiving notice of the Parent's Due Process Complaint ("DPC") and prior to initiation of an impartial due process hearing under 34 C.F.R. §300.511, the DOE must convene a meeting with the Parent and the relevant members of the IEP Team who have specific knowledge of the facts identified herein. The Parent requests an immediate Resolution Meeting. In the event, DOE fails to hold the resolution meeting within 15 days of receipt of the Parent's DPC or fails to participate in the Resolution Meeting, then the Parent is requesting the Impartial Hearing Officer ("IHO") to begin the impartial hearing timeline immediately as per 34 C.F.R. §300.510[b][5]; 8 N.Y.C.R.R. §200.5[j][2][vi][b]. The Parent also requests that the Impartial Hearing Office expedite this DPC by scheduling a pre-hearing conference immediately to address the ongoing violations of state and federal law as outlined below. Our Clients request that any Impartial Hearing be open to the public as per 34 C.F.R. §300.512(c).

Address:
300 East 95th Street
Suite 130
New York, NY 10128

Phone:
646-850-5035

1

## **PENDENCY**

Our Clients request an interim order of pendency pursuant to federal and state special education law. Specifically, the IDEA and New York Education Law both contain "stay-put" provisions which give the student the right to remain in his or her current educational placement at public expense during the pendency of any administrative or judicial proceedings. 20 U.S.C. §1415(j); N.Y. Educ. Law 4404(4). Thus, the law allows the Student to remain in his "last-agreed-upon placement" until the impartial hearing process (including all appeals) is complete, unless the Parent and the DOE otherwise agree in writing.

As per 20 U.S.C. §1415(j), the Student's pendency entitlements are automatic and are required to be implemented by the DOE as a matter of law without the necessity of any application, motion, or other showing by Student's counsel, until there is a final order.

The DOE was put on notice through the Ten-Day Notice filed by the Parent (see Exhibit A) that the Parent is asserting their "stay-put" rights. While not required, attached is a Pendency Form based on the DOE's previous forms outlining the basis for pendency and the pendency program (see Exhibit B). The legal basis for pendency for this Student is attached as Exhibit C. The DOE has not responded to the Parent's Ten-Day Notice, nor have they made any indication they will begin implementing the Student's Pendency Placement.

Due to the DOE's history of failing to automatically implement Student's pendency in previous school years, we respectfully request an immediate pendency hearing so an Interim Order on Pendency can be issued by the Impartial Hearing Officer ("IHO"). Without the implementation and honoring of the statutory entitlement of pendency, the Student will suffer from the lack of funding for the services and program at iBRAIN. We are providing a Draft Interim Order on Pendency (See Exhibit D), which includes:

- Funding for the cost of tuition, and supplemental services, where applicable, to be paid directly to the International Academy for the Brain ("iBRAIN") pursuant to the enrollment agreement between the Parent-Petitioner and iBRAIN (see Exhibit E) as outlined in Petitioner's DPC; and,
- Funding for transportation services, as well as all services necessary to said transportation, to be paid directly to the transportation provider, pursuant to the transportation contract between the Parent-Petitioner and the transportation company (see Exhibit F) as outlined in Petitioner's DPC.

## **DISPUTED ISSUES**

This Due Process Complaint ("DPC") includes three sections: (I) a description of ███ educational needs and abilities; (II) an enumeration of the ways by which DOE failed to meet its obligation to provide ███ with a FAPE; and, (III) a proposal for how this failure may be remedied.

## I.    ███    **EDUCATIONAL NEEDS AND ABILITIES**

███ suffers from a traumatic brain injury resulting in severe impairments in the following areas: cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem

2

solving, sensory, perceptual and motor abilities, psychosocial behavior, physical functions, information processing, and speech. These impairments adversely affect ▮▮▮▮ educational skills and performance.

Due to the severe nature of his brain injury, ▮▮▮▮ is non-verbal and non-ambulatory, and has highly intensive management needs, requiring a high degree of individualized attention and intervention throughout the school day. ▮▮▮▮ has several diagnoses including a seizure disorder and glaucoma. He began having seizures at just four months old on the left side of the brain, and seizures on the right side of the brain at six months old. ▮▮▮▮ also has significant vision problems affecting both eyes and is "legally" blind.

▮▮▮▮ requires a small, structured classroom offering an educational program delivered via a 1:1 direct instruction model, as well as a modified environment reducing visual and sound distractions. ▮▮▮▮ additionally requires a full-time 1:1 paraprofessional, to support his healthcare needs, to ensure that he is able to attend and participate in his educational program, and to assist with all school activities and activities of daily living ("ADL").

▮▮▮▮ also needs periodic breaks, additional processing time for tasks, and purposeful repetition of tasks during therapy sessions and educational instruction, to accommodate ▮▮▮▮ highly intensive needs.

▮▮▮▮ requires an extensive regimen of related services, delivered in 60-minute sessions, including occupational therapy (OT), physical therapy (PT), speech and language therapy (SL), assistive technology (AT), vision education services (VES), hearing education services (HES), and music therapy (MT) to benefit from special education instruction. Because of the intensive level of services that ▮▮▮▮ requires, it is necessary for ▮▮▮▮ to attend a program which operates on an extended school day as part of an extended school year program.

▮▮▮▮ also requires an extended school day in order to accommodate the level of care required to prepare him for the school day upon arrival, and to prepare him for dismissal at the end of the day.

## EDUCATIONAL PROGRAM HISTORY

▮▮▮▮ has attended iBRAIN since the 2018-2019 school year. At iBRAIN, ▮▮▮▮ receives an appropriate educational program that addresses all of ▮▮▮▮ health and educational needs. ▮▮▮▮ receives academic instruction in a 6:1:1 class, with direct instruction, as well as 1:1 related services for OT, PT, SL, VES, HES, and MT in 60-minute sessions to allow for repetition, rest, transitioning, and reinforcement of skills. ▮▮▮▮ also receives AT devices and services. All of ▮▮▮▮ related services are provided on a push-in/pull-out basis so that ▮▮▮▮ will be able to generalize skills across environments and locations. ▮▮▮▮ also has the services of a 1:1 health paraprofessional to support his needs in his related services, classroom activities, and activities of daily living ("ADL").

As stated herein, the DOE denied the Student a FAPE by failing to recommend an IEP that was reasonably calculated to provide ▮▮▮▮ with educational benefits and enable him to make progress. In fact, the DOE has failed to offer ▮▮▮▮ an appropriate educational program throughout his entire history with the DOE.

First, there were significant Procedural Violations of the IDEA for all of the IEPs DOE recommended for ▮▮▮▮ which (a) impeded the Student's right to a FAPE; (b) significantly impeded

3

the Parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the Student; and, (c) caused a deprivation of educational benefits.

These Procedural Violations include, but not are not limited to a Failure to: (1) Provide Procedural Safeguards Notice; (2) Conduct evaluation or reevaluation (at least every 3 years); (3) Provide Parent with mandated notices, such as, Meeting Notices, PWNs, IEPs, Evaluations; (4) Provide Parent with information on how to request an IEE at public expense; (5) Provide proper meeting notices/PWN; (6) Acknowledge/listen to/accommodate Parent's concerns at the IEP meeting; (7) Provide appropriate PWN for each change or refusal or change proposed; (8) Place Student in the least restrictive environment (LRE); (9) Develop an IEP for each school year at issue; (10) Include appropriate present levels of performance; (11) Identifying the Student's needs; (12) Include goals to match each of the Student's needs that are objectively written with a baseline of performance (objective means of measuring progress on a regular basis); (13) Include a section on Parent's concerns, or failure to include Parent's concerns and failure to inform Parent about this option; (14) Include or address assistive technology (AT) needs; (15) Include or identify all Student's management needs; (16) Clearly identify all services provided including Location, Frequency, Duration; (17) Explain whether Student is to be educated with non-disabled peers, and when; (18) IEP meeting notice and meeting failed to include mandated members of the CSE team and therefore failure to convene a properly composed CSE team without the Student's Special Education Teacher, Related Service Providers, Parent Member, among others; (19) Failure to follow proper procedures in developing an IEP; (20) Critical decisions made outside of IEP team; (21) Critical decisions pre-determined; (22) Timely or actually conduct an annual CSE review and develop an IEP; and (23) Timely or actually provide an appropriate school location notice.

In addition, there are many Substantive Violations of the IDEA for each of the years the DOE actually developed an IEP for ▮▮▮▮ including, but not limited to: (1) the Student's disability and unique needs from that disability are not identified in the IEP; (2) there were no current or appropriate evaluations done prior to the development of each IEP; (3) an IEE should have been conducted; (4) the IEP doesn't fully explain each service the Student will receive and whether the teachers and providers are trained in that service; (5) the IEP does not provide training for (a) assistive technology, (b) two-person transfers, (c) seizures and other medical needs of the Student; (6) some goals are not measurable and most goals simply repeat year after year; (7) the IEPs do not reflect meaningful progress nor does the level of progress correctly reflect the Student's potential; (8) there are not appropriate accommodations on the IEP; (9) it is not clear how classwork, testing, and curriculum are modified for this Student; (10) the Student is not educated alongside non-disabled peers; and (11) the Parent's concerns are not included nor addressed in the IEPs.

## 2024-2025 School Year

On February 6, 2024, the DOE's Committee on Special Education ("CSE") met to develop a new IEP for ▮▮▮▮ for the 24/25 ESY. The Parent and ▮▮▮▮ teacher and service providers at iBRAIN attended and participated in the IEP meeting. The CSE concurred with iBRAIN's recommendations that ▮▮▮▮ be classified as a student with a traumatic brain injury ("TBI") and that he receive related services in the same frequency and duration (i.e., 60 minutes) as he currently receives at iBRAIN. The CSE also agreed with iBRAIN's transportation recommendations for ▮▮▮▮

However, despite all of ▮▮▮▮ therapists' information and advocacy that ▮▮▮▮ requires a small classroom environment with minimal distractions in order to receive educational benefits, the CSE once again recommended a large 12:1+(3:1) classroom in a District 75 public school. Parent

again strongly disagreed due to concerns of ████ regressing in a 12:1+(3:1) placement where DOE would be unable to provide the 1:1 instruction and attention, or the learning environment, that ████ requires. Further, Parent objected to the DOE's failure to recommend an extended school day.

Parent also disagreed with DOE's failure to recommend music therapy. While Parent was informed that music was part of the curriculum in District 75 schools, it would not be provided by a licensed music therapist.

By Prior Written Notice ("PWN") dated June 11, 2024, Parent was informed of DOE's placement recommendation of a 12:1+(3:1) class, related services and a School Location Letter ("SLL") for ████ for the 24/25 ESY at P.S. M079, Horan School. The Parent scheduled an appointment with the Horan School staff and subsequently attended a tour/discussion at Horan. However, like multiple previous times, the Horan School simply would not be able to implement the recommended IEP. Nor did the Parent, after another visit and discussion with the Horan staff, believe that the proposed school was adequate to provide the necessary level of services that ████ requires.

In light of these failures, Parent decided to re-enroll ████ in iBRAIN for the 24-25 ESY.

**iBRAIN is Appropriate for ████ and the Balance of Equities Favors the Parent's Claims**

The educational program ████ currently receives at iBRAIN is appropriate. At iBRAIN, ████ attends a small 6:1:1 class, with direct and small group instruction, which minimizes distractions and enables ████ to attend, receive educational benefits, and make progress. His classmates have similar academic, social-emotional, management, behavioral, and physical needs. ████ receives an extensive regimen of related services, including individual OT 5x a week, PT 5x a week, SL 5x a week, vision education services 3x a week, hearing education 2x a week, and MT 3x a week individually and 1x a week in a group, all delivered in 60-minute sessions. This allows ████ to generalize skills in multiple environments. ████ also receives AT services 1x a week as well. ████ is assisted by a 1:1 paraprofessional throughout the day. ████ has made considerable progress in all domains at iBRAIN, and it is incontrovertible that at iBRAIN, ████ is receiving special education, and related services, designed to meet his unique needs.

Parent has always made ████ available for evaluations, observations, and assessments by DOE. Parent attended the February 2024 IEP meeting and participated actively in the meeting. Parent disagreed with DOE's recommended IEP and placement recommendation at the meeting. Parent timely sent DOE a 10-Day Notice. Accordingly, equitable considerations favor a full award, via direct payment, of tuition and related services, including special transportation, for ████ at iBRAIN.

## II.    **DOE FAILED TO PROVIDE A FAPE TO STUDENT**

Parent contends that DOE failed to offer or provide ████ with a FAPE because DOE failed to provide a program and placement uniquely tailored to meet ████ needs for the 2024-2025 ESY. The recommended February 2024 IEP constitutes a denial of a FAPE for the 2024-2025 ESY. Parent additionally challenges herein any and all IEPs offered to ████ for the 2024-2025 ESY. This request is based on, but not limited to, the following factors, which have procedurally and substantively denied Student a FAPE:

## A. DOE FAILED TO RECOMMEND AN APPROPRIATE CLASS

    a.  The recommended 12:1+(3:1) classroom is not appropriate for ▮▮▮

    b.  The recommended 12:1+(3:1) class is too large and too crowded to provide ▮▮▮ with the quiet, distraction-free environment he needs in order to receive educational benefits and make progress.

    c.  ▮▮▮ requires a small 6:1:1 class with direct instruction and intensive 1:1 attention from a special education teacher.

    d.  Parent disagreed with the 12:1+(3:1) recommendation at the February 2024 IEP meeting and stressed that the recommended class size does not offer ▮▮▮ the appropriate amount of individualized instruction.

    e.  Parent informed the CSE of concerns that ▮▮▮ would regress in a class which contained 12 students who have a wide range of academic, physical, emotional, social, and behavioral characteristics and needs.

    f.  The recommended class of students having a wide range of academic, physical, emotional, and behavioral characteristics, is contrary to Regulations of the N.Y.S. Commissioner of Education. 8 N.Y.C.R.R. § 200.6(h)(3).

    g.  ▮▮▮ teacher and related service providers expressed very clearly at the February 2024 IEP meeting their recommendation that ▮▮▮ requires a small, 6:1:1 class with minimal noise, light, and movement.

    h.  ▮▮▮ presents with highly intensive management needs, which, pursuant to § 200.6(h)(4)(ii)(a) of the Commissioner's Regulations, mandate placement in a class with no more than six students.

## B. DOE FAILED TO RECOMMEND AN APPROPRIATE SCHOOL LOCATION

    a.  The CSE denied a FAPE by failing to recommend an appropriate school location for ▮▮▮

    b.  The DOE recommended the Horan School for ▮▮▮ a school location which has multiple times been rejected by the Parent and found not to be appropriate by multiple IHOs and SROs.

    c.  The DOE denied the Student a FAPE because the CSE failed to recommend an extended school day for ▮▮▮

    d.  The proposed 12:1+(3:1) classroom is inappropriate for ▮▮▮

        i.  The majority of the students in DOE classes are ambulatory, which indicates that ▮▮▮ will not be placed with students who have similar needs and abilities, which is his entitlement under 8 N.Y.C.R.R. § 200.6(h)(3).

        ii.  There is a wide range of academic, social, emotional, behavioral, physical, and developmental needs in the proposed class.

        iii.  The recommended classroom presents safety risks to ▮▮▮ because a majority of the students in 12:1+(3:1) classes are ambulatory.

    e.  A District 75 school cannot implement the recommended IEP as written.

        i.  There are not enough hours in the regular school day to provide the Student with all of the mandated related services and instructional hours.

        ii.  DOE denied a FAPE by failing to recommend an extended school day for the Student.

## C. DOE FAILED TO MANDATE APPROPRIATE RELATED SERVICES

    a.  DOE failed to recommend music therapy, provided by a licensed music therapist,

as a related service.
b. DOE failed to recommend hearing education services.

## D. **DOE FAILED TO EVALUATE** ▮▮▮ **IN ALL AREAS OF HIS DISABILITY**

    a. DOE failed to adequately address the Parent's request to consider an NYSED-approved Non-Public School (NPS), by, inter alia, failing to conduct evaluations in connection with an NPS placement, which is violative of the DOE's Standard Operating Procedures Manual ("SOPM").

    b. DOE failed to give ▮▮▮ an audiological examination.

    c. DOE failed to recommend an NPS program that would be appropriate for ▮▮▮ given that there was no appropriate DOE program.

    d. Parent hereby disagrees with the DOE's evaluations, or lack thereof, and formally requests an order directing DOE to fund independent educational evaluation ("IEE") in the form of an independent neuropsychological evaluation to be conducted by a qualified provider of Parent's choosing at a reasonable market rate.

## E. **DOE PREDETERMINED THE OUTCOME OF** ▮▮▮ **IEP**

    a. Despite the clear, unequivocal recommendations of ▮▮▮ teacher and service providers that ▮▮▮ be placed in a small class so that he can receive educational benefits with minimal distraction, as well as Parent's statements of concern that ▮▮▮ would regress in a class of 12 students, DOE recommended a large 12:1+(3:1) sensory-overloaded class.

    b. It was clear at the meeting that DOE intended to disregard the concerns of the majority of the IEP team and recommend a 12:1+(3:1) class.

## III. **PROPOSED RESOLUTION FOR DOE'S FAILURE TO OFFER OR PROVIDE A FAPE**

    In light of the above, DOE has failed to offer ▮▮▮ a FAPE for the 2024-2025 ESY. Furthermore, ▮▮▮ placement at iBRAIN for the 2024-2025 ESY is appropriate to address his academic, physical, and social/emotional needs, and is reasonably calculated to confer educational benefits upon him. Additionally, there are no equitable considerations which would bar a full award for direct payment of tuition, related services and transportation, since at all relevant times, ▮▮▮ Parent has cooperated in the CSE review, development, and placement process.

    Thus, the Parent hereby reserves the right to raise any other procedural or substantive issues that may come to their attention during the pendency of the litigation of this matter, including, but not limited to:

1) challenging the qualifications of any of the DOE's proposed supervisors, teachers, paraprofessionals, and/or any other service provider who might have been assigned to work with ▮▮▮

2) challenging the appropriateness of DOE's recommended placement by claiming that it cannot or will not maintain an appropriate student-to-staff ratio for the entirety of the school day; and,

3) challenging the appropriateness of DOE's recommended placement by claiming that it will not or cannot provide ▆▆▆ with all of the related services he needs to make meaningful progress.

In sum, DOE has failed to offer ▆▆▆ a FAPE for the 2024-2025 extended school year. However, in an effort to avoid prolonged litigation of this matter, Parent proposes the terms of a possible settlement discussed below:

a. An Order declaring that DOE denied Student a FAPE during the 2024-2025 ESY;

b. A determination that iBRAIN is an appropriate placement for Student;

c. An Order directing payment by DOE directly to iBRAIN for the cost of Full Tuition for the 2024-2025 ESY, in addition to the costs of related services and a 1:1 health paraprofessional;

d. Direct payment/prospective funding of special education transportation with limited travel time, a 1:1 transportation nurse, air conditioning, a lift bus, and a regular-sized wheelchair;

e. Reconvene a new IEP meeting to address changes if necessary; and,

f. An Order directing DOE to fund an independent comprehensive neuropsychological evaluation.

Should this matter proceed to litigation and Parent is a prevailing party on any substantial issue, then we will additionally seek an award of attorneys' fees and the recovery of all related fees and disbursements as permitted by relevant statute.

Sincerely,

/s/ Edward Lent
Edward Lent, Esq.
Liberty and Freedom Legal Group, Ltd.
Attorneys for Parents
Email: hearings@pabilaw.org

8

**LIBERTY & FREEDOM**
**L E G A L   G R O U P**
Empowering YOUR Voice through Civil Rights Advocacy

June 17, 2024

<u>**Sent Via Electronic Mail: (10daynoticecse9@schools.nyc.gov)**</u>
New York City Department of Education
Committee on Special Education 9
333 7th Avenue, 12th Floor New York, New York 10001

<u>**TEN DAY NOTICE**</u>

Student:                         ███████████
NYC ID#:                      ███████
DOB:                            ███████
Parent(s)/Guardian(s):     Linda Cohen
Home Address:             ████████████████████████

To Whom It May Concern:

      The Liberty and Freedom Legal Group, Ltd. ("Counsel"), represents the above-named student ("Student" or "███████" and their parent(s)/guardian(s) ("Parent") (collectively "Clients"), in matters pertaining to the classification, program, placement, and implementation of special education and related services for the Student.

      Pursuant to 20 U.S.C. §1412 (a)(10)(C)(iii) and 34 C.F.R. §300.148 (d)(1)), and on behalf of our Clients, we are providing the New York City Department of Education, the Student's local educational agency ("DOE"), ten (10) business days' notice of the Parents' rejection of the most recent proposed DOE Individualized Education Program ("IEP"), recommended program and school placement, for the 2024-2025 extended school year ("ESY") because of the DOE's failure to offer or provide the Student with a Free Appropriate Public Education ("FAPE") and maintain the Student at their last agreed upon educational placement, the International Academy for the Brain, d/b/a iBRAIN, Ltd. ("iBRAIN"), while seeking public funding for the Student's placement. iBRAIN is located at 403 East 91st Street, New York, NY 10128, and is a specialized educational program designed to educate students, like the Student, who suffer from a brain injury or brain-based disorder.

      Parents are requesting the DOE to maintain this status quo during the pending impartial hearing process and any appeals, through the "stay-put" provision pursuant to 20 U.S.C. §1415 (j) and have included the DOE Pendency Form already pre-populated with this Ten-Day Notice as Exhibit A. In order to maintain the Student in their pendency program, please be prepared to fully implement this pendency placement at the start of the extended school year.

      This notice is sent in addition to the Parents having expressed their concerns, disagreements, and rejection of the Committee on Special Education's ("CSE") recommendations at the most recent Individualized Education Program ("IEP") meeting.  The Parent continues to request Independent Education Evaluations (IEEs) of the Student; to be conducted at public expense, in order to appropriately assess the Student in all areas related to their suspected disabilities, including, but not limited to neuropsychological, physical therapy, occupational therapy, speech-language therapy, special education and assistive technology assessments due to the lack of proper

Address:

300 East 95th Street
Suite 130
New York, NY 10128

Phone:

646-850-5035

A - 1

.

assessments conducted by the DOE prior to the development of the most recent IEP meeting.

The Student is a child who suffers from a brain-based injury and the Student's educational needs are multifaceted and complex, and the DOE's recommended program and placement will not appropriately address their educational needs for the 2024-2025 extended school year.

Based on the Parents' review of the proposed recommended program and placement for the Student, the proposed IEP to be implemented during the 2024-2025 extended school year is not designed to enable the Student to receive appropriate educational benefits or receive appropriate related services. The proposed District 75 public school placement recommendations cannot be implemented, as proposed in the IEP, during the regular school day. Parents are also concerned about the appropriateness of the recommended placement for reasons including, but not limited to, class size ratio, class functional and academic grouping, staffing, accessibility, availability of adequate resources, and the lack of individualized attention and support. Further, the Parents are concerned the physical structure and facility of the proposed school location is not appropriate to address the Student's individual needs.

Our Clients remain willing and ready to entertain an appropriate public or approved non-public school placement that can provide the required intensive academic and related services program the Student requires. Accordingly, the Parents request the CSE reconvene for this purpose once the IEEs have been completed in order to develop an appropriate IEP. At this time, however, the Parents have no choice other than to re-enroll the Student in iBRAIN, which is an appropriate placement for the Student and is the last agreed- upon placement between the Parents and the DOE.

Very truly yours,

/s:/Edward Lent
Edward Lent, Esq.
Liberty and Freedom Legal Group.
Attorneys for Parents


Cc:     Linda Cohen, Rolando Cohen

linda@colanyc.com,
rolando@colanyc.com

# <u>Pendency Implementation Form</u>

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

| Student Name | OSIS Number | DPC Number |
|---|---|---|
| ███████ | ███ | |

1. The basis for pendency is:   SRO Decision No. 23-262, 1/12/2024

2. The pendency program consists of the following:

| Tuition | | |
|---|---|---|
| **School Name** | **10- or 12-Month Program** | **Other Notes** |
| International Academy for the Brain (iBRAIN) | 12-month program | Direct payment of Full Tuition to iBRAIN as per the terms of the enrollment contract between iBRAIN and parent |

| Services | | | | |
|---|---|---|---|---|
| **Service or Item** | **Ratio and Frequency** | **10- or 12-Month Program** | **DOE or Private Provider** | **Private Provider Name and Rate** |
| Special Transportation services | Daily; Round-trip for all school days | 12-month | Private | Direct payment to Sisters Travel and Transportation Services, LLC as per the terms of the transportation agreement with the parent |
| | | | | |

Form submitted by: Peter Albert, July 2, 2024, Parents' Counsel

---

For DOE use only:

The above program should be implemented as pendency

Pendency starts on: July 2, 2024
The date the DPC was filed: July 2, 2024


_____        _____
DOE Reviewer              Date

B - 1



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 23-262

**Application of a STUDENT WITH A DISABILITY, by his parent, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Brain Injury Rights Group, Ltd., attorneys for petitioner, by Zack Zylstra, Esq.

Liz Vladeck, General Counsel, attorneys for respondent, by Ezra Zonana, Esq.

## DECISION

## I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioner (the parent) appeals from the decision of an impartial hearing officer (IHO) which denied her request for respondent (the district) to fund the costs of the student's transportation services during the 2023-24 school year. For reasons explained herein, the appeal must be sustained in part and the matter must be remanded to the IHO for further administrative proceedings.

## II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

Given the limited issues on appeal, a full recitation of the student's educational history is not warranted. Briefly, the student began attending the International Academy for the Brain (iBrain) for the 2018-19 school year and has continuously attended iBrain since that time (see Parent Ex. I ¶ 7).[1]

---

[1] The Commissioner of Education has not approved iBrain as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7).

On March 14, 2023, a CSE convened to conduct the student's annual review, and, finding the student eligible for special education as a student with a traumatic brain injury, developed an IEP for the student with an implementation date of March 27, 2023 (see Parent Ex. B at pp. 1, 78, 81). The March 2023 CSE recommended a 12-month program for the student consisting of a 12:1+(3:1) special class placement in a specialized school (Parent Ex. B at pp. 71, 73, 78). The student's March 2023 IEP recommended one 60-minute session per month of parent counseling and training, and that the student receive: three periods per week of adapted physical education; five 60-minute sessions per week of individual occupational therapy (OT); five 60-minute sessions per week of individual physical therapy (PT); five 60-minute sessions per week of individual speech-language therapy; five 60-minute sessions per week of individual vision education services; and individual school nursing services as needed (id. at pp. 71-72). The March 2023 IEP recommended that the student receive the following special transportation accommodations and services: "[t]ransportation from the closest safe curb location to school;" 1:1 paraprofessional services; a lift bus; accommodation for a regular sized wheelchair; limited travel time; and climate control (id. at pp. 77-78).

On June 26, 2023, the parent executed an enrollment contract with iBrain for the student's attendance during the 2023-24 school year from July 5, 2023 through June 21, 2024 (see Parent Ex. E at pp. 1, 6).

In a due process complaint notice dated July 5, 2023, the parent alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2023-24 school year based on various procedural and substantive violations (see Parent Ex. A at pp. 1-8). As relief, the parent sought an order directing the district to directly pay iBrain for the costs of the student's tuition in addition to the costs of his related services and the services of a 1:1 paraprofessional; to directly or prospectively fund the costs of the student's special education transportation services with "limited travel time, a 1:1 transportation paraprofessional, air conditioning, a lift bus, and a regular-sized wheelchair"; to fund the costs of an independent educational evaluation (IEE) consisting of a neuropsychological evaluation; and to reconvene a CSE meeting to "address changes if necessary" (id. at p. 8).

The evidence reflects that the parent executed a "School Transportation Annual Service Agreement" (transportation agreement) with Sisters Travel and Transportation Services, LLC (Sisters Travel) to provide the student with round-trip transportation between his home and iBrain during the 2023-24 school year beginning on July 1, 2023 and concluding on June 30, 2024 (Parent Ex. F at pp. 1, 6).[2] According to the transportation agreement, the parent was responsible to pay for approximately 218 school days during the 2023-24, 12-month school year, whether or not the student utilized the transportation service on a particular day unless the transportation provider was at fault for the student not utilizing the services (id. at pp. 1, 2). The transportation agreement allowed for each party to terminate the agreement "for cause" and allowed the parent to terminate the agreement if the student "relocate[d] outside of [the] local school district or due to health reasons [the student] [wa]s no longer requiring special school transportation services" (id. at p. 3). In addition, the terms of the transportation agreement allowed the parent to terminate the

---

[2] The transportation agreement does not include the date the parent executed the agreement (see generally Parent Ex. F). During testimony, the parent affirmed that she recalled signing the transportation agreement on July 7, 2023 (see Tr. pp. 25, 98).

agreement if the parent had "exhausted all legal remedies available to them to secure third party funding"; however, the parent "remain[ed] responsible for any balance due to the [transportation provider] on the date of such termination" (id.). The total amount of the transportation services was listed as $128,620, with payments due in three installments on July 5, 2023; September 1, 2023; and January 1, 2024 (id. at p. 2). The transportation agreement noted that the provider would "not take any deductions, omissions, or refunds for unexcused absences, withdrawal, suspension or for any other reason except as outlined" therein (id. at p. 2).

On September 8, 2023, the district submitted subpoenas to the IHO requesting information from iBrain and from Sisters Travel (Dist. Ex. 1).

An impartial hearing convened on September 26, 2023 and concluded on October 12, 2023 after two days of proceedings (Tr. pp. 17-136).[3] At the outset of the hearing, the district conceded that it could not defend its program because it did not provide the parent with a school location where the student's IEP would have been implemented (Tr. pp. 30-31). During the September 26, 2023 hearing following the testimony of the parent's witnesses, the district indicated that some of the testimony concerned information that was requested in the district's subpoenas and requested that the IHO sign the subpoenas (Tr. pp. 103-04). The IHO indicated that he had not signed the subpoenas because he believed they related to the parent's burden and were overbroad, later adding that he was waiting for the parent's presentation of evidence before signing the subpoenas (Tr. pp. 104, 107, 108-09). The IHO then indicated that if the district wrote "narrowly targeted subpoenas" on the issues explored during the hearing, the IHO would review them and sign them if he concluded that they were appropriate (Tr. pp. 110-11). On September 26, 2023, the district submitted an updated subpoena requesting information from iBrain, but not an updated subpoena requesting information from Sisters Travel, and the parent objected to the subpoena (Dist. Ex. 2 at pp. 1-2, 4). The IHO addressed the district's request and the parent's objections in an interim decision dated September 26, 2023 and signed the district's proposed subpoena on the same day (September 26, 2023 Interim IHO Decision at p. 2; Dist. Ex. 2 at p. 4). iBrain responded to the district's subpoena on October 10, 2023 (Dist. Ex. 3). The parties then reconvened for the final hearing date on October 12, 2023 and presented their closing arguments (Tr. pp. 116-36).

In a decision dated October 18, 2023, the IHO determined that the district failed to offer the student a free appropriate public education (FAPE) for the 2023-24 school year, that iBrain was an appropriate unilateral placement, and that equitable considerations weighed in favor of the parent's request for an award of funding for the cost of the student's tuition (IHO Decision at pp. 21-24). As relief, the IHO ordered the district to fund the cost of the student's tuition at iBrain for the 2023-24 school year (id. at p. 26-27). However, although the IHO found "that the student was recommended for, and required, specialized transportation services" he ruled that "[t]he equities require that the amount to be reimbursed or paid by the district not be unreasonably above the range of fair market rates" (id. at pp. 24-25). The IHO ordered that the district was:

> obligated to pay no more than the highest of three objective measures: (1) the
> approved Medicaid rate for a trip such as the one between the student's home and

---

[3] A pendency hearing was held on July 25, 2023 (Tr. pp. 1-7). A pre-hearing conference was conducted on August 25, 2023 (Tr. pp. 8-16).

the school utilizing comparable vehicle and staff; (2) the approved Medicare rate for a trip such as the one between the student's home and the school utilizing comparable vehicle and staff; or (3) the actual rate paid by the district during 2023-24 for comparable services in comparable vehicle with comparable staff provided to its Office of Pupil Transportation by entities contracting with the district to provide such services (id. at p. 25)[4]

Further, in ordering funding for transportation, the IHO ordered that the district fund the cost of the student's transportation "for each day actually transported during the 2023-2024 school year up to the date of th[e] [IHO] Decision" (IHO Decision at p. 27). For the remainder of the 2023-24 school year, the IHO ordered the district to either fund transportation at the IHO's specified rates or provide the student with transportation through the district (id.). In his decision, the IHO also found that the district failed to prove that it had timely evaluated the student prior to the March 2023 CSE meeting (id. at p. 26). As such, the IHO ordered that the district evaluate the student in all relevant or suspected areas of disability before the next reconvene of the CSE (id. at p. 27).

**IV. Appeal for State-Level Review**

The parties' familiarity with the particular issues for review on appeal in the parent's request for review and the district's answer with cross-appeal is also presumed and, therefore, the allegations and arguments will not be recited here. The following issues presented on appeal must be resolved in order to render a decision in this case:

1. Whether the IHO erred by not awarding the full cost of the transportation contract between the parent and Sisters Travel;

2. Whether the IHO erred in directing the district to conduct evaluations of the student in all areas of suspected or actual disability.

**V. Applicable Standards**

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits

---

[4] At least a portion of the IHO's transportation cost reduction rationale was requested by the district representative during the hearing (Tr. pp. 31-32, 129-30).

(Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 580 U.S. at 404). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc],

200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[5]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

### A. Transportation

At the outset, the parties have not appealed from the IHO's findings that the district failed to offer the student a FAPE for the 2023-24 school year, that iBrain was an appropriate unilateral placement for the student for the 2023-24 school year, and that the parent was entitled to an award of direct funding for the costs of the student's tuition at iBrain for the 2023-24 school year (see generally Req. for Rev.; Answer). As a result, these determinations have become final and binding on the parties and will not be reviewed on appeal (34 CFR 300.514[a]; 8 NYCRR 200.5[j][5][v]; see M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6-*7, *10 [S.D.N.Y. Mar. 21, 2013]).

---

[5] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 580 U.S. at 402).

The final criterion for a reimbursement award is that the parent's claim must be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; R.E., 694 F.3d at 185, 194; M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]; see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable"]; L.K. v. New York City Dep't of Educ., 674 Fed. App'x 100, 101 [2d Cir. Jan. 19, 2017]). With respect to equitable considerations, the IDEA also provides that reimbursement may be reduced or denied when parents fail to raise the appropriateness of an IEP in a timely manner, fail to make their child available for evaluation by the district, or upon a finding of unreasonableness with respect to the actions taken by the parents (20 U.S.C. § 1412[a][10][C][iii]; 34 CFR 300.148[d]; E.M. v. New York City Dep't of Educ., 758 F.3d 442, 461 [2d Cir. 2014] [identifying factors relevant to equitable considerations, including whether the withdrawal of the student from public school was justified, whether the parent provided adequate notice, whether the amount of the private school tuition was reasonable, possible scholarships or other financial aid from the private school, and any fraud or collusion on the part of the parent or private school]; C.L., 744 F.3d at 840 [noting that "[i]mportant to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA"]).[6]

It is uncontested that the student requires special transportation, including a transportation paraprofessional, in order to attend school (see Parent Ex. B at pp. 77-78). The parent testified that the sole reason she chose Sisters Transportation for the student was because "[i]t was suggested through [iBrain]" (Tr. p. 97). When questioned whether she had been presented with any "alternative or additional transportation options," the parent replied that she had used "a yellow school bus" in the past, "but it ha[d] not been appropriate for [the student]" (Tr. pp. 97-98). The parent confirmed that the March 2023 CSE included transportation services in the student's March 2023 IEP, but she testified that she did not get a call from the Office of Pupil Transportation to set

---

[6] In support of the parent's contention that the IHO erred by failing to award the parent the full cost of the transportation contract with Sisters Travel, the parent relies on a recent district court case, which reviewed similar contracts with the same transportation company and determined that the terms of the contracts required parents "to pay fees irrespective of whether the students use[d] the services" (Abrams v. New York City Dep't of Educ., 2022 WL 523455 at p. *5 [S.D.N.Y. Feb. 22, 2022]). In opposition, the district relies on another holding from the same district court, Araujo v. New York City Department of Education, 2023 WL 5097982 (S.D.N.Y. Aug. 9, 2023), to support its position that the IHO properly limited the award of transportation costs to be within the range of fair market rates, as opposed to the amount the parent contracted to pay in the transportation agreement. In further support, the district points to a similar holding in Davis v. Banks, 2023 WL 5917659 (S.D.N.Y. Sept. 11, 2023). It is worth noting that none of the cases cited by the parties are directly relevant to the issue being addressed on appeal, i.e. whether the IHO erred in reducing the award of transportation funding, as all three of the matters cited by the parties involved implementation of either pendency orders or a final IHO decision and, therefore, the cases focused on enforcement and the language included in the orders that were being enforced rather than a review of the administrative decisions themselves (see Davis, 2023 WL 5917659 ["the sole source of the [district's] reimbursement obligations in each Plaintiff's case[s] is the applicable administrative order"]; Araujo, 2023 WL 5097982 ["[p]laintiffs have not met the IDEA's exhaustion requirement with respect to challenges to the [IHO's decision] itself, as opposed to [d]efendant's implementation of the [IHO's decision]"]; Abrams, 2022 WL 523455 ["[t]he heart of this matter[] boils down to the [district's] legal obligations under the [p]endency [o]rders"]).

up the student's transportation through the district (Tr. p. 101). The parent testified that the last time the student received transportation through the district was "maybe in 2014, maybe 2015" but that the student had "only utilized Sisters transportation" since beginning at iBrain in the 2018-19 school year (Tr. pp. 101-02). The parent testified that she had not received any invoices from Sisters Transportation for the 2023-24 school year (id.).

It is concerning that the parent testified that she did not review any other transportation companies to compare availability and pricing before signing a contract with Sisters Transportation with the intent that it would obligate the district to pay $128,620 to Sisters Transportation for the 2023-24 school year, while there is no indication that the parent ever expected to make any payments (Tr. pp. 97-98, 101; Parent Ex. F at p. 2). The parent noted that the March 2023 "CSE also agreed with iBRAIN's transportation recommendations for [the student]" and the student's March 2023 IEP recommended all the transportation accommodations and services recommended by iBrain (Req. for Rev. at p. 2 ¶ 5; compare Parent Ex. B at pp. 77-78 with Parent Ex. C at p. 81). State law provides that districts must generally provide transportation for children residing in the district "to and from the school they legally attend" (Educ. Law § 3635[1][a]). A request for transportation must be made by April 1 of the preceding school year, except that a district may not deny a late request "where a reasonable explanation is provided for the delay" (Educ. Law § 3635[2]).

In this case, the IEP for the student's 2023-24 school year was finalized in March 2023, well before the April 1 deadline for the parent to request that the district provide the student with transportation to iBrain pursuant to the transportation recommendations contained in the March 2023 IEP. It is important to note that although the parent disagreed with other portions of the March 2023 IEP, she agreed with the CSE's recommendations for special transportation. The parent is correct to quote N.Y. Educ. Law §4402(4)(d) which directs that school districts in New York State are mandated to provide special education to students with appropriate transportation to and from a nonpublic school within fifty miles (Req. for Rev. at p. 7 ¶ 3). But I repeat my concern with the parent's admission that she accepted iBrain's recommendation to utilize Sisters Transportation and entered into a contract that essentially obligates the district to pay over $100,000 a year without attempting to contact any other transportation companies or the district itself to see if the district could have provided the same or similar transportation free to the parent.

The concerns above alone may not have resulted in the outcome of this proceeding. However, after conducting an independent review of the evidence in the record, I have additional concerns regarding the parent's transportation reimbursement request. Although not part of the student's 2023-24 school year, the iBrain quarterly progress report dated April 21, 2023 noted that the student had "just started at the school" and that progress towards his music therapy goals "could not be assessed due to all remote instruction model currently in use" (Dist. Ex. 4 at pp. 15-17). The iBrain quarterly progress report dated July 7, 2023 noted that "[f]or this school year, we will be working on recalling information he has also learned at home" but also stated that the student "really like[d] his classmates" and for most of the student's music therapy comments it is noted that there were "[l]imited opportunities to address this goal this quarter and will continue to be targeted next quarter" (Dist. Ex. 5 at pp. 1, 4, 11-12).[7] The deputy director of special education at

---

[7] The student's extended 2023-24 school year started on July 5, 2023 (Parent Ex. E at p. 1).

iBrain (deputy director) testified that the student had five students in his class (Tr. pp. 38, 42-43). When asked how often the deputy director interacted with the student the deputy director answered that he observed the student specifically "at least once a week" although he did not indicate if that observation occurred remotely or in person (Tr. p. 54). Additionally, the parent testified that the student had excellent attendance and was rarely absent (Tr. pp. 98-99). However, other than testifying that Sisters Transportation provided transportation services for the student and that the student had a transportation paraprofessional for the 2023-24 school year, there is little evidence as to how frequently the student actually attended school in-person during the 2023-24 school year. Accordingly, the conflicting evidence contained in the hearing records prevents me from finding with reasonable confidence that the student is attending iBrain fully in-person for transportation purposes, such that it would have been reasonable to enter into a contract for transportation services that required payment whether or not the student was present in school.

It is worth noting that much of the above discrepancies in the hearing record could have been resolved had the district been permitted to subpoena records from Sisters Transportation as originally requested, or had the parent sought to produce a complete hearing record by producing that information within the control of the transportation contractor she selected. In particular, the district had requested invoices or billing information pertaining to the student, including "invoices, dates of service, and billing summaries for the 2023-2024 School Year" (Dist. Ex. 1 at p. 5). Had the district submitted a subpoena seeking information from Sisters Transportation for the IHO's signature on September 26, 2023, I may have been inclined to authorize it had the IHO decided not to do so, but since the district failed to pursue its subpoena as related to Sisters Transportation, that issue has become moot.

As noted above, there are significant concerns regarding the student's in-person attendance during the 2023-24 school year, whether the parent contacted any alternative service providers in order to determine a reasonable rate for a private provider of special transportation, whether the parent had a full understanding that she would be responsible for payment to Sisters Transportation if the district is not ordered to make payments, and why the parent did not seek to have the district transport the student to iBrain considering the district was offering the same special transportation as what was being sought privately. Rather than deny relief that may be warranted, to address these questions, the matter is being remanded to the IHO for further proceedings.

Nevertheless, I must also address the IHO's finding that the transportation services were excessive in terms of their cost and that, therefore, equitable factors did not support the parent's request for relief. The IHO acknowledged that there was no foundation in the hearing record to define a reasonable rate for transportation (IHO Decision at p. 25). The IHO then capped the amount of funding for transportation to an amount determined by "three objective measures" rather than calculated by the contract between the parent and the private transportation agency she contracted with (IHO decision at p. 25; see Parent Ex. F). Among the factors that may warrant a reduction in tuition based on equitable considerations is whether the frequency of the services or the cost for the services was excessive (M.C., 226 F.3d at 68; see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable"]; L.K., 674 Fed. App'x at 101; E.M., 758 F.3d at 461 [noting that whether the amount of the private school tuition was reasonable is one factor relevant to equitable

C - 10

considerations]).  The IHO may consider evidence regarding whether the rate charged by the private school or agency was unreasonable or regarding any segregable costs charged by the private school or agency that exceed the level that the student required to receive a FAPE (see L.K. v. New York City Dep't of Educ., 2016 WL 899321, at *7 [S.D.N.Y. Mar. 1, 2016], aff'd in part, 674 Fed. App'x 100).

In the absence of any documentary or testimonial evidence regarding the reasonableness of the costs of the transportation services, the IHO's finding that "the district is obligated to reimburse or directly pay for the costs of these services, but this obligation is capped by the highest of three objective measures of market rates" has no support in the hearing record (see IHO decision at pp. 25-26).[8]  In so finding, the IHO seemed to improperly rely on his own knowledge of the markets for special transportation services (i.e., judicial notice).[9]  Accordingly, this finding was without merit.  The IHO may address any concerns regarding excessive costs by instructing the parties to further develop the evidentiary record with respect to that issue upon remand.  Should the IHO remain committed to introducing a government reimbursement rate through judicial notice, at the very least the IHO must first disclose the specific rate(s) in dollar figures or method of calculation upon which a rate is based including how or where the parties may access the same information, then provide the parties a reasonable opportunity to respond with fact arguments or rate information of their own.

## B.  Evaluations

The district cross-appeals from the IHO's directive that it conduct evaluations of the student "in all areas of suspected disability."  Although the district claims that the parent failed to request that the district conduct evaluations of the student in the due process complaint notice or at the impartial hearing, the district is incorrect.  In the parent's due process complaint notice, the parent alleged that the district failed to evaluate the student in all areas of disability, asserted that she disagreed with the district's evaluations or lack thereof, and formally requested "an order directing [the district] to fund [an] independent educational evaluation ("IEE") in the form of an independent neuropsychological evaluation to be conducted by a qualified provider" (Parent Ex. A at pp. 7, 8).

---

[8] The IHO may have considered the terms of the contract with Sisters Travel to be excessive or constitute price gauging, and it may be the IHO is correct in his assumption; however, without evidence in the hearing record to support the IHO's assumption of excessiveness of cost, it is just that and there is no basis for upholding it.

[9] Generally, an adjudicative fact may be judicially noticed when that fact "is not subject to reasonable dispute because it" is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" (Fed. R. Evid. 201[a], [b][1]-[b][2]).  While a court is empowered with the discretion to "take judicial notice on its own," a court "must take judicial notice if a party requests it and the court is supplied with the necessary information" (Fed. R. Evid. 201[c][1]-[2]).  In addition, while a court "may take judicial notice at any stage of the proceeding," a party—upon request—must be provided with the opportunity to be heard "on the propriety of taking judicial notice and the nature of the fact to be noticed" (Fed. R. Evid. 201[d]-[e]).  However, if a court "takes judicial notice before notifying a party, the party, on request, is still entitled to be heard" (Fed. R. Evid. 201[e]).  The IHO's use of judicial notice in this case also offends State regulation, which requires, in part, that an IHO's decision "shall be based solely upon the record of the proceeding before the [IHO]" (8 NYCRR 200.5[j][5][v]).

The IHO was careful in crafting his order to only direct that the parent "may seek" IEEs "in areas not assessed by the district or with which the family disagrees, at reasonable market prices" (IHO Decision at p. 27). Otherwise, the IHO directed that "prior to the 2023-24 annual review the district shall ensure the student has been fully evaluated in all areas of actual o[r] suspected disability" (id.). Despite the student's current placement at iBrain, it is the district's responsibility to have the student properly evaluated prior to the next time the CSE convenes so that the CSE be fully informed as to the student's needs before developing an IEP for the student.

A district must conduct an evaluation of a student where the educational or related services needs of a student warrant a reevaluation or if the student's parent or teacher requests a reevaluation (34 CFR 300.303[a][2]; 8 NYCRR 200.4[b][4]); however, a district need not conduct a reevaluation more frequently than once per year unless the parent and the district otherwise agree and at least once every three years unless the district and the parent agree in writing that such a reevaluation is unnecessary (8 NYCRR 200.4[b][4]; see 34 CFR 300.303[b][1]-[2]). A CSE may direct that additional evaluations or assessments be conducted in order to appropriately assess the student in all areas related to the suspected disabilities (8 NYCRR 200.4[b][3]). Any evaluation of a student with a disability must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information provided by the parent, that may assist in determining, among other things the content of the student's IEP (20 U.S.C. § 1414[b][2][A]; 34 CFR 300.304[b][1][ii]; see Letter to Clarke, 48 IDELR 77 [OSEP 2007]). In particular, a district must rely on technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors (20 U.S.C. § 1414[b][2][C]; 34 CFR 300.304[b][3]; 8 NYCRR 200.4[b][6][x]). A district must ensure that a student is appropriately assessed in all areas related to the suspected disability, including, where appropriate, social and emotional status (20 U.S.C. § 1414[b][3][B]; 34 CFR 300.304[c][4]; 8 NYCRR 200.4[b][6][vii]). An evaluation of a student must be sufficiently comprehensive to identify all of the student's special education and related services needs, whether or not commonly linked to the disability category in which the student has been classified (34 CFR 300.304[c][6]; 8 NYCRR 200.4[b][6][ix]).

Upon review of the March 2023 IEP, it appears that the most recent reports used by the March 2023 CSE were: a February 7, 2023 and March 2, 2023 Dynamic AAC Goals Grid assessment, a March 2, 2023 Communication Function Classification System assessment, a March 2, 2023 pediatric evaluation of disability inventory, and a March 3, 2023 Level 1 vocational assessment parent interview, but the remaining information reviewed by the CSE were iBrain reports, iBrain's educational plan and evaluative information from 2022 and 2021 (Parent Ex. B at pp. 1-3). It is apparent from the IHO's decision that he was deeply dissatisfied with the district's failure to defend its March 2023 IEP and that the IHO believed that once the district "conceded [its] inability to meet [its] burden [it] need[ed] [to] immediately turn [its] attention to working together with the family and the decision-maker as problem solvers to develop an appropriate alternative" (IHO Decision at p. 19). The IHO found that "[t]he district did not here make any showing of having timely conducted an evaluation of the student," which he determined was a substantive denial of FAPE, that "create[ed] the need that it do so, immediately" (id. at p. 26). The March 2023 IEP documented that the parent "expressed that she would like the audiological evaluation to be conducted for [the student]" (Parent Ex. B at p. 80). The IHO noted that "there [wa]s no indication about what, if anything, the district did in response to this request" and, therefore, the IHO ordered that the district "ensure that the student will have been fully evaluated

utilizing assessments no older than three years prior to the next review, in all areas of actual or suspected disability, prior to the student's next CSE review" (IHO Decision at p. 26).  Because it is the district's responsibility ensure that a student is appropriately assessed in all areas of suspected disability, the IHO's order is permissible and will not be disturbed.

## VII. Conclusion

Having found that the IHO erred in his reasoning behind the limit of the award of transportation costs to fair market value rates, but also having found that the evidentiary record lacks sufficient evidence about the student's in-person attendance at iBrain during the 2023-24 school year to determine the reasonableness of the parent entering into the transportation contract for the 2023-24 school year, on appeal, the matter must be remanded to the IHO.

Having found that the district failed to provide any evidence that it had evaluated the student within the regulatory timelines, I decline to reverse the IHO's order directing the district to conduct evaluations of the student in all areas of suspected disability.

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**THE CROSS-APPEAL IS DISMISSED.**

**IT IS ORDERED** that the IHO's decision, dated October 18, 2023, is modified by reversing that portion which ordered the district to fund the student's transportation for days the student was transported to and from iBrain capped by the highest of the three measures outlined by the IHO in his decision; and,

**IT IS FURTHER ORDERED** that the matter shall be remanded to the IHO for further proceedings consistent with this decision.

Dated:        **Albany, New York**
              **January 12, 2024**

              **JUSTYN P. BATES**
              **STATE REVIEW OFFICER**

13

C - 13

NEW YORK CITY OFFICE OF ADMINISTRATIVE
TRIALS AND HEARINGS (OATH)
SPECIAL EDUCATION HEARINGS DIVISION
-----------------------------------------------------------------X
In the Matter of the Due Process Complaint of
Linda Cohen and Rolando Cohen ("Parent"), as Parent/Guardian of

M.C. ("Student"), and Individually;


                         Petitioners,                                      **ORDER OF PENDENCY**

   -against-

                                                      **IHO Case No.**

**THE NEW YORK CITY DEPARTMENT
OF EDUCATION,**                                **IHO**

                    Respondent.
-----------------------------------------------------------------X


      This Order addresses a Student with disabilities whose Parent challenges the Individualized Educational Program ("IEP") and placement proposed for the 2024-2025 extended school year by Respondent The New York City Department of Education ("DOE"). Through this Order, the Parent seeks to enforce the Student's pendency rights under § 1415(j) of the Individuals with Disabilities Education Act ("IDEA") and Section 4404(4) of the New York State Education Law, which entitle the Student to remain in his/her current educational placement, at public expense, during the pendency of their administrative and/or judicial proceeding.

      Under IDEA, the pendency inquiry identifies the Student's then-current educational program/placement. *Mackey v. Bd. of Educ., Arlington C.S.D.*, 386 F.3d 158 (2d Cir. 2004), *supplemented*, 112 F. App'x 89 (2d Cir. 2004). Although not defined by statute, the phrase "then current educational placement" has been found to mean the last agreed-upon placement at the moment when the due process proceeding is commenced. *Murphy v. Arlington C.S.D.*, 86 F. Supp. 2d 354 (S.D.N.Y. 2000), *aff'd,* 297 F.3d 195 (2d Cir. 2002).

      The Student's "last agreed upon placement" is at the International Academy for the Brain ("iBRAIN"). This placement is based upon the SRO Decision No. 23-262, 1/12/2024  which found that: 1) DOE denied Student a FAPE; 2) iBRAIN was appropriate for Student; and, 3) equitable considerations supported a full award of direct payment of tuition and related services, including special transportation for Student at iBRAIN.

      Unless otherwise excluded, Pendency includes all costs of special education and related

services, including transportation. Under the IDEA, "related services" include transportation, and under N.Y. Educ. Law, "special education" includes transportation. When a student receives special education services, an order on pendency– without transportation—would render the award meaningless.

For the preceding reasons, it is hereby ORDERED that effective July 2, 2024, and during the pendency of all Due Process Proceedings relative to IHO Case No.          , the 2024-2025 Extended School Year, and all administrative and judicial proceedings thereafter, the DOE shall fund the Student's placement at iBRAIN. This placement includes the following:

- Funding for the cost of Full Tuition to be paid directly to the International Academy for the Brain ("iBRAIN") pursuant to the enrollment agreement between the Parent-Petitioner and iBRAIN (see Exhibit E in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint; and
- Funding for transportation services, as well as all services necessary to said transportation, to be paid directly to the transportation provider pursuant to the transportation contract between the Parent-Petitioner and the transportation company (see Exhibit F in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint; and

Dated: _____        So Ordered: _____
                                                IHO :

2

D - 2



Phone - 646-315-1548
Email - info@iBrainNYC.org
Web - www.iBrainNYC.org

**ANNUAL ENROLLMENT CONTRACT**

This is a contract ("Enrollment Contract" or "Agreement") between Linda Larach-Cohen & Rolando Cohen ("Parent(s)/Guardian(s)") and The International Academy for the Brain, dba iBRAIN Ltd ("*i*Brain") for the enrollment of ████████ ("Student") for the 2024 - 2025 school year ("School Year"). The parties hereby agree to the following terms:

<u>Enrollment Period</u>

1. *i*Brain offers enrollment to Student for the extended school year ("School Year"), starting on July 2, 2024, and ending on June 27, 2025, subject to the terms and conditions set forth below.

<u>Academic Program, Related and Other Services</u>

2. Parent(s)/Guardian(s) attests they have reviewed the curriculum program for *i*Brain's educational and related services programs and certain related materials.

3. Parent(s)/Guardian(s) understands the academic and related service programs for Student for the School Year will be provided as follows:

    a. *i*Brain will provide the academic and related service programming as outlined in: (i) Student's most recent Individualized Education Program ("IEP") issued by the Student's local school district; or (ii) recommend an academic program that will be outlined in Student's *i*Brain IEP if the local school district's IEP has not been updated or if *i*Brain and Parent(s)/Guardian(s) disagree with the proposed academic program recommendation in Student's IEP issued by the local school district for the academic year. Where *i*Brain recommends changes to the Student's recent IEP, *i*Brain assumes all responsibility to defend against all challenges to the appropriateness of the changes it makes to Student's academic programming as reflected on the most recent IEP.

<u>Tuition, Deposit and Related Service Fees</u>

4. **Deposit:**  Parent(s) agrees to pay an initial, non-refundable deposit of $100 ("Deposit") made payable to "International Academy for the Brain" for the 2024-2025 school year. The Deposit will be applied against the Full Tuition as outlined in Sections 7 and will be due the first day of school.

5. **Base Tuition Fees:** Base Tuition Fee for the *i*Brain program is **$213,000** for the School Year starting on July 2, 2024 and ending on June 27, 2025. The Base Tuition includes the cost of an individual paraprofessional, and school nurse as well as the academic programming outlined in Section 3.

6. **Supplemental Tuition Fees:** The Base Tuition cost does not include the cost of related services, transportation paraprofessional, any individual nursing services or assistive technology devices and

Manhattan: 403 East 91st Street
New York, NY 10128
Brooklyn: 213 48th Street
Brooklyn, NY 11220

E - 1

equipment. Supplemental Tuition includes the cost of the Student's related services programming such as physical therapy, occupational therapy, speech-language therapy, vision education services, assistive technology services, music therapy, hearing education services and parent counseling and training as outlined in Section 3. The total Supplementary Tuition Fees for the 2024-2025 school year is **$159,982.60.**

7. **Full Tuition:** Full Tuition for the 2024-2025 academic year is inclusive of Base Tuition Fees as described in Section 5 and Supplemental Tuition Fees as described in Section 6. The Full Tuition is **$372,982.60** shall be paid in three installments with the first payment of **$63,557.57** due by July 2, 2024, the second installment payment of **$118,752.31** due by September 5, 2024, and the third payment of **$190,672.72** due by January 2, 2025.

## **Payment Terms**

8. **Payment Obligation**:  It is understood and agreed the enrollment of Student is for the full academic year and the obligation to pay tuition cannot be apportioned or mitigated except as expressly provided for herein.  *i*Brain will not make any deductions, omissions, or refunds for excused or unexcused absences, withdrawal, suspension, or for any other reason, except as outlined in Sections 10 and 11.

It is understood Parent(s)/Guardian(s) may seek public funding from their local school district to pay for Student's Full Tuition due to *i*Brain for the School Year by asserting Student's due process rights.  In the event Parent(s)/Guardian(s) is required to file a due process complaint against the local school district seeking an Order on Pendency and/or Findings of Fact and Decision for funding, the tuition payment obligations will be suspended, except those obligations outlined in sections 8(a) and 8(b), until a final determination/decision is issued by an impartial hearing officer, state review officer, or state or federal court, and then all monies then-due will become immediately due within thirty (30) days of the final adjudication.

   a.  **Pendency Placement - Payment Obligations**: It is understood Parent(s)/Guardian(s) may seek public funding from the local school district to pay for Student's Full Tuition due to *i*Brain for the School Year by asserting Student's Due Process Rights under 20 U.S.C. § 1415[j], whereby the local school district is required to maintain Student in his/her last-agreed upon placement during the pendency of any impartial hearing proceedings ("Stay-put") which is automatic upon filing a Due Process Complaint ("DPC"). Upon filing the DPC and asserting the Stay-put provision ("DPC Date"), the payments obligations as outlined in this Enrollment Contract shall be due within 30 days of DPC Date, according to the terms herein. Payment obligations shall remain in effect until the Stay-put rights are no longer active.

   In the event the local school district does not comply with the Stay-put rights of Student and fails to make the payment obligations as outlined in this Enrollment Agreement, Parent(s) /Guardian(s): (1) may seek immediate enforcement of the Stay-put rights in state or federal court and MUST provide a payment schedule within two weeks of such enforcement action; (2), if Parent(s)/Guardian(s) does not seek enforcement within 14 days of the payment obligations becoming due, Parent(s)/Guardian(s) will be required to execute a payment schedule while the Student remains at iBRAIN; or, (3) Parent(s)/Guardian(s) will be required to establish payment plan and may withdraw Student by terminating contract per section 11.

   b.  **Order on Pendency Denied - Payment Obligations:**  It is understood Parent(s)/Guardian(s) may seek public funding from the local school district to pay for Student's Full Tuition due iBrain for the School Year by asserting Student's Due Process Rights under 20 U.S.C. § 1415[j], whereby the

E - 2

Document Ref: TQEGH-GFGUF-OPEHP-QOWZP

local school district is required to maintain Student in his/her last-agreed upon placement during the pendency of any impartial hearing proceedings ("Stay-put") is automatic upon filing a Due Process Complaint ("DPC"). In the event Parent(s)/Guardian(s) seeks and is denied an Order on Pendency by an Impartial Hearing Officer, State Review Officer, or a state or federal court, for all or part of the Full Tuition funding from the local school district due under this Enrollment Contract, Parent(s)/Guardian(s) will be permitted to immediately withdraw Student from iBrain by terminating this contract per Section 11 within 30 days of receipt of the Order on Pendency. Parent(s)/Guardian(s) will be required to execute a payment schedule to comply with the contractual obligations based upon the financial need of Parent(s)/Guardian(s) for any balances due to *i*Brain on the date of withdrawal.

c. Late Payment Penalty. Upon the failure to pay in full any payment obligation due based on the terms of this Enrollment Contract ("Amount Outstanding") within seven (7) business days of the due date for such payment, a late payment penalty of ten percent (10.0%) of the Amount Outstanding (the "Late Payment Amount") shall immediately be added to the Amount Outstanding. The imposition of the Late Payment Amount shall be in addition to any other rights and remedies of iBRAIN under this Agreement. Any balances of any amount which remains unpaid, i.e., Amount Outstanding, including any Late Payment Amount, more than thirty (30) days after it is due shall accrue interest until paid at the rate equal to the lesser of two percent (2.0%) per calendar month or the maximum amount allowed under Applicable Law. However, in no event shall this interest provision be construed as a grant of permission for payment delays.

9. **Failure to Secure Tuition Funding:** In the event Parent(s)/Guardian(s) seeks a Findings of Fact and Decision, but is denied all or part of the Full Tuition funding from the local school district due under this Enrollment Contract by a final administrative or judicial decision, including all state and federal appeals resolving the claim for such funding, Parent(s)/Guardian(s) will be permitted to immediately withdraw Student from *i*Brain by terminating this contract per Section 11.

## Contract Release and Termination

10. **Release:** Parent(s)/Guardian(s) acknowledges that Parent(s)/Guardian(s) will be released from this Enrollment Contract without financial penalty or continuing responsibility for tuition payments outlined in this Enrollment Contract should the local school district offer a free appropriate public education to Student by the first day of the School Year as indicated in Section 1 and the Parent(s)/Guardian(s) provides notice as outlined in Section 11 prior to the first day of the School Year. Parent(s)/Guardian(s) may be released from this Enrollment Contract if the Student relocates outside of the local school district, or, if due to health reasons, Student is no longer able to attend *i*Brain, and Parent(s)/Guardian(s) provides notice as outlined in Section 11.

11. **Termination:** Parent(s)/Guardian(s) may terminate this Enrollment Contract by submitting a written Termination Notice per Section 25. The Termination Notice must, (a) be in writing, (b) dated, (c) state Student's name and (d) provide Parent(s)/Guardian(s)'s reasons for terminating the Enrollment Contract. The Termination Notice may be sent through the U.S. Postal Service via certified mail, return receipt, or Federal Express delivery service or by courier. If submitted through the U.S. Postal Service by First Class Mail, the Termination Notice shall be deemed received by *i*Brain five business days after the date that the Termination Notice is postmarked, consistent with Section 25.

If Parent(s)/Guardian(s) terminates this Enrollment Agreement, Parent(s)/Guardian(s) will forfeit Student's non- refundable Tuition Deposit set forth in Section 4 in its entirety and any other payments made per the

E - 3

Document Ref: TQEGH-GFGUF-OPEHP-QOWZP

terms of this Enrollment Agreement.

Applicable tuition refunds, if any, shall be determined as follows:

    A. All pre-paid tuition fees will be refunded ***if and only if*** the written Termination Notice in the form stated above was RECEIVED on or before the first day of attendance by Student.

    B. If written Termination Notice is received after the Student's first day of attendance, Parent(s) /Guardian(s) will be responsible for paying all tuition fees for the calendar month in which Termination Notice is received on a *pro rata* basis. Parent(s)/Guardian(s) also will be responsible for paying all outstanding tuition and fees then due and owing, if any, for all months prior to the month in which Termination Notice is received. All such fees shall be paid within ten (10) calendar days after Termination Notice is received by *i*Brain.

**School/Family Cooperation**

12. **Parent(s)/Guardian(s) Must Cooperate with School District:**  In the event Parent(s)/Guardian(s) decides to seek direct funding from their local school district for the Student's placement and related services at *i*Brain, Parent(s)/Guardian(s) agrees to take all necessary steps to secure funding and to cooperate fully in the process required to secure such funding. In the event that Parent(s)/Guardian(s) does not cooperate with the process, *i*Brain may elect, upon 60 days' notice, to terminate Student's enrollment at *i*Brain.

**Conditions of Enrollment**

13. Parent(s)/Guardian(s) hereby authorizes *i*Brain to conduct any interviews, medical examinations, psycho-educational evaluations, and/or related service evaluations necessary for the continued assessment related to Student; and Parent(s)/Guardian(s) authorizes *i*Brain to make necessary information regarding Student available to its staff and/or other paid or unpaid individuals working for or on behalf *i*Brain, including medical and dental consultants and other health care or educational professionals.

14. Parent(s)/Guardian(s) understands that *i*Brain will provide clinical and training services for the community and hereby authorize and consent to the provision of such services, including without limitation, observation, information sharing and trainee participation to the extent *i*Brain deems necessary for training students and staff of other agencies, as well as volunteers, and *i*Brain agrees to use discretion in selecting trainees and sharing information related to Student and to ensure that staff are made aware of the confidentiality of these matters.

15. **Compliance with Local School District Requirements**:  Parent(s)/Guardian(s) and *i*Brain agree to cooperate with respect to their interaction with the New York State Education Department and/or their local school district to ensure compliance with applicable laws, regulations and rules.

16. **Medical Releases**:  Parent(s)/Guardian(s) agrees to promptly sign a Health Insurance Portability and Accountability Act ("HIPAA") release form and a Family Educational Rights and Privacy Act ("FERPA") release form for the purpose of allowing *i*Brain to communicate with Student's related service therapists and medical providers and have access to Student's medical and therapy providers' records. Parent(s)/Guardian(s) agrees to inform *i*Brain if there are any changes to Student's medical conditions and/or changes to Student's medication regimen. Parent(s)/Guardian(s) further agrees that such information obtained or developed by *i*Brain may be used for research and published accordingly.

E - 4

Document Ref: TQEGH-GFGUF-OPEHP-QOWZP

17. **Physical Restraint**:  Parent(s)/Guardian(s) authorizes *i*Brain to use the amount of passive physical restraint believed to be reasonable under the circumstances (and endeavor to use the least amount of such restraint), and utilize environmental time out and/or apply a protective device as necessary to ensure the safety of the Student,  staff, and any individual working with the Student in the event Student may cause or reasonably demonstrate a threat of causing injury to self or others, or serious damage to property.

18. Parent(s)/Guardian(s) authorizes *i*Brain to include names, address, telephone number and email addresses in the Family and Staff Membership List to facilitate reasonable communication among families and area support groups for the families.

19. **Consent to Photograph, Video, Record and Interview**:  Parent(s)/Guardian(s) understands Student may be filmed by *i*Brain in individual or group sessions, during recreational activities and/or during community outings; and Parent(s)/Guardian(s) agrees to promptly sign a Communications Release granting *i*Brain all rights to publicly exhibit or display photographs and/or photographic slide projections and/or video of Student and/or to permit use thereof by or in any media, including, but not limited to copyright status (or common law copyright) and, staff members may photograph or film Student for the purpose of keeping personal mementos of their time together with Student.

20. Parent(s)/Guardian(s) authorizes *i*Brain to display or enter Student's artwork or original creation(s) in appropriate competitions including public and private exhibitions; and Parent(s)/Guardian(s) authorizes Student to attend trips and events outside of the school setting with appropriate staff support.

21. **Access to Student's Records**:   Parent(s)/Guardian(s) has the legal right to inspect and review any educational records relating to Student as well as a legal right to a copy of Student's school files, and Parent(s)/Guardian(s) agrees to reimburse *i*Brain for reasonable copying costs associated with such request.

**Miscellaneous Terms**

22. **Assignment**:   Parent(s)/Guardian(s) agrees this Enrollment Contract may be assigned or transferred by *i*Brain and it will be binding upon and inure to the benefit of the successors and assigns of *i*Brain.
    a. Assignment of Right to Sue. In the event the local school district, or another entity ("Obligor"), is obligated by administrative or court order to make payment(s) to iBRAIN on behalf of the Parent(s)/Guardian(s) ("Assignor") under the terms of this Agreement and fails to make such payment(s) within thirty-five (35) days upon becoming due ("Outstanding Financial Obligation"), at the written request of iBRAIN, the Parent(s)/Guardian(s) shall assign and transfer to iBRAIN ("Assignee") the title and ownership to such claim and cause of action that exists in Parent(s)/Guardian(s) favor against any such entity and thereby authorize iBRAIN to prosecute said action to resolve said claim at iBRAIN's discretion. Assignor understands that whatever amounts Assignee does not collect from Obligor (whether it be all or part of what is due) shall be paid by Assignor as per the terms of the Agreement.

23. **Severability**:  *i*Brain and Parent(s)/Guardian(s) agree in the event any provision of this Enrollment Contract shall become invalid or unenforceable, in whole or in part, for any reason whatsoever, the remaining provisions shall, nevertheless, be valid and binding as if such invalid or unenforceable provision had not been contained in this Enrollment Contract.

24. **Governing Law**:  This Enrollment Contract shall be governed by, construed and enforced in accordance

E - 5

Document Ref: TQEGH-GFGUF-OPEHP-QOWZP

with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. New York State shall be the jurisdiction and venue for any dispute involving this Enrollment Contract. The Enrollment Contract may be executed in counterpart with facsimile or electronic copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

25. **Notice**:  By executing this Enrollment Contract, each party agrees hereto to the terms set forth above and all notices required under this Enrollment Contract shall be delivered via the U.S. Postal Service via certified mail, return receipt, or Federal Express delivery service, or by courier to the following parties at the address set forth below:

International Academy for the Brain
ATTN: Mr. Kieran Lavin
55 West 116th Street, #159
New York, New York 10026

26. **Merger**:  This Enrollment Contract contains the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. The express terms herein control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Enrollment Contract may not be modified or amended other than by an agreement in writing, duly signed by all parties.

By signing below, Parent(s)/Guardians acknowledges that he/she/they have read this Enrollment Contract, understand(s) the terms and conditions, and agree(s) to the conditions outlined in this Enrollment Contract. It is further understood that any questions concerning these conditions have been discussed.

Parent(s)/Guardian(s) signature below signifies that he/she/they have read and understand all aspects of this Enrollment Contract and recognize the legal responsibilities in regard to this Enrollment Contract.

**International Academy for the Brain**

*Kieran Lavin*

X_____

By: Kieran Lavin

International Academy for the Brain

Date:____2024-06-22_____

**Parent/Guardian**

X_____

Name(s): ____Linda Larach (Cohen)____

Parent(s)/Guardian(s) of:_██████████_____

Date:____2024-06-24_____

E - 6

Document Ref: TQEGH-GFGUF-OPEHP-QOWZP

# Signature Certificate

Reference number: TQEGH-GFGUF-OPEHP-QOWZP

| Signer | Timestamp | Signature |
| --- | --- | --- |

**Kieran Lavin**
Email: kieran@kieranlavin.com

| | | |
| --- | --- | --- |
| Sent: | 18 Jun 2024 20:11:39 UTC | |
| Viewed: | 22 Jun 2024 16:04:16 UTC | |
| Signed: | 22 Jun 2024 16:04:24 UTC | |

*Kieran Lavin*

**Recipient Verification:**
✔Email verified              22 Jun 2024 16:04:16 UTC

IP address: 24.238.85.70
Location: East Stroudsburg, United States

**Linda Larach Cohen**
Email: linda@colanyc.com

| | | |
| --- | --- | --- |
| Sent: | 18 Jun 2024 20:11:39 UTC | |
| Viewed: | 24 Jun 2024 19:05:57 UTC | |
| Signed: | 25 Jun 2024 00:16:11 UTC | |

**Recipient Verification:**
✔Email verified              25 Jun 2024 00:06:12 UTC

IP address: 173.52.224.72
Location: New York, United States

Document completed by all parties on:
25 Jun 2024 00:16:11 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.



### SCHOOL TRANSPORTATION ANNUAL SERVICE AGREEMENT

This annual agreement, hereinafter referred to as "AGREEMENT", is made and entered into by and between LINDA LARACH-COHEN & ROLANDO COHEN hereinafter referred to as "CLIENT", Parent(s)/Guardian(s) of ███████████ hereinafter referred to as "STUDENT" residing at ███████ ███████████, hereinafter referred to as "HOME" and Sisters Travel and Transportation Services, LLC, a New York State limited liability corporation, hereinafter referred to as "PROVIDER", located at 2585 Broadway #240, New York, NY 10025.

### 1.   TERM

This annual AGREEMENT shall be effective from July 2, 2024, through June 27, 2025, hereinafter referred to as "TERM", and cannot be terminated except as provided in Section 7.

The STUDENT attends a private school, the International Academy for the Brain ("iBRAIN"), located at 403 East 91st Street, New York, NY 10128 (iBRAIN-Manhattan), or at 213 48th Street, Brooklyn, NY 11220 (iBRAIN-Brooklyn) hereinafter referred to as "SCHOOL".

STUDENT attends SCHOOL year-round for approximately 223 days based on SCHOOL's, 12-month 2024-2025 School Year calendar, hereinafter referred to as "SCHOOL DAYS."

### 2.   PURPOSE OF THIS AGREEMENT

The purpose of this AGREEMENT is to establish responsibilities between PROVIDER and CLIENT, hereinafter referred to as "PARTIES", related to the provision of special school transportation services, hereinafter referred to as "SERVICES", for STUDENT during the TERM from HOME to SCHOOL and SCHOOL to HOME during SCHOOL DAYS.

### 3.   SCHEDULE OF SERVICE

The pick-up location each SCHOOL DAY morning will be HOME and the drop-off location will be SCHOOL, hereinafter referred to as "AM TRIP."

The pick-up location each SCHOOL DAY in the afternoon will be SCHOOL and the drop-off location will be HOME, hereinafter referred to as "PM TRIP."

The AM TRIP and PM TRIP will be no more than 60 minutes each way.

The timing of the AM TRIP and PM TRIP will be determined at least seven (7) days prior to the first day of SCHOOL DAYS.  There will be a 15-minute grace period for STUDENT to be ready for AM TRIP and PM TRIP, hereinafter referred to as "FLEXIBLE PICK-UP / DROP-OFF TIMES."

In addition, the CLIENT has the right to change the AM TRIP or PM TRIP times or locations, within New York City, with 72 hours notification to PROVIDER, hereinafter referred to as "CHANGE TO TRIP."  The CLIENT must receive written email confirmation from PROVIDER of the request of CHANGE TO TRIP to guarantee modification to the AM TRIP or PM TRIP.

*INCLEMENT WEATHER*
PROVIDER will follow the decisions of the SCHOOL, for all Inclement Weather school delays or cancellations.  Transportation will be provided for delayed opening and early dismissals according to SCHOOL's weather-related changes.  PROVIDER reserves the right to make a decision to adjust pickup times as necessary when it is determined to be in the best interest of STUDENT, this information will be communicated to each CLIENT via email and/or phone call.

### 4.   PROVIDER RESPONSIBILITES

1

F - 1

PROVIDER shall provide the vehicles, drivers and dispatching necessary to provide the SERVICES in accordance with the terms of this AGREEMENT.

The PROVIDER agrees to use safe and clean equipment and properly trained and licensed drivers employed by or under contract with the PROVIDER.

The vehicle providing SERVICES for CLIENT shall meet any and all standards required by federal and state law. The vehicle will also maintain the following conditions: Air conditioning, regular-size wheelchair accessibility (e.g., lift-bus/wheelchair ramp), and sitting space to accommodate a person to travel with STUDENT, as needed. If STUDENT requires additional equipment for transportation (i.e., oxygen tanks), the vehicle will accommodate these additional needs of STUDENT

## 5.  **INSURANCE**

PROVIDER shall obtain and keep in force during the TERM of this AGREEMENT the following insurance coverages:

Workmen's Compensation Insurance in compliance with the laws of the State of New York covering all employees who perform for PROVIDER under this AGREEMENT.

Comprehensive Auto Liability Insurance on all vehicles used in connection with this AGREEMENT whether owned, non-owned, or hired; and

Comprehensive General Liability Insurance with limits for bodily injury or death.

## 6.  **FEES and PAYMENT FOR SERVICES**

The PARTIES agree all SERVICES will be billed at an annual rate of $147,403.00, hereinafter referred to as "FEES". CLIENT shall pay FEES with three payment installments: Payment 1: $24,567.25 due on July 2, 2024, Payment 2: $49,134.25 due on September 1, 2024, and a final payment, Payment 3 $73,701.50 due on January 1, 2025.

CLIENT understands and accepts FEES will be based on SCHOOL DAYS, whether STUDENT used SERVICES or not, unless PROVIDER was at fault for STUDENT not utilizing SERVICES. All of the FEES described above are considered "PROVIDED SERVICES". CLIENT warrants STUDENT will be enrolled in SCHOOL for the TERM and obligation to pay FEES is unconditional and cannot be apportioned or mitigated, except as explained above. PROVIDER will not take any deductions, omissions, or refunds for unexcused absences, withdrawal, suspension or for any other reason except as outlined in Section 7.

PROVIDER understands and accepts CLIENT will be seeking third party payments for SERVICES from the local school district (e.g., New York City Department of Education) ("THIRD PARTY") through either a Stipulation Agreement or through an impartial hearing process. PROVIDER agrees to suspend payment obligations until an interim or final administrative or judicial decision is made obligating THIRD PARTY to pay all or part of FEES and those payment obligations will become immediately due as per the terms of this AGREEMENT, and shall be paid within thirty (30) days of the interim or final decision or execution of a Stipulation Agreement. In the event an administrative or court decision is not in the CLIENT's favor for payment, payment will be suspended until the CLIENT has exhausted all legal remedies available to them to secure third party funding, when all payments will immediately become due.

Late Payment Penalty. Upon the failure to pay in full any payment obligation due based on the terms of this AGREEMENT ("Amount Outstanding") within seven (7) business days of the due date for such payment, a late payment penalty of ten percent (10.0%) of the Amount Outstanding (the "Late Payment Amount") shall immediately be added to the Amount Outstanding. The imposition of the Late Payment Amount shall be in addition to any other rights and remedies of PROVIDER under this AGREEMENT. Any balances of any

2

Document ID: 76622b77-1c9d-44a6-be9f-3deebc6b3283

amount which remains unpaid, i.e., Amount Outstanding, including any Late Payment Amount, more than thirty (30) days after it is due shall accrue interest until paid at the rate equal to the lesser of two percent (2.0%) per calendar month or the maximum amount allowed under Applicable Law. However, in no event shall this interest provision be construed as a grant of permission for payment delays.

7.  **TERMINATION**

Termination for Cause.  If PROVIDER or CLIENT fails to perform in the manner called for in this AGREEMENT, or if PROVIDER or CLIENT fails to comply with any other provisions of the AGREEMENT and fails to correct such noncompliance within five (5) business days written notice thereof, CLIENT or PROVIDER may terminate this AGREEMENT for cause.

Termination shall be effected by serving a written notice of termination on PROVIDER or CLIENT setting forth the manner in which PROVIDER or CLIENT is in default.

The CLIENT may terminate the AGREEMENT if STUDENT relocates outside of local school district or due to health reasons STUDENT is no longer requiring special school transportation services.  Termination shall be effected by serving a written notice of termination on PROVIDER setting forth the conditions for termination.

In the event, CLIENT has exhausted all legal remedies available to them to secure third party funding, the CLIENT may terminate the AGREEMENT in writing, but will remain responsible for any balance due to PROVIDER on the date of such termination.

8.  **INDEPENDENT CONTRACTOR RELATIONSHIP**

The PARTIES acknowledge and agree the SERVICES performed by the PROVIDER, its employees, agents or sub-contractors shall be as an independent contractor and nothing in this AGREEMENT shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the PARTIES.

9.  **COMPLIANCE WITH LAWS**

PROVIDER, in the performance of this AGREEMENT, shall comply with all applicable federal, state and local laws and ordinances, including regulations for licensing, certification and operation of facilities, programs, accreditation, and licensing of individuals, and any other standards or criteria as described in this AGREEMENT to assure quality of services.

10.  **NONDISCRIMINATION POLICY**

PROVIDER is an equal opportunity employer.

Nondiscrimination in Employment.  In the performance of this AGREEMENT, PROVIDER will not discriminate against any employee or applicant for employment on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap; provided that the prohibition against discrimination in employment because of handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. PROVIDER shall ensure that applicants are employed, and that employees are treated during their employment, without regard to their race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following:  employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay, or other forms of compensation; and selection for training, including apprenticeships.

Nondiscrimination in Services.  PROVIDER will not discriminate against any recipient of any services or benefits provided for in this AGREEMENT on the grounds of race, creed, color, natural origin, sex, marital

3

F - 3

Document ID: 76622b77-1c9d-44a6-be9f-3deebc6b3283

status, age or the presence of any sensory, mental or physical handicap.

If any assignment and/or subcontracting by PROVIDER, said assignment or subcontract shall include appropriate safeguards against discrimination. PROVIDER shall take such action as may be required to ensure full compliance with the provisions in the immediately preceding paragraphs herein.

**11. ASSIGNMENT/SUBCONTRACTING**

PROVIDER may assign or subcontract its performance under this AGREEMENT or any portion of this AGREEMENT and it will be binding upon and inure to the benefit of the successors and assigns of PROVIDER.

In the event THIRD PARTY, or another entity ("Obligor"), is obligated by administrative or court order to make payment(s) to PROVIDER on behalf of CLIENT ("Assignor") under the terms of this AGREEMENT and fails to make such payment(s) within thirty-five (35) days upon becoming due ("Outstanding Financial Obligation"), at the written request of PROVIDER, CLIENT shall assign and transfer to PROVIDER ("Assignee") the title and ownership to such claim and cause of action that exists in CLIENT's favor against any such entity and thereby authorize PROVIDER to prosecute said action to resolve said claim at PROVIDER's discretion. Assignor understands that whatever amounts Assignee does not collect from Obligor (whether it be all or part of what is due) shall be paid by Assignor as per the terms of the AGREEMENT.

**12. CONSENT TO COLLATERAL ASSIGNMENT**

CLIENT hereby consents to the collateral assignment by the PROVIDER of all of its right, title and interest in, to and under this AGREEMENT to a collateral agent pursuant to any security agreement the PROVIDER may enter into. The PARTIES agree the collateral agent (or its designee or assignee) shall be entitled to enforce this AGREEMENT in its own name and to exercise any and all rights of the PROVIDER under this AGREEMENT in accordance with the terms hereof (either in its own name or in the name of the PROVIDER, as the collateral agent may elect), and the PARTIES agree to comply and cooperate in all respects with such exercise. Without limiting the generality of the foregoing, the collateral agent (or its designee or assignee), shall have the full right and power to enforce directly against the CLIENT all obligations of the CLIENT under this AGREEMENT and otherwise to exercise all remedies available to the PROVIDER hereunder, and to make all demands and give all notices and make all requests (either in its own name or in the name of the PROVIDER, as the collateral agent may elect) required or permitted to be made or given by the PROVIDER under this AGREEMENT, and the CLIENT acknowledges and agrees that any such action taken by the collateral agent shall be deemed effective for all purposes of this AGREEMENT to the same extent as if such action had been taken directly by the PROVIDER. If the CLIENT shall receive inconsistent directions under this AGREEMENT from the PROVIDER and the collateral agent, the directions of the collateral agent shall be deemed the superseding directions (so long as such directions are consistent with the provisions of this AGREEMENT) and the CLIENT shall accordingly comply with such directions of the collateral agent.

**13. MODIFICATIONS**

Either party may request modifications/amendments to this AGREEMENT, however, no change or addition to this AGREEMENT shall be valid or binding upon either party unless such change or addition be in writing and signed by both PARTIES. Such amendments shall be attached to and made a part of this AGREEMENT.

**14. NOTICE**

By executing the AGREEMENT, the PARTIES agree to the terms set forth above and all notices required for in the AGREEMENT shall be sent by certified mail, return receipt or overnight delivery with signature to the addresses designated for the PARTIES on the first page of this AGREEMENT.

4

F - 4

Document ID: 76622b77-1c9d-44a6-be9f-3deebc6b3283

### 15. **ATTORNEY'S FEES AND COSTS**

If any legal proceeding is brought for the enforcement of this AGREEMENT, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this AGREEMENT, the prevailing party shall be entitled to recover from the other party, in addition to any other relief to which such party may be entitled, reasonable attorney's fees and others costs incurred in such action or proceeding.

### 16. **JURISDICTION**

This AGREEMENT has been and shall be construed as having been made and delivered within New York State, and it is agreed by the PARTIES hereto this AGREEMENT shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. Any action of law, suit in equity, or judicial proceeding for the enforcement of this AGREEMENT or any provisions thereof, shall be instituted and maintained only in any of the courts of competent jurisdiction in New York County, New York State.

### 17. **SEVERABILITY**

It is understood and agreed by the parties hereto that if any part, term or provision of this AGREEMENT is held by the courts of the United States to be illegal, the validity of the remaining provisions shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the AGREEMENT did not contain the particular provision held to be invalid.

If it should appear that any provision hereof is in conflict with any statutory provision of New York State, said provision which may conflict therewith shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to such statutory provision.

### 18. **ENTIRE CONTRACT**

The PARTIES agree this AGREEMENT is the complete expression of the terms hereto and any oral representations or understandings not incorporated herein are excluded. Further, any modification of this AGREEMENT shall be in writing and signed by both PARTIES. Failure to comply with any of the provisions stated herein shall constitute material breach of contract and cause for termination. It is also agreed by the PARTIES the forgiveness of the nonperformance of any provision of this AGREEMENT does not constitute a waiver of the provisions of this AGREEMENT.

### 19. **EXECUTION OF AGREEMENT**

The AGREEMENT may be executed in counterpart with facsimile copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

F - 5

Document ID: 76622b77-1c9d-44a6-be9f-3deebc6b3283

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed.

*CLIENT:*

_____
DATE

███████████
STUDENT NAME

LINDA LARACH-COHEN & ROLANDO COHEN
CLIENT NAME

_____
CLIENT SIGNATURE

*PROVIDER:*

*Peter Lam*
_____
Account Manager/Authorized Signature

Peter Lam
Account Manager/Authorized Signatory Name
Sisters Travel and Transportation Services, LLC
2585 Broadway #240, New York, NY 10025

6

F - 6



## Completed Document Audit Report
Completed with SignWell.com

**Title:** ███████████ **24-25 AGREEMENT**

Document ID: 76622b77-1c9d-44a6-be9f-3deebc6b3283

Time Zone: (GMT+00:00) Coordinated Universal Time

---

## Files

███████ 24-25 AGREEMENT.docx                          Jun 17, 2024 16:55:57 UTC

## Activity

| | | |
|---|---|---|
| **Sisters Travel and Transportation Services**<br>IP: 158.222.168.132 | created the document | Jun 17, 2024 16:56:19 UTC |
| **Sisters Travel and Transportation Services**<br>IP: 158.222.168.132 | sent the document to sisterstravelllc@gmail.com and linda@colanyc.com | Jun 17, 2024 17:07:15 UTC |
| **Linda Larach-Cohen**<br>IP: 173.52.224.72 | first viewed document | Jun 25, 2024 00:19:22 UTC |
| **Linda Larach-Cohen**<br>IP: 173.52.224.72 | signed the document | Jun 25, 2024 00:27:40 UTC |
| **Sisters Travel and Transportation Services**<br>IP: 184.153.75.82 | first viewed document | Jun 25, 2024 14:26:08 UTC |
| **Sisters Travel and Transportation Services**<br>IP: 184.153.75.82 | signed the document | Jun 25, 2024 14:26:27 UTC |

F - 7