# EXHIBIT 5

**LIBERTY & FREEDOM**
**L E G A L   G R O U P**
Empowering YOUR Voice through Civil Rights Advocacy

July 2, 2024

**Sent Via Electronic Mail: (IHOQUEST@SCHOOLS.NYC.GOV)**
Impartial Hearing Office
New York City Department of Education
131 Livingston Street, Room 201
Brooklyn, NY 11201

### DUE PROCESS COMPLAINT - SCHOOL YEAR 2024-2025

| | |
|---|---|
| Student: | |
| NYC ID#: | |
| DOB: | |
| Parent(s)/Guardian(s): | Patrick Donohue |
| Home Address: | |
| School: | International Academy for the Brain ("iBRAIN") |

To Whom It May Concern:

The Liberty and Freedom Legal Group, Ltd. ("Counsel"), represents the above-named student ("Student" or "           " and her parent(s)/guardian(s) Patrick Donohue ("Parent") (collectively "Clients"), in matters pertaining to the classification, program, placement, and implementation of special education and related services for the Student for the 2024-2025 extended school year ("24/25 ESY").

The New York City Department of Education ("DOE") has procedurally and substantively denied the Student a Free Appropriate Public Education ("FAPE") as mandated by federal law, for the 2024-2025 extended school year. Accordingly, we write to request an impartial hearing pursuant to Section 1415 of the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq. ("IDEA"), Article 89 of the New York State Education Law, and Part 200.5 of the Regulations of the New York State Commissioner of Education.

Please note, as per Section 300.510(a)(1) of the Part B regulations of 34 CFR §300.510, consistent with section 615(f)(1)(B)(i) of the IDEA, within 15 days of receiving notice of the parent's due process complaint, and prior to the initiation of an impartial due process hearing under 34 CFR §300.511, the NYC DOE must convene a meeting with the parent and the relevant members of the IEP Team who have specific knowledge of the facts identified in the due process complaint. Our Clients request an immediate resolution meeting and also request the Impartial Hearing Office to expedite this complaint by scheduling a Pre-Hearing Conference immediately in order to address the ongoing violations of state and federal law as outlined below. Our Clients also request that the Impartial Hearing be open to the public per 34 C.F.R. §300.512(c).

### PENDENCY

Our Clients request an interim order of pendency pursuant to federal and state special education law. Specifically, the federal IDEA and New York Education Law both contain "stay-put" provisions which give the child the right to remain in his or her current educational placement at public expense during the pendency of any administrative or judicial proceedings. 20 U.S.C.

Address:

300 East 95th Street
Suite 130
New York, NY 10128

Phone:

646-850-5035

§1415(j); N.Y. Educ. Law 4404(4). Thus, the law allows the student to remain in his or her "last-agreed-upon placement" until the impartial hearing process (including all appeals) is complete, unless the Parent and the DOE otherwise agree in writing.

As per 20 U.S.C. §1415(j), the Student's pendency entitlements are automatic and are required to be implemented by the DOE as a matter of law without the necessity of any application, motion, or other showing by Student's counsel, until there is a final order.

The DOE was put on notice through the Ten-Day Notice filed by the Parent (see Exhibit A) that the Parent is seeking to assert their "stay-put" rights. While not required, attached is a Pendency Form based on the DOE's previous forms outlining the basis for pendency and the pendency program (see Exhibit B). The legal basis for pendency for this Student is attached as Exhibit C. The DOE has not responded to the Parent's Ten-Day Notice regarding Pendency; nor have they made any indication they will begin implementing the Student's Pendency Placement.

Due to the DOE's history of failing to automatically implement Student's pendency in previous school years, we respectfully request an immediate pendency hearing so an Interim Order on Pendency can be issued by the Impartial Hearing Officer ("IHO"). Without the implementation and honoring of the statutory entitlement of pendency, the Student will suffer from the lack of funding for the services and program at iBRAIN. We are providing a Draft Interim Order on Pendency (See Exhibit D), which includes:

- Funding for the cost of tuition, and supplemental services, where applicable, to be paid directly to the International Academy for the Brain ("iBRAIN") pursuant to the enrollment agreement between the Parent-Petitioner(s) and iBRAIN (see Exhibit E) as outlined in Petitioner's Due Process Complaint; and
- Funding for transportation services, as well as all services necessary to said transportation, to be paid directly to the transportation provider, in installments, pursuant to the transportation contract between the Parent-Petitioner and the transportation company (see Exhibit F) as outlined in Petitioner's Due Process Complaint;
- Funding for nursing services to be paid directly to the nursing service provider, in installments pursuant to the nursing contract between the Parent-Petitioner and nursing services provider (see Exhibit G) as outlined in Petitioner's Due Process Complaint.

## DISPUTED ISSUES

This Due Process Complaint includes three sections: (I) a description of ███████ educational needs and abilities; (II) an enumeration of the ways by which DOE failed to meet its obligation to provide ██████ with a FAPE; and, (III) a proposal for how this failure may be remedied.

## I.    STUDENT'S EDUCATIONAL NEEDS AND ABILITIES

███████ suffers from a brain injury resulting in severe impairments in the following areas: cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual and motor abilities, psychosocial behavior, physical functions, information processing and speech. ██████ suffered from trauma and abuse at the hands of her baby nurse and was diagnosed with traumatic brain injury by her neurologist. ███████ is diagnosed with, *inter alia*, spastic quadriplegic cerebral palsy (GMFM level 5) with Lennox – Gastaut Syndrome, Cortical Visual Impairment (CVI), neuromuscular scoliosis, and a seizure disorder. ██████ also has a g-tube for feeding. These impairments have adversely affected ██████ educational skills and performance.

2

Due to the severe nature of her brain injury, ██████ is non-verbal and non-ambulatory. ██████ has highly intensive management needs, requiring a high degree of individualized attention and intervention throughout the school day.

Accordingly, ██████ requires a small, highly-structured classroom offering an educational program delivered via a 1:1 direct instruction model, with a full-time 1:1 paraprofessional during the school day and while in transit to and from school to assist with all activities of daily living, academic instruction, and related services, and with a full-time 1:1 nurse to support her medical needs and monitor seizure activity. ██████ requires a modified environment reducing visual and sound distractions. She requires a two-person transfer to and from her wheelchair or other repositioning. Furthermore, ██████ requires an air-conditioned environment to prevent additional seizures, including academic and therapy periods, and transportation to and from school. In addition, periodic breaks, additional processing time for tasks, and purposeful repetition of tasks during therapy sessions and educational instruction are required to accommodate ██████ highly significant needs in order for ██████ to receive educational benefits and make meaningful progress.

██████ also requires an intensive regimen of related services, including occupational therapy (OT), physical therapy (PT), speech and language therapy (SL), Vision Education Services (VES), assistive technology (AT), and music therapy (MT) in order to benefit from special education instruction. Because of the intensive level of services that ██████ requires, it is necessary for ██████ to attend a program which operates on an extended school day within an extended school year to prevent regression. Furthermore, ██████ requires an extended school day to prepare her for the school day upon arrival, and to prepare her for dismissal at the end of the day.

EDUCATIONAL PROGRAM HISTORY

██████ began attending iBRAIN during the 2018-2019 school year. ██████ Parent has re-enrolled her at iBRAIN for the 24-25 ESY. At iBRAIN, ██████ continues to receive an appropriate educational program that addresses her health and educational needs. Since ██████ enrollment at iBRAIN, she has received all of her related services and academic instruction, as well as additional support and special transportation, at iBRAIN. ██████ currently attends a 6:1:1 class and receives the following services:  OT: 5 times per week for 60 minutes; PT: 5 times per week for 45 minutes; SL: 5 times per week for 60 minutes; VES: 3 times per week for 60 minutes; MT: 3 times per week for 60 minutes; and AT: once per week for 60 minutes.

At iBRAIN, ██████ also utilizes an AT device and receives assistance from a 1:1 paraprofessional for all activities of daily living, classroom activities, and related services. ██████ also receives assistance from a 1:1 nurse to manage her seizures.  Furthermore, she receives transportation services, which include: a 1:1 travel nurse, a lift bus/wheelchair ramp, a regular sized-wheelchair, air conditioning, trip with no restrictions on face/mouth, and limited travel time of 60 minutes.

On January 19, 2024, the DOE convened a Committee on Special Education ("CSE") to develop ██████ Individualized Education Program ("IEP") ("January 2024 IEP"). The CSE recommended a 12:1+(3:1) class in a District 75 public school. The CSE also recommended the following services:  OT: 5 times per week for 60 minutes; PT: 5 times per week for 60 minutes; SL: 5 times per week for 60 minutes; VES: 3 times per week for 60 minutes; and AT: once per week for 60 minutes.

Because of her age, the CSE recommended transition goals for ████ The CSE also recommended a 1:1 paraprofessional, 1:1 nurse, as well as the use of an AT device. However, the CSE did not recommend Music Therapy for ████ Furthermore, for transportation services / accommodations, the CSE recommended: curb transportation, a 1:1 travel nurse, lift bus, climate control, a regular-sized wheelchair, limited travel time of an unspecified duration.

At the IEP meeting, ████ teachers and providers expressed, and Parent agreed, that a District 75 public school program would fail to address her highly intensive management needs. They also collectively advised the CSE that the lack of music therapy, which is an essential part of ████ program and progress, would hinder that progress. In addition, the proposed class size and the school building itself would be too large and would be an overly stimulating visual and auditory environment, in addition to creating health and safety concerns for ████

Parent also expressed a number of significant concerns regarding the placement of ████ especially with the recommended 12:1+(1:3) class size, which in practice would total 25-30 adults if each student has a 1:1 paraprofessional and 1:1 nurse, which in turn would be dangerous to ████ due to the distractions, lack of support and inability to effectively monitor her medical needs. Parent also raised concerns about the instructional time in the recommended program, which would be insufficient in relation to teacher availability and would extremely limit individualized learning needed by ████ to receive educational benefits and make meaningful progress.

By letter dated February 22, 2024, the DOE sent Parent a Prior Written Notice ("PWN") package and a School Location Letter ("SLL"), recommending placement in a M138 at M288 - 02M2088: Food and Science High School for the 24-25 ESY. ████ parent toured that placement to determine if it could meet ████ educational needs, and the school staff and the Parent agreed the IEP could not be implemented at that school. Thus, Parent had no choice but to seek an alternative placement that would be appropriate for ████ and ensure her progress.

As a result of the issues noted above, Parent decided to re-enroll ████ at iBRAIN and informed the DOE of this decision via a Ten-Day Notice ("TDN") on June 10, 2024.

## DOE FAILED TO OFFER OR PROVIDE A FAPE TO STUDENT

The DOE failed to offer or provide ████ with a FAPE because DOE failed to provide an IEP and placement uniquely tailored to meet ████ needs for the 24-25 ESY. Additionally, our Clients challenge herein any and all IEPs offered to ████ for the 24-25 ESY. This Due Process Complaint is based on, but not limited to, the following factors, which have procedurally and substantively denied Student a FAPE:

**A. DOE FAILED TO RECOMMEND AN APPROPRIATE CLASS SIZE IN THE LEAST RESTRICTIVE ENVIRONMENT**

    a. The recommended 12:1+(3:1) classroom is grossly inappropriate for ████ Jane.

    b. The recommended 12:1+(3:1) class is too large and too crowded to provide ████ with the quiet, distraction-free environment she needs to receive educational benefits and to make progress.

    c. ████ requires a small 6:1:1 class with intensive 1:1 attention from a special education teacher to make progress.

    d. Parent disagreed with the 12:1+(3:1) recommendation at the January 2024 IEP meeting and stressed, *inter alia*, that the recommended class size does not offer ████ the appropriate amount of individualized instruction.

e. ██████ teacher and related service providers expressed very clearly at the January 2024 IEP meeting their recommendation that ██████ requires a small, 6:1:1 class ratio with minimal noise, light, and movement so that ██ will be able to attend without distractions.

f. ██████ presents with highly intensive management needs, which, pursuant to § 200.6(h)(4)(ii)(a) of the Commissioner's Regulations, mandates placement in a class with <u>no more than six students</u>.

## B. DOE FAILED TO RECOMMEND AN APPROPRIATE SCHOOL LOCATION

a. DOE's recommendation of a District 75 public school is not appropriate for ██████ 12:1+(3:1) classes in District 75 schools have students with different educational and behavioral needs than ██████ who suffers from an acquired brain injury.

b. DOE failed to recommend a school location where ██████ would be placed with peers who have similar needs, as is her entitlement under the law.

c. DOE's recommendation of a District 75 school would subject ██████ to danger, as she is visually impaired, lacks safety awareness, and is unable to protect herself.

d. Depriving ██████ of access to peers who are working on similar academic and related service goals and who can act as appropriate peer models constitutes denial of FAPE for ██████

e. The DOE purposefully changed ██████ Management Needs from the previous IEP by removing, "Climate control throughout all environments that Sara Jane will be in the school building" without any explanation, reasoning or PWN. The DOE was on notice the previous school location ██████ was recommended did not have Climate Controls throughout the building, therefore, making the school impossible to appropriately implement the IEP.

f. DOE failed to recommend an extended school day.

g. It is mathematically impossible for DOE to provide ██████ with all of her mandated related services in a typical school week in a District 75 school, as there are simply not enough hours in the school week to provide ██████ with all of her mandated instructional time and related services.

h. DOE failed to adequately address Parent's request to consider an NYSED-approved Non-Public School (NPS), which is in clear contradiction with the DOE's Standard Operating Procedures Manual ("SOPM").[1]

i. DOE's proposed school location, M138 at M288 - 02M288: Food and Finance High School was not appropriate for ██████ for multiple reasons.

  i. The proposed DOE specialized public-school program does not offer an extended school day necessary to implement IEP-mandated related services as indicated on the January 2024 IEP.

  ii. DOE failed to recommend an extended school day. The full complement of related services cannot be implemented during the limits of a regular school day.

  iii. The school was not fully climate controlled and lacked air-conditioning outside of the classrooms, thereby making it unsafe for ██████

  iv. None of the students within the proposed school received SLL services for more than 30 minutes, therefore, the school would not be able to implement the 60-minute Group SLL weekly mandate.

---

[1] See pages 71-72 of the SOPM for considering a non-public school placement https://infohub.nyced.org/in-our-schools/working-with-the-doe/special-education-providers/standard-operating-procedures-manual, as well as its other procedures it violating in developing this IEP.

C. **DOE FAILED TO RECOMMEND APPROPRIATE RELATED SERVICES AND SUPPORTS**

    a. The IEP team, and the documents presented by iBRAIN, and incorporated into the January 2024 IEP, indicated that ▮▮▮▮ benefits greatly from music therapy as a related service. DOE's failure to recommend music therapy, based not on ▮▮▮▮ needs but on DOE's inability to provide the service, denied ▮▮▮ a FAPE.

    b. DOE failed to specifically identify and recommend whether a related service is to be facilitated via push-in or pull-out on the January 2024 IEP.

    c. Even though DOE knows Music Therapy is recognized as a Related Service by the U.S. Department of Education[2], and the New York State Education Department[3], it was pre-determined not to be included in ▮▮▮▮ IEP. The CSE also failed to include a Music Therapist from the School District to consider Music Therapy during the IEP Meeting.

D. **DOE FAILED TO CONDUCT NECESSARY EVALUATIONS**

    a. DOE failed to provide sufficient evaluative data to support its recommendations for ▮▮▮▮

    b. DOE's evaluations failed to thoroughly assess ▮▮▮▮ in all areas of her suspected disability.

    c. DOE failed to conduct or update the Student's social history.

    d. DOE failed to conduct a current classroom observation.

    e. DOE failed to follow its own procedures identified in the SOPM when considering an NYSED-non-public school placement ("NPS"), which shows that DOE ignored Parent's request for considering an NPS by failing to consider the following before the January 2024 IEP meeting:

        i. DOE failed to provide a psychological assessment completed within three years or, if the school psychologist determines that this is unnecessary, a written report by the psychologists indicating the reasons the assessment was not needed before the January 2024 IEP meeting;

        ii. DOE failed to assess ▮▮▮▮ specific educational needs for the last six months prior to the January 2024 IEP meeting; and

        iii. DOE failed to recommend an NPS program that would be appropriate for ▮▮▮▮ given that there is no DOE program appropriate for her.

    f. DOE failed to conduct a neuropsychological evaluation of ▮▮▮▮ The evaluations conducted by the DOE were insufficient to accurately assess

    g. ▮▮▮▮ requires an independent neuropsychological evaluation to determine her true diagnoses and which would accurately reflect her needs and abilities. ▮▮▮▮ also requires an assistive technology evaluation.

    h. Parent hereby restates his disagreement with the DOE's evaluations and request an Independent Educational Evaluation ("IEE") to take the form of funding for an independent psychological assessment, educational needs

---

[2] The United States Department of Education has previously determined that Music Therapy may be considered a related service, see Pages 25-26 of its June 2010 "QUESTIONS AND ANSWERS ON INDIVIDUALIZED EDUCATION PROGRAMS (IEPS), EVALUATIONS, AND REEVALUATIONS" https://www2.ed.gov/policy/speced/guid/idea/iep-qa-2010.pdf

[3] The New York State Department of Education has also recognized Music Therapy as a related service, see https://www.musictherapy.org/nysed_clarifies_music_therapy_as_a_related_service/.

assessment, and a neuropsychological evaluation to be conducted by a qualified provider of Parent's choosing at a reasonable market rate.

**E.  DOE FAILED TO RECOMMEND APPROPRIATE SPECIAL EDUCATION TRANSPORTATION SERVICES AND ACCOMMODATIONS**

    a.  In the January 2024 IEP, DOE recommended the following transportation accommodations/services: curb transportation, lift bus, and regular-sized wheelchair, and climate control. These alone would not appropriately address ▮▮▮▮▮ transportation needs.

    b.  DOE failed to recommend the following accommodations/services, including but not limited to, limited travel time of 60 minutes.

**F.  DOE FAILED TO TIMELY RECOMMEND A SCHOOL LOCATION**

    a.  The DOE convened a CSE on January 19, 2024 to develop ▮▮▮▮▮ IEP. Parent received a Prior Written Notice ("PWN") and a School Location Letter ("SLL") on February 22, 2024.  The parent visited the DOE proposed placement on June 12, 2024.  At that visit, the Parent and the School Staff agreed the proposed school location could not implement the January 2024 IEP and the DOE never sent a new SLL.

### iBRAIN is Appropriate for ▮▮▮▮▮

At iBRAIN, ▮▮▮▮▮ continues to receive special education programming, supported by appropriate related services that address her highly intensive management needs, that provide educational benefits to ▮▮▮▮▮ and allow her to make meaningful progress. She attends a small 6:1:1 class with peers who function on a similar level and who are working on similar communication and therapeutic goals.

### Equitable Considerations Favor a Full Award of Direct Payment for Tuition and Related Services and Transportation

Parent has always made ▮▮▮▮▮ available for evaluations and/or observations by the DOE. Furthermore, Parent participated in the January 2024 IEP meeting, but had to disagree with the CSE's recommendation at the meeting as the recommendations were inappropriate for ▮▮▮▮▮ Parent expressed that he was willing to investigate DOE's proposed public-school location and has now done so.  Accordingly, any analysis of equitable considerations supports a full award of tuition and related services, including special transportation, for ▮▮▮▮▮ at iBRAIN.

**III.  PROPOSED RESOLUTION FOR DOE'S FAILURE TO OFFER OR PROVIDE A FAPE**

In light of the above, DOE has failed to offer ▮▮▮▮▮ a FAPE for the 24-25 ESY. Furthermore, ▮▮▮▮▮ placement at iBRAIN for the 24-25 ESY is appropriate to address ▮▮▮▮▮ academic, physical, social, and emotional needs, and is reasonably calculated to confer educational benefits upon ▮▮▮▮▮ Additionally, there are no equitable considerations which would bar direct/prospective payment for all costs associated with ▮▮▮▮▮ placement at iBRAIN, as, at all relevant times, our Client's have cooperated in the DOE/CSE review, development, and placement process.

Our Clients hereby reserve the right to raise any other procedural or substantive issues that may come to their attention during the pendency of the litigation of this matter, including, but not limited to: (1) challenging the qualifications of any of the DOE's proposed supervisors, teachers, paraprofessionals, and/or any other service provider who might have been assigned to work with

Student; (2) challenging the appropriateness of DOE's recommended placement by claiming that it cannot or will not maintain an appropriate student-to-staff ratio for the entirety of the school day and that the Student's IEP can be implemented as drafted without an extended school day; (3) challenging the appropriateness of DOE's recommended placement by claiming that it will not or cannot provide ███████ with all of the related services she needs to make meaningful progress; and (4) challenging the appropriateness of the recommended school location by claiming that it does not have the appropriate facilities to effectively implement the DOE's proposed recommendations (e.g., AC, elevator access, therapy rooms).

In an effort to avoid prolonged litigation of this matter, Parent proposes the terms of settlement discussed below:

a. An Order declaring that DOE denied Student a FAPE during the 2024-2025 school year;

b. A determination that iBRAIN is an appropriate placement for Student;

c. An Order declaring that DOE denied Student a FAPE during the 2024-2025 extended school year;

d. A determination that iBRAIN is an appropriate placement for Student during 2024-2025 extended school year;

e. An order declaring that equitable considerations favor full funding by the DOE for ███████ placement at iBRAIN for 2024-2025 extended school year;

f. An order directing payment by DOE directly to iBRAIN for the cost of Full Tuition for 2024-2025 extended school year in accordance with the enrollment agreement between the Parent and iBRAIN;

g. An order directing payment by DOE directly to the special transportation company for special education transportation services in accordance with the terms of the transportation agreement between the Parent and the transportation company during the 2024-2025 extended school year;

h. Direct payment/prospective funding of 1:1 nursing services, including a travel nurse pursuant to the Nursing Services Agreement between Parent and the nursing provider during the 2024-2025 extended school year;

i. Request a Reconvened IEP meeting for ███████ to address her developmental needs upon completion of an IEE;

j. An Order directing DOE to fund an independent neuropsychological evaluation.

Should this matter proceed to litigation and Parent is a prevailing party on any substantial issue, then we will additionally seek an award of attorneys' fees and the recovery of all related fees and disbursements as permitted by relevant statute.

Very truly yours,

/s:/
Peter Albert, Esq.
Liberty and Freedom Legal Group, Ltd.
Attorneys for Parents
Email: hearings@pabilaw.org

cc:    Patrick Donohue, Parent

**LIBERTY & FREEDOM**
**L E G A L   G R O U P**
Empowering YOUR Voice through Civil Rights Advocacy

June 17, 2024

**Sent Via Electronic Mail: (10daynoticecse9@schools.nyc.gov)**
New York City Department of Education
Committee on Special Education 9
333 7th Avenue, 4th floor
New York, NY 10001

**TEN-DAY NOTICE**

Student:                    ███████████████
NYC ID#:                  ███████████
DOB:
Parent(s)/Guardian(s):    Patrick Donohue
Home Address:             ████████████████████████████
School:                   International Academy for the Brain ("iBRAIN")

To Whom It May Concern:

The Liberty and Freedom Legal Group, Ltd. ("Counsel"), represents the above-named student
("Student" or "█████████" and their parent(s)/guardian(s) ("Parents") (collectively "Clients"), in
matters pertaining to the classification, program, placement, and implementation of special
education and related services for the Student.

Pursuant to 20 U.S.C. §1412 (a)(10)(C)(iii) and 34 C.F.R. §300.148 (d)(1)), and on behalf of our
Clients, we are providing the New York City Department of Education, the Student's local
educational agency ("DOE"), ten (10) business days' notice of the Parents' rejection of the most
recent proposed DOE Individualized Education Program ("IEP"), recommended program and
school placement, for the 2024-2025 extended school year ("ESY") because of the DOE's failure
to offer or provide the Student with a Free Appropriate Public Education ("FAPE") and maintain
the Student at their last agreed upon educational placement, the International Academy for the
Brain, d/b/a iBRAIN, Ltd. ("iBRAIN"), while seeking public funding for the Student's
placement. iBRAIN is located at 403 East 91st Street, New York, NY 10128, and is a specialized
educational program designed to educate students, like the Student, who suffer from a brain
injury or brain-based disorder.

Parents are requesting the DOE to maintain this status quo during the pending impartial hearing
process and any appeals, through the "stay-put" provision pursuant to 20 U.S.C. §1415 (j) and
have included the DOE Pendency Form already pre-populated with this Ten-Day Notice,
as Exhibit A. In order to maintain the Student in their pendency program, please be prepared to
fully implement this pendency placement at the start of the extended school year.

This notice is sent in addition to the Parents having expressed their concerns, disagreements, and
rejection of the Committee on Special Education's ("CSE") recommendations at the most recent

**Address:**

300 East 95th Street
Suite 130
New York, NY 10128

**Phone:**

646-850-5035

A - 1

Individualized Education Program ("IEP") meeting.  The Parent continues to request Independent Education Evaluations (IEEs) of the Student; to be conducted at public expense, in order to appropriately assess the Student in all areas related to their suspected disabilities, including, but not limited to neuropsychological, physical therapy, occupational therapy, speech-language therapy, special education and assistive technology assessments due to the lack of proper assessments conducted by the DOE prior to the development of the most recent IEP meeting.

The Student is a child who suffers from a brain-based injury and the Student's educational needs are multifaceted and complex, and the DOE's recommended program and placement will not appropriately address their educational needs for the 2024-2025 extended school year.

Based on the Parents' review of the proposed recommended program and placement for the Student, the proposed IEP to be implemented during the 2024-2025 extended school year is not designed to enable the Student to receive appropriate educational benefits or receive appropriate related services.  The proposed District 75 public school placement recommendations cannot be implemented, as proposed in the IEP, during the regular school day. Parents are also concerned about the appropriateness of the recommended placement for reasons including, but not limited to, class size ratio, class functional and academic grouping, staffing, accessibility, availability of adequate resources, and the lack of individualized attention and support. Further, the Parents are concerned the physical structure and facility of the proposed school location is not appropriate to address the Student's individual needs.

Our Clients remain willing and ready to entertain an appropriate public or approved non-public school placement that can provide the required intensive academic and related services program the Student requires. Accordingly, the Parents request the CSE reconvene for this purpose once the IEEs have been completed in order to develop an appropriate IEP. At this time, however, the Parents have no choice other than to re-enroll the Student in iBRAIN, which is an appropriate placement for the Student and is the last agreed- upon placement between the Parents and the DOE.

Very truly yours,

/s:/
Peter Albert
Liberty and Freedom Legal Group, Ltd.
Attorneys for Parents


cc:      Patrick Donohue

## Pendency Implementation Form

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

| Student Name | OSIS Number | DPC Number |
|---|---|---|
| ███████ | ███████ | |

1. The basis for pendency is:    Unappealed FOFD IHO Case No. 251257, 11/17/2023

2. The pendency program consists of the following:

| Tuition | | |
|---|---|---|
| **School Name** | **10- or 12-Month Program** | **Other Notes** |
| International Academy for the Brain (iBRAIN) | 12-month program | Direct payment of Full Tuition to iBRAIN as per the terms of the enrollment contract between iBRAIN and parent |

| Services | | | | |
|---|---|---|---|---|
| **Service or Item** | **Ratio and Frequency** | **10- or 12-Month Program** | **DOE or Private Provider** | **Private Provider Name and Rate** |
| Special Transportation services | Daily; Round-trip for all school days | 12-month | Private | Direct payment to Sisters Travel and Transportation Services, LLC as per the terms of the transportation agreement with the parent |
| Individual Nursing Services | Daily; for all school days | 12-month | Private | Direct payment to Park Avenue Home Care as per the terms of the nursing agreement with the parent |

Form submitted by: Peter Albert, July 2, 2024, Parents' Counsel

---

For DOE use only:

The above program should be implemented as pendency

Pendency starts on: July 2, 2024
The date the DPC was filed: July 2, 2024

_____          _____
DOE Reviewer                             Date

B - 1

## FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case Number: | 251257 |
| Student's Name: | ██████████ ("Student") |
| Impartial Hearing Officer: | Michael Das |
| Date of Filing: | 7/6/2023 |
| Hearing Requested by: | Patrick Donohue ("Parent") |
| Date of Hearing: | 10/5/2023, 10/10/2023, 10/12/2023 |
| Record Close Date: | 11/17/2023 |
| Date of Decision: | 11/17/2023 |

## BACKGROUND

The Parent, through Parent Attorney, filed a Due Process Complaint ("DPC") on or about July 6, 2023. (P-A)[1]. In the DPC, Parent alleges that the Department of Education ("DOE" or "District") failed to offer Student with a free appropriate public education ("FAPE") for the 2023-2024 school year. *Id*. By way of relief, Parent seeks an award of direct tuition funding for Student's attendance during the 2023-2024 school year at Private School, a private program not approved by the Commissioner of Education for the education of students with disabilities, along with direct funding for transportation and nursing services. *Id*. Furthermore, Parent alleges that the equities support their claim for tuition reimbursement for the 2023-2024 school year. *Id*.

In light of the foregoing and as more fully discussed below, I find that: (i) the DOE failed to meet its burden that it offered Student a FAPE for the 2023-2024 school year, (ii) Private School offers Student with specially designed instruction sufficient to meet Student's needs, and (iii) the equities support Parent's requested relief and student is entitled to both transportation and nursing costs.

## PROCEDURAL HISTORY

I was appointed as the Impartial Hearing Officer on July 13, 2023.[2] On August 15, 2023, the parties appeared for a virtual Pre-Hearing Conference. On that date, parties discussed the pendency form as there was a disagreement on what pendency was based on.[3] Parent's counsel submitted a proposed pendency form via email prior to the Pre-Hearing Conference. The parties were told to discuss pendency off the record and determine whether they could come to an agreement. On September 6th, 2023, one of the attorneys representing parent sent an email indicating DOE would not agree to pendency so a pendency hearing was necessary.[4] Parties were advised to submit their pendency motions and exhibits by email. A status conference was held on September 15, 2023. Parent wished for a hearing at that time but that request was denied. The assigned IHO initially set a short hearing date as Parent did not consent to an extension of the compliance date. The DOE objected to the short time period.[5] After the hearing, the assigned IHO sent an email allowing the DOE to make a formal request for an extension of the

---

[1] Exhibits will be cited throughout as Parent ("P"), District ("DOE"), or IHO ("I") – Exhibit Letter (for Parent), Exhibit Number (for District), Exhibit Numeral (for IHO) – page number of exhibit. So, P-A-3 is Parent's Exhibit A, page 3.
[2] All references to the Transcript will be made with the date of the conference discussed and the Transcript page number and line. Thus, 8/15/23, Tr. 10, 9-12 is referencing August 15, 2023, on Transcript page 10, lines 9 through 12.
[3] 8/15/23, Transcript.
[4] IHO-I.
[5] 9/15/23 Transcript.

compliance date via email. The DOE requested an extension of compliance, and it was granted over the parent's counsel objections via email.[6]

On October 5, 2023, both parties appeared for a virtual Due Process Hearing. DOE sought to introduce 17 exhibits into the record.[7] Parent objected to exhibits 10, 14, and 15 where exhibit 15 was not allowed into the record.[8] Parent then moved to enter exhibits A-L into the record where certain paragraphs of exhibit L was allowed into the record over DOE's objection and Exhibits B and I were allowed in for the purposes of understanding pendency only.[9] Both parties opened on the record and submitted written closings. The parties returned for a second hearing date on October 10, 2023 to complete witness testimony.[10] Parent also attempted to introduce additional evidence into the record, outside the five day disclosure but that request was denied.[11]

On that date, Parent withdrew their own testimonial affidavit and refused to answer questions DOE had about other exhibits in evidence.[12] DOE requested to have other exhibits withdrawn from evidence as they intended to question Parent about them but that request was denied.[13] Parent continued to refuse to answer any questions as he was only appearing as an attorney and not the parent.[14] The hearing was adjourned to allow the DOE to draft and serve a subpoena on Parent, who was already at the hearing, to answer questions at the hearing he was already attending.

The parties returned for a final date of hearings on October 12, 2023. The DOE submitted a subpoena by email prior to this final hearing date but Parent refused to acknowledge it and refused to testify.[15][16] Parent requested to enter additional exhibits as evidence in the middle of the hearing which was denied. DOE requested an extension in order to submit written closings

---

[6] IHO II.
[7] 10/5/2023, Transcript, 76-78.
[8] Id. at 78-87.
[9] Id. at 87-103.
[10] 10/10/2023, Transcript.
[11] Id. at 223-228.
[12] Id. at 312-317.
[13] Id. at 317-319.
[14] Id. at 320.
[15] Id. at 337-350.
[16] Parent's position was that he was acting as an attorney and not as a parent. Moreover, he disputed the appropriateness and service of DOE's subpoena. However, Parent submitted multiple notices of appearance on this case that listed several other attorneys (including himself) as co-counsel and had at least one other attorney appear with him at two of the three hearing dates, and had another attorney draft the closing arguments. Parent was warned by the assigned IHO that his refusal to answer questions as parent may lead to an adverse inference which Parent voraciously objected to. Parent's own behavior extended a process that he himself decried as being too long and he consistently spoke over/interrupted both the IHO and the DOE attorney in an inappropriate manner. However, no adverse inference was drawn as there was enough evidence in the record to provide clarity in this case and it is understandable that a parent, despite being an attorney, may become unprofessional due to the interest in protecting their child's rights.

and that request was granted over Parent's objections. Parties submitted written closings on October 30th.

**FINDINGS OF FACT AND DECISION**

After a full review of the record generated at hearing, I make the following findings of fact and determinations. Student has a brain injury that results in "severe impairments in the following areas: cognition, language, memory, attention, reasoning, abstract thinking, judgment, program solving, sensory, perceptual and motor abilities, psychosocial behavior, physical functions, information processing and speech."[17] She has been diagnosed with "spastic quadriplegic cerebral palsy….with Lennox – Gastaut Syndrome, Cortical Visual Impairment (CVI), neuromuscular scoliosis, and a seizure disorder."[18] Student is "non-verbal and non-ambulatory."[19] She has "highly intensive management needs, requiring a high degree of individualized attention and intervention throughout the school day."[20] Student's classification and entitlement to special education programming and services is not in dispute.

An Individualized Education Program ("IEP") dated December 12, 2023 ("2023 IEP") recommended special education programs and services consisting of: (i) Special Class, 12:1 (3+1), thirty-five times per week; (ii) Occupational Therapy ("OT"), individual service, five times per week, 60 minutes per session; (iii) Physical Therapy, individual service, five times per week, 60 minutes per session; (iv) School Nurse Services, individual service, daily per week, FTE 1:1, (v) Speech-Language Therapy ("SLT"), individual service, four times per week, 60 minutes per session; (vi) SLT, group service, once per week, 30 minutes per session; (vii) Vision Education Services, individual service, three times per week, 60 minutes per session ; (viii) Parent Counseling and Training, group service, once per month, 60 minutes per session; and (ix) Paraprofessional (Health) for safety, ambulation, feeding, individual service, daily, full time.[21] The 2023 IEP also recommended Assistive Technology ("AT") devices and services.[22] Student was also recommended transportation from the closest safe curb location along with limited travel time, 1:1 nursing services, and a lift as Student in is in a wheelchair.[23]

The Placement Recommendation was a DOE Specialized School (District 75).[24] A 12-month service and/or program was recommended.[25] The 2023 IEP states the student requires a number of extensive management needs; she needs breaks through her numerous therapy sessions, a learning environment that is free from distractions, a classroom with limited environmental complexity and visual clutter, climate control throughout her school, small class

---

[17] P-A-3.
[18] Id.
[19] Id.
[20] Id.
[21] P-E-40.
[22] Id. at 41.
[23] Id. at 43,44.
[24] Id. at 40.
[25] Id. at 41.

C - 4

sizes, therapy should be done in environments that do not have a great deal of noise, position changes every hour or every two hours, along with numerous other needs. [26]

### Burden

School districts have the burden of proof, including the burden of persuasion and burden of production, in IDEA due process hearings, except that a parent or person in parental relationship seeking tuition reimbursement for a unilateral parental placement has the burden of persuasion and burden of production on the appropriateness of such placement.[27]

### Prong I

The IDEA provides that children with disabilities are entitled to a Free Appropriate Public Education ("FAPE").[28]A FAPE consists of specialized education and related services designed to meet a student's unique needs, provided in conformity with a comprehensive written Individualized Education Program ("IEP").[29] A school district has offered a student a FAPE when: (a) the board of education complies with the procedural requirements set forth in the IDEA; and (b) the IEP is developed through the IDEA's procedures and is reasonably calculated to enable the student to receive educational benefits.[30] In order to meet its substantive FAPE obligations, a district must offer a student an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[31]

As to Prong I of the *Burlington/Carter* standard, the DOE failed to meet its burden. The Principal of the District 75 school could not properly articulate how they could manage to combine Student's academic sessions with the Student's needs for nineteen hours of related services per week.[32] The Principal indicated the Student would not be able to fit all of her academic sessions and related services into the normal school day.[33] While the Principal did indicate that there is an after school program, she could not articulate with specifics how services may be administered to the student,[34] which is crucial given the number of services and management needs Student has. While on re-direct, DOE counsel attempted to rehabilitate the witness by clarifying that the services may be performed during academic sessions, such that additional hours would be unnecessary, that is still not sufficient; Principal established that therapy can happen on several different floors, in several different rooms (some of which may not be designed for the specific therapy being done), with no clear information on how the student may be moved between floors or rooms. It is also deeply concerning that Principal would indicate Student, with nineteen hours of services that also requires multiple paraprofessionals/assistants/nurses, could be adequately provided those services in a classroom

---

[26] Id. at 21-22.
[27] NYS Educ. Law § 4404(1)(c).
[28] 20 U.S.C. § 1400 (d)(1)(A).
[29] 34 C.F.R. § 300.13.
[30] *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982)
[31] *Andrew F. v. Douglas County Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017).
[32] 10/5/23, Transcript. 117-132.
[33] Id. at 132.
[34] Id. at 125-126.

with twelve other students who also may have their own paraprofessional/assistants/nurses;[35] it is conceivable that there may be over two dozen individuals in one classroom at one time which would fly in the face of the direct management needs of the IEP. Moreover, the school does not have air conditioning in its hallways[36] which was a direct requirement under the DOE's own IEP.[37] Principal stated the therapists may use any location they deem appropriate for therapy but didn't address how the student can function in a non-airconditioned hallway if a therapist believed Student needed to have therapy in a hallway. Throughout the testimony, Principal's demeanor during the cross-examination was somewhat combative and she seemed unwilling to either answer questions or admit to deficiencies her school may have.[38] DOE also called a school psychologist who admitted on cross-examination that the DOE conducted minimal to no independent evaluations, assessments, observations of Student and it appears no psychological evaluation was done by the DOE in the last three years.[39] The DOE's witness did not seem to be able to sufficiently answer all of Parent's questions regarding the proper procedure for considering Parent's request for a nonpublic school placement and was not clear as to why parent's requests for a more limited class size or different placement were not considered. There was also an inordinate amount of testimony and conversation regarding music therapy and while the psychologist indicated she was aware of it, could not properly articulate why it was not considered as a part of student's related services; without any independent evaluations, updated assessments or observations, the DOE seemed to rely on the information provided by the Private School while cherry picking what services/placements they would offer. A review of the record herein establishes that the weight of the evidence supports the conclusion that the DOE failed to offer Student an educational program reasonably calculated to offer a FAPE for the 2023-2024 school year. It is unclear if and how the DOE would be able to implement the Management Needs at the proposed school location. Based on the DOE's failure to sustain its burden under the Education Law, the record establishes that the DOE failed to provide Student with a FAPE for the 2023-2024 school year.

### *Prong II*

A private school placement must be "proper under the Act."[40] This means that the private school must offer an educational program which met the student's special education needs.[41] Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate."[42] Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's

---

[35] Id. at 135-141.
[36] Id. at 141.
[37] P-E-21.
[38] 10/5/23, Transcript 153-159.
[39] Id. at 173-186.
[40] Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12, 15 (1993); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985).
[41] See Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112, 115 (2d Cir. 2007); Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).
[42] *Gagliardo*, 489 F.3d at 112

placement is appropriate should be considered in determining the appropriateness of the parents' placement.'"[43]

Parents need not show that the placement provides every special service necessary to maximize the student's potential.[44] When determining whether a unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether the placement is "reasonably calculated to enable the child to receive educational benefits."[45] A private placement is appropriate if it provides instruction specially designed to meet the unique needs of a student.[46]

The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement. No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.[47]

Private School is a "high specialized special education program in New York City created for children who suffer from brain injuries or brain-based disorders."[48] These students can be verbal, nonverbal, and non-ambulatory.[49] Students at Private School require 1:1 paraprofessionals and many other also require 1:1 nursing.[50] The school is specifically designed to meet the needs of students who have a "disability classification of Traumatic Brain Jury" which requires "a significant degree or high degree of individualized attention and intervention."[51] Private School creates its own IEP[52] for each student to help create an individualized program focused on "improving functioning skills appropriate to their cognitive, physical and developmental levels, through a collaborative and multidisciplinary approach which incorporates the best practices from the medical, clinical, and educational fields."[53] This IEP is so extensive the DOE utilized primarily this only in creating their own IEP for Student. Private

---

[43] *Gagliardo*, 489 F.3d at 112, quoting *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006)
[44] *Frank G.*, 459 F.3d at 364-65.
[45] *Frank G.*, 459 F.3d at 364; see *Gagliardo*, 489 F.3d at 115.
[46] 20 U.S.C. § 1401(29); Educ. Law § 4401(1); 34 CFR 300.39(a)(1); 8 NYCRR 200.1(ww); *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 386 (2d Cir. 2014).
[47] *Gagliardo*, 489 F.3d at 112, quoting *Frank G.*, 459 F.3d at 364-65.
[48] P-L-2.
[49] Id.
[50] Id.
[51] Id.
[52] P-C.
[53] P-L-3.

school offers a number of related services that designed to work with the student's academic schedules and can be done in a number of dedicated spaces.[54]

The Deputy Director of Special Education for Private School testified that student is in a 6:1:1 class with numerous related services along with assistive technology devices and 1:1 nursing and paraprofessionals throughout the day.[55] She is provided with proper air conditioning, transportation services, and limited travel time as required by her IEP.[56] She has also been making progress in her educational setting at Private School.[57] Student's IEP also notes progress she has made in a variety of physical, emotional, and academic areas. In academics, she is able to engage and understand the environment she's in and has progressed in in utilizing her assistive technology devices to communicate with others.[58] She can use assistive technology switches to help her make choices when answering academic questions which has helped her achieve literacy goals.[59] She is learning a number of "interest-based words" along with a number of concepts from books, videos, and other class activities.[60] She has increased her vocabulary as a result and she is getting better picking words associated with concepts with less support.[61] Her math skills are similarly improving as she is understanding the function and use of money to exchange for goods.[62] She has also progressed in her ability to engage in social situations by participating in group activities with classmates.[63] She has also progressed in her ability to use her Assistive Technology devices to communicate her needs as well as utilizing it during games, social situations, and other activities.[64] Similarly, she continues to make progress in her speech goals.[65]

I find that Parent has met their burden in proving that the private program offered an educational program which met Student's need under Prong II of the *Burlington/Carter* standard. Private School is providing the 1:1 and small group instruction Student needs to make academic progress. Moreover, Private School is implementing the Management Needs listed on the 2023 IEP and providing related services. Both the Deputy Director and the progress information from the Private School IEP demonstrate Student is making academic progress.

In reviewing the record before me, the weight of the evidence establishes that Student's individual special education needs were addressed by Private School and that the instruction offered was "reasonably calculated to enable the child to receive educational benefits."[66]

---

[54] Id.
[55] P-L-5.
[56] Id.
[57] Id.
[58] P-C-16.
[59] Id.
[60] Id.
[61] Id.
[62] Id. at 17.
[63] Id.
[64] Id. at 20-21.
[65] Id. 24.
[66] *Frank G.*, 459 F.3d at 364.

_Equities_

Even if a parent establishes a right to reimbursement under the IDEA, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant."[67] In making that equitable determination, a hearing officer may consider many factors, including, inter alia, whether a parent's unilateral withdrawal of her child from the public school was justified, whether the parent provided the Department with adequate notice of the withdrawal, whether the amount of private-school tuition was reasonable, whether the parent should have availed herself of need-based scholarships or other financial aid from the private school, and whether there was any fraud or collusion in generating (or inflating) the tuition to be charged to the Department, or whether the arrangement with the school was fraudulent or collusive in any other respect.[68]

Here, Parent provided the necessary Ten-Days' Notice of their concerns with the DOE's offer of a FAPE for Student for the school years at issue.[69] Therein, Parent detailed specific concerns.[70] Parent, furthermore, gave the DOE notice of their intention to unilaterally place the Student at the Private School.[71] No evidence was submitted at hearing describing the DOE's response to the Ten-Day Letter.

By way of relief, Parent seeks to have the balance of unpaid tuition sent directly to the Private School. Direct tuition funding is relief encompassed by the equitable remedial powers inherent in IDEA. See e.g. _Mr. and Mrs. A. v. New York City Dep't of Educ._, 769 F. Supp. 2d 403, 406 (S.D.N.Y. 2011) (parents may seek direct funding in the instance in which, "due to a lack of financial resources, [parents of a student with a disability] have not made tuition payments but are legally obligated to do so").

I find no issue with the reasonableness of the costs, including tuition, associated with the Private School. (P-P).[72] This is a school tailored to students with brain injuries that require a tremendous amount of supportive care to handle basic functions of living while simultaneously promoting academic progress; this was clear from the testimony, documents, and cross-examination and I have no reason to believe the tuition would be inappropriate in this case. Moreover, I find that the weight of the evidence establishes that Parent cooperated with the DOE and its CSE's efforts to develop an IEP and recommend a program and placement for the school years at issue.[73] Overall and after considering the record at hearing, I find that the equities support Parent's claim for direct funding of tuition for the 2023-2024 school year. Moreover, parent has requested that 1:1 nursing services and transportation be provided to the parent which are also granted.

---

[67] _Forest Grove Sch. Dist. v. T.A._, 557 U.S. 230, 246-47, 129 S. Ct. 2484, 174 L. Ed. 2d 168 (2009).
[68] _E.M. v. New York City Dep't of Educ._, 758 F.3d 442, 461 (2d Cir. 2014).
[69] P-J.
[70] Id.
[71] Id.
[72] P-D.
[73] 10/10/2023, Transcript 276

The IDEA specifically includes transportation and any modifications or accommodations necessary to assist a student to benefit from their special education.[74]  Similarly, New York State law defines special education as "specially designed instruction … *and transportation*, provided at no cost to the parents to meet the unique needs of a child with a disability" and requires school districts to provide disabled students with "suitable transportation to and from special classes or programs."[75]  By the authority delegated by Congress, the New York State Legislature afforded all private school students full access to all special education services. Student requires transportation services that are commiserate with her recommendations in the IEP; for example, it stands to reason that a student who needs air conditioning in every part of her building for a school day would also require air-conditioning during transportation to and from school but the DOE failed to recommend that with no explanation. Similarly, the student requires dedicated nursing services to ensure she can function in a highly specialized and controlled educational program; this is a student who has difficulty functioning during her every day and it stands to reason she, as her IEP indicates, requires specialized services that the DOE did not demonstrate they can provide; rather they attacked the payment structure of the nursing service instead. Student needs nursing services and there was not an appropriate level of evidence to determine that the parent's choice was unnecessary as the DOE failed to demonstrate they were able to provide the service Student desperately needs. Transportation and nursing services are something this student requires to achieve a level of education commiserate with her peer and federal law.

---

[74] *See* 20 U.S.C. § 1401 [26]; 34 CFR § 300.34 [a] and [c] [16]

[75] Educ. Law § 4401 [1], [2] and [4] [a] [emphasis added], 8 NYCRR § 200.1 [ww] and 8 NYCRR § 200.2 [b] [1]; [a]; and *see Ne. Cent. Sch. Dist. v. Sobol,* 79 N.Y.2d 598, 608 [1992]

## **ORDER**

NOW, THEREFORE, IN LIGHT OF THE ABOVE FINDINGS OF FACT:

**IT IS HEREBY, ORDERED,** that the DOE shall pay to Private School the remainder of any tuition funds, totaling $306,544.00 dollars within 60 days of submission of a signed, notarized bill encompassing tuition costs owed by Parent to Private School for Student's attendance at Private School for the 2023-2024 school year; and it is further,

**ORDERED,** that the DOE shall fund door-to-door special education transportation services to and from Private School of the parents choosing for the 2023-2024 school year, totaling $111,180.00; and it is further,

**ORDERED**, that the DOE shall fund 1:1 nursing services of parents choosing, totaling $265,960.00 for the 2023-2024 school year;

Dated:  11/17/2023

_____/u/Michael Das_____
Michael Das
Impartial Hearing Officer

C - 11

## <u>NOTICE OF RIGHT TO APPEAL</u>

Within 40 days of the date of this decision, the parent and/or the Public School District has a right to appeal the decision to a State Review Officer (SRO) of the New York State Education Department under section 4404 of the Education Law and the Individuals with Disabilities Education Act.

If either party plans to appeal the decision, a notice of intention to seek review shall be personally served upon the opposing party no later than 25 days after the date of the decision sought to be reviewed.

An appealing party's request for review shall be personally served upon the opposing party within 40 days from the date of the decision sought to be reviewed. An appealing party shall file the notice of intention to seek review, notice of request for review, request for review, and proof of service with the Office of State Review of the State Education Department within two days after service of the request for review is complete. The rules of procedure for appeals before an SRO are found in Part 279 of the Regulations of the Commissioner of Education. A copy of the rules in Part 279 and model forms are available at http://www.sro.nysed.gov.

C - 12

## DISTRICT EVIDENCE

| Exhibit | Title | Date | Pages |
|---------|-------|------|-------|
| 1 | Due Process Complaint | 7/5/2023 | 11 |
| 2 | Private School Report and Education Plan | 11/29/2022 | 78 |
| 3 | Individualized Education Program | 12/1/2022 | 46 |
| 4 | Level 1 Vocational Assessment | 12/8/2021 | 3 |
| 5 | Social History Update | 12/8/2021 | 3 |
| 6 | IEP Meeting Minutes | 12/1/2022 | 6 |
| 7 | IEP Attendance Page | 12/1/2022 | 1 |
| 8 | Email from Special Education Teacher | 9/12/2022 | 1 |
| 9 | Email from Clerical Associate | 6/22/2022 | 3 |
| 10 | Email from School Psychologist | 6/27/2023 | 3 |
| 11 | Private School Quarterly Progress Report | 9/30/2022 | 19 |
| 12 | Skilled Nursing Referral Form | 12/1/2022 | 1 |
| 13 | Prior Written Notice and School Location Letter | 6/18/2023 | 14 |
| 14 | Medicaid Provider Policy and Billing Handbook | 3/29/2018 | 84 |
| 15 | Removed by IHO | | |
| 16 | Affidavit of School Psychologist | 10/2/2023 | 5 |
| 17 | Affidavit of Deputy Director | 10/3/2023 | 2 |

## PARENT EVIDENCE

| Exhibit | Title | Date | Pages |
|---------|-------|------|-------|
| A | Due Process Complaint IH # 251257 | 07/05/2023 | 11 |
| B | Finding of Fact Decision IH# 210867 | 11/07/2022 | 20 |
| C | Private School IEP 2023-24 School Year | 11/29/2022 | 80 |
| D | Private School Enrollment Contract 2023-24 School Year | 07/02/2023 | 6 |
| E | DOE IEP | 12/12/2022 | 46 |
| F | Transportation Agreement 2023-24 School Year | 07/01/2023 | 6 |
| G | Nursing Agreement 2023-24 School Year | 07/05/2023 | 8 |
| H | Proposed Order of Pendency 2023-24 School Year | 08/30/2023 | 2 |
| I | Findings of Fact and Decision IH # 196228 | 08/11/2021 | 57 |
| J | Ten Day Notice 2023-24 School Year | 06/20/2023 | 2 |
| K | Withdrawn | | |
| L | Affidavit of Deputy Director | 9/27/2023 | 5 |

## IHO EXHIBITS

| Exhibit | Title | Date | Pages |
|---|---|---|---|
| I | Pendency Discussion | Various | 5 |
| II | Hearing Date Discussion | Various | 10 |

Findings of Fact and Decision                                                                    15
Case Number 251257

**APPENDIX**

| Redacted Information | Term Used In FOFD |
|---|---|
| ███████████ | Student |
| Patrick Donohue | Parent |
| Jared Arader | DOE Attorney |
| Bay Ridge Preparatory School | Private School |
| Dorothy Pfeiffer | School Psychologist |
| Dr. Greer Phillips | Deputy Director of Special Education |
| Sara Beck | Special Education Teacher |
| Sharon Self | Clerical Associate |

NEW YORK CITY OFFICE OF ADMINISTRATIVE
TRIALS AND HEARINGS (OATH)
SPECIAL EDUCATION HEARINGS DIVISION
-------------------------------------------------------------------X
In the Matter of the Due Process Complaint of
Patrick Donohue ("Parent"), as
Parent/Guardian of

SJD ("Student"), and Individually;


                Petitioners,                      **<u>ORDER OF PENDENCY</u>**

    -against-

                                   **IHO Case No.**

**THE NEW YORK CITY DEPARTMENT
OF EDUCATION,**                       **IHO**

              Respondent.
-------------------------------------------------------------------X

     This Order addresses a Student with disabilities whose Parent challenges the Individualized Educational Program ("IEP") and placement proposed for the 2024-2025 extended school year by Respondent The New York City Department of Education ("DOE"). Through this Order, the Parent seeks to enforce the Student's pendency rights under § 1415(j) of the Individuals with Disabilities Education Act ("IDEA") and Section 4404(4) of the New York State Education Law, which entitle the Student to remain in his/her current educational placement, at public expense, during the pendency of their administrative and/or judicial proceeding.

     Under IDEA, the pendency inquiry identifies the Student's then-current educational program/placement. *Mackey v. Bd. of Educ., Arlington C.S.D.*, 386 F.3d 158 (2d Cir. 2004), *supplemented*, 112 F. App'x 89 (2d Cir. 2004). Although not defined by statute, the phrase "then current educational placement" has been found to mean the last agreed-upon placement at the moment when the due process proceeding is commenced. *Murphy v. Arlington C.S.D.*, 86 F. Supp. 2d 354 (S.D.N.Y. 2000), *aff'd*, 297 F.3d 195 (2d Cir. 2002).

     The Student's "last agreed upon placement" is at the International Academy for the Brain ("iBRAIN"). This placement is based upon the Unappealed FOFD IHO Case No. 251257, 11/17/2023, which found that: 1) DOE denied Student a FAPE; 2) iBRAIN was appropriate for Student; and, 3) equitable considerations supported a full award of direct payment of tuition and related services, including special transportation and nursing services, for Student at iBRAIN.

1

**D - 1**

Unless otherwise excluded, Pendency includes all costs of special education and related services, including transportation. Under the IDEA, "related services" include transportation, and under N.Y. Educ. Law, "special education" includes transportation. When a student receives special education services, an order on pendency– without transportation—would render the award meaningless.

For the preceding reasons, it is hereby ORDERED that effective July 2, 2024, and during the pendency of all Due Process Proceedings relative to IHO Case No.        the 2024-2025 Extended School Year, and all administrative and judicial proceedings thereafter, the DOE shall fund the Student's placement at iBRAIN. This placement includes the following:

- Funding for the cost of Full Tuition to be paid directly to the International Academy for the Brain ("iBRAIN") pursuant to the enrollment agreement between the Parent-Petitioner and iBRAIN (see Exhibit E in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint; and
- Funding for transportation services, as well as all services necessary to said transportation, to be paid directly to the transportation provider pursuant to the transportation contract between the Parent-Petitioner and the transportation company (see Exhibit F in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint; and
- Funding for nursing services to be paid directly to the nursing service provider pursuant to the nursing contract between the Parent-Petitioner and nursing services provider (see Exhibit G in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint.

Dated: _____        So Ordered: _____
                                              IHO



Phone - 646-315-1548
Email - info@iBrainNYC.org
Web - www.iBrainNYC.org

## ANNUAL ENROLLMENT CONTRACT

**This is a contract ("Enrollment Contract" or "Agreement") between Patrick Donohue ("Parent(s)/Guardian(s)") and The International Academy for the Brain, dba iBRAIN Ltd ("iBrain") for the enrollment of** ▊▊▊▊▊▊▊ **("Student") for the 2024 - 2025 school year ("School Year"). The parties hereby agree to the following terms:**

### Enrollment Period

1. *i*Brain offers enrollment to Student for the extended school year ("School Year"), starting on July 2, 2024, and ending on June 27, 2025, subject to the terms and conditions set forth below.

### Academic Program, Related and Other Services

2. Parent(s)/Guardian(s) attests they have reviewed the curriculum program for *i*Brain's educational and related services programs and certain related materials.

3. Parent(s)/Guardian(s) understands the academic and related service programs for Student for the School Year will be provided as follows:

   a. *i*Brain will provide the academic and related service programming as outlined in: (i) Student's most recent Individualized Education Program ("IEP") issued by the Student's local school district; or (ii) recommend an academic program that will be outlined in Student's *i*Brain IEP if the local school district's IEP has not been updated or if *i*Brain and Parent(s)/Guardian(s) disagree with the proposed academic program recommendation in Student's IEP issued by the local school district for the academic year. Where *i*Brain recommends changes to the Student's recent IEP, *i*Brain assumes all responsibility to defend against all challenges to the appropriateness of the changes it makes to Student's academic programming as reflected on the most recent IEP.

### Tuition, Deposit and Related Service Fees

4. **Deposit:** Parent(s) agrees to pay an initial, non-refundable deposit of $100 ("Deposit") made payable to "International Academy for the Brain" for the 2024-2025 school year. The Deposit will be applied against the Full Tuition as outlined in Sections 7 and will be due the first day of school.

5. **Base Tuition Fees:** Base Tuition Fee for the *i*Brain program is **$213,000** for the School Year starting on July 2, 2024 and ending on June 27, 2025. The Base Tuition includes the cost of an individual paraprofessional, and school nurse as well as the academic programming outlined in Section 3.

6. **Supplemental Tuition Fees:** The Base Tuition cost does not include the cost of related services, transportation paraprofessional, any individual nursing services or assistive technology devices and

Manhattan: 403 East 91st Street
New York, NY 10128
Brooklyn: 213 48th Street
Brooklyn, NY 11220

E - 1

equipment. Supplemental Tuition includes the cost of the Student's related services programming such as physical therapy, occupational therapy, speech-language therapy, vision education services, assistive technology services, music therapy, hearing education services and parent counseling and training as outlined in Section 3. The total Supplementary Tuition Fees for the 2024-2025 school year is **$133,088.80.**

7. **Full Tuition:** Full Tuition for the 2024-2025 academic year is inclusive of Base Tuition Fees as described in Section 5 and Supplemental Tuition Fees as described in Section 6. The Full Tuition is **$346,088.80** shall be paid in three installments with the first payment of **$58,974.77** due by July 2, 2024, the second installment payment of **$110,189.71** due by September 5, 2024, and the third payment of **$176,924.32** due by January 2, 2025.

## Payment Terms

8. **Payment Obligation**:  It is understood and agreed the enrollment of Student is for the full academic year and the obligation to pay tuition cannot be apportioned or mitigated except as expressly provided for herein. *i*Brain will not make any deductions, omissions, or refunds for excused or unexcused absences, withdrawal, suspension, or for any other reason, except as outlined in Sections 10 and 11.

It is understood Parent(s)/Guardian(s) may seek public funding from their local school district to pay for Student's Full Tuition due to *i*Brain for the School Year by asserting Student's due process rights.  In the event Parent(s)/Guardian(s) is required to file a due process complaint against the local school district seeking an Order on Pendency and/or Findings of Fact and Decision for funding, the tuition payment obligations will be suspended, except those obligations outlined in sections 8(a) and 8(b), until a final determination/decision is issued by an impartial hearing officer, state review officer, or state or federal court, and then all monies then-due will become immediately due within thirty (30) days of the final adjudication.

   a.  **Pendency Placement - Payment Obligations**: It is understood Parent(s)/Guardian(s) may seek public funding from the local school district to pay for Student's Full Tuition due to *i*Brain for the School Year by asserting Student's Due Process Rights under 20 U.S.C. § 1415[j], whereby the local school district is required to maintain Student in his/her last-agreed upon placement during the pendency of any impartial hearing proceedings ("Stay-put") which is automatic upon filing a Due Process Complaint ("DPC"). Upon filing the DPC and asserting the Stay-put provision ("DPC Date"), the payments obligations as outlined in this Enrollment Contract shall be due within 30 days of DPC Date, according to the terms herein. Payment obligations shall remain in effect until the Stay-put rights are no longer active.

   In the event the local school district does not comply with the Stay-put rights of Student and fails to make the payment obligations as outlined in this Enrollment Agreement, Parent(s) /Guardian(s): (1) may seek immediate enforcement of the Stay-put rights in state or federal court and MUST provide a payment schedule within two weeks of such enforcement action; (2), if Parent(s)/Guardian(s) does not seek enforcement within 14 days of the payment obligations becoming due, Parent(s)/Guardian(s) will be required to execute a payment schedule while the Student remains at iBRAIN; or, (3) Parent(s)/Guardian(s) will be required to establish payment plan and may withdraw Student by terminating contract per section 11.

   b.  **Order on Pendency Denied - Payment Obligations:** It is understood Parent(s)/Guardian(s) may seek public funding from the local school district to pay for Student's Full Tuition due iBrain for the School Year by asserting Student's Due Process Rights under 20 U.S.C. § 1415[j], whereby the

E - 2

Document Ref: GNCRA-AOGAQ-FPDAH-QJOEX

local school district is required to maintain Student in his/her last-agreed upon placement during the pendency of any impartial hearing proceedings ("Stay-put") is automatic upon filing a Due Process Complaint ("DPC"). In the event Parent(s)/Guardian(s) seeks and is denied an Order on Pendency by an Impartial Hearing Officer, State Review Officer, or a state or federal court, for all or part of the Full Tuition funding from the local school district due under this Enrollment Contract, Parent(s)/Guardian(s) will be permitted to immediately withdraw Student from iBrain by terminating this contract per Section 11 within 30 days of receipt of the Order on Pendency. Parent(s)/Guardian(s) will be required to execute a payment schedule to comply with the contractual obligations based upon the financial need of Parent(s)/Guardian(s) for any balances due to *i*Brain on the date of withdrawal.

    c.   Late Payment Penalty. Upon the failure to pay in full any payment obligation due based on the terms of this Enrollment Contract ("Amount Outstanding") within seven (7) business days of the due date for such payment, a late payment penalty of ten percent (10.0%) of the Amount Outstanding (the "Late Payment Amount") shall immediately be added to the Amount Outstanding. The imposition of the Late Payment Amount shall be in addition to any other rights and remedies of iBRAIN under this Agreement. Any balances of any amount which remains unpaid, i.e., Amount Outstanding, including any Late Payment Amount, more than thirty (30) days after it is due shall accrue interest until paid at the rate equal to the lesser of two percent (2.0%) per calendar month or the maximum amount allowed under Applicable Law. However, in no event shall this interest provision be construed as a grant of permission for payment delays.

9.   **Failure to Secure Tuition Funding:** In the event Parent(s)/Guardian(s) seeks a Findings of Fact and Decision, but is denied all or part of the Full Tuition funding from the local school district due under this Enrollment Contract by a final administrative or judicial decision, including all state and federal appeals resolving the claim for such funding, Parent(s)/Guardian(s) will be permitted to immediately withdraw Student from *i*Brain by terminating this contract per Section 11.

## Contract Release and Termination

10.   **Release:** Parent(s)/Guardian(s) acknowledges that Parent(s)/Guardian(s) will be released from this Enrollment Contract without financial penalty or continuing responsibility for tuition payments outlined in this Enrollment Contract should the local school district offer a free appropriate public education to Student by the first day of the School Year as indicated in Section 1 and the Parent(s)/Guardian(s) provides notice as outlined in Section 11 prior to the first day of the School Year. Parent(s)/Guardian(s) may be released from this Enrollment Contract if the Student relocates outside of the local school district, or, if due to health reasons, Student is no longer able to attend *i*Brain, and Parent(s)/Guardian(s) provides notice as outlined in Section 11.

11.   **Termination:** Parent(s)/Guardian(s) may terminate this Enrollment Contract by submitting a written Termination Notice per Section 25. The Termination Notice must, (a) be in writing, (b) dated, (c) state Student's name and (d) provide Parent(s)/Guardian(s)'s reasons for terminating the Enrollment Contract. The Termination Notice may be sent through the U.S. Postal Service via certified mail, return receipt, or Federal Express delivery service or by courier. If submitted through the U.S. Postal Service by First Class Mail, the Termination Notice shall be deemed received by *i*Brain five business days after the date that the Termination Notice is postmarked, consistent with Section 25.

If Parent(s)/Guardian(s) terminates this Enrollment Agreement, Parent(s)/Guardian(s) will forfeit Student's non- refundable Tuition Deposit set forth in Section 4 in its entirety and any other payments made per the

E - 3

Document Ref: GNCRA-AOGAQ-FPDAH-QJOEX

terms of this Enrollment Agreement.

Applicable tuition refunds, if any, shall be determined as follows:

A.  All pre-paid tuition fees will be refunded *if and only if* the written Termination Notice in the form stated above was RECEIVED on or before the first day of attendance by Student.

B.  If written Termination Notice is received after the Student's first day of attendance, Parent(s) /Guardian(s) will be responsible for paying all tuition fees for the calendar month in which Termination Notice is received on a *pro rata* basis.  Parent(s)/Guardian(s) also will be responsible for paying all outstanding tuition and fees then due and owing, if any, for all months prior to the month in which Termination Notice is received.  All such fees shall be paid within ten (10) calendar days after Termination Notice is received by *i*Brain.

## School/Family Cooperation

12. **Parent(s)/Guardian(s) Must Cooperate with School District:**  In the event Parent(s)/Guardian(s) decides to seek direct funding from their local school district for the Student's placement and related services at *i*Brain, Parent(s)/Guardian(s) agrees to take all necessary steps to secure funding and to cooperate fully in the process required to secure such funding. In the event that Parent(s)/Guardian(s) does not cooperate with the process, *i*Brain may elect, upon 60 days' notice, to terminate Student's enrollment at *i*Brain.

## Conditions of Enrollment

13. Parent(s)/Guardian(s) hereby authorizes *i*Brain to conduct any interviews, medical examinations, psycho-educational evaluations, and/or related service evaluations necessary for the continued assessment related to Student; and Parent(s)/Guardian(s) authorizes *i*Brain to make necessary information regarding Student available to its staff and/or other paid or unpaid individuals working for or on behalf *i*Brain, including medical and dental consultants and other health care or educational professionals.

14. Parent(s)/Guardian(s) understands that *i*Brain will provide clinical and training services for the community and hereby authorize and consent to the provision of such services, including without limitation, observation, information sharing and trainee participation to the extent *i*Brain deems necessary for training students and staff of other agencies, as well as volunteers, and *i*Brain agrees to use discretion in selecting trainees and sharing information related to Student and to ensure that staff are made aware of the confidentiality of these matters.

15. **Compliance with Local School District Requirements**:  Parent(s)/Guardian(s) and *i*Brain agree to cooperate with respect to their interaction with the New York State Education Department and/or their local school district to ensure compliance with applicable laws, regulations and rules.

16. **Medical Releases**:  Parent(s)/Guardian(s) agrees to promptly sign a Health Insurance Portability and Accountability Act ("HIPAA") release form and a Family Educational Rights and Privacy Act ("FERPA") release form for the purpose of allowing *i*Brain to communicate with Student's related service therapists and medical providers and have access to Student's medical and therapy providers' records. Parent(s)/Guardian(s) agrees to inform *i*Brain if there are any changes to Student's medical conditions and/or changes to Student's medication regimen. Parent(s)/Guardian(s) further agrees that such information obtained or developed by *i*Brain may be used for research and published accordingly.

E - 4

Document Ref: GNCRA-AOGAQ-FPDAH-QJOEX

17. **Physical Restraint**:  Parent(s)/Guardian(s) authorizes *i*Brain to use the amount of passive physical restraint believed to be reasonable under the circumstances (and endeavor to use the least amount of such restraint), and utilize environmental time out and/or apply a protective device as necessary to ensure the safety of the Student,  staff, and any individual working with the Student in the event Student may cause or reasonably demonstrate a threat of causing injury to self or others, or serious damage to property.

18. Parent(s)/Guardian(s) authorizes *i*Brain to include names, address, telephone number and email addresses in the Family and Staff Membership List to facilitate reasonable communication among families and area support groups for the families.

19. **Consent to Photograph, Video, Record and Interview**:  Parent(s)/Guardian(s) understands Student may be filmed by *i*Brain in individual or group sessions, during recreational activities and/or during community outings; and Parent(s)/Guardian(s) agrees to promptly sign a Communications Release granting *i*Brain all rights to publicly exhibit or display photographs and/or photographic slide projections and/or video of Student and/or to permit use thereof by or in any media, including, but not limited to copyright status (or common law copyright) and, staff members may photograph or film Student for the purpose of keeping personal mementos of their time together with Student.

20. Parent(s)/Guardian(s) authorizes *i*Brain to display or enter Student's artwork or original creation(s) in appropriate competitions including public and private exhibitions; and Parent(s)/Guardian(s) authorizes Student to attend trips and events outside of the school setting with appropriate staff support.

21. **Access to Student's Records**:  Parent(s)/Guardian(s) has the legal right to inspect and review any educational records relating to Student as well as a legal right to a copy of Student's school files, and Parent(s)/Guardian(s) agrees to reimburse *i*Brain for reasonable copying costs associated with such request.

## Miscellaneous Terms

22. **Assignment**:  Parent(s)/Guardian(s) agrees this Enrollment Contract may be assigned or transferred by *i*Brain and it will be binding upon and inure to the benefit of the successors and assigns of *i*Brain.
    a.  Assignment of Right to Sue. In the event the local school district, or another entity ("Obligor"), is obligated by administrative or court order to make payment(s) to iBRAIN on behalf of the Parent(s)/Guardian(s) ("Assignor") under the terms of this Agreement and fails to make such payment(s) within thirty-five (35) days upon becoming due ("Outstanding Financial Obligation"), at the written request of iBRAIN, the Parent(s)/Guardian(s) shall assign and transfer to iBRAIN ("Assignee") the title and ownership to such claim and cause of action that exists in Parent(s)/Guardian(s) favor against any such entity and thereby authorize iBRAIN to prosecute said action to resolve said claim at iBRAIN's discretion. Assignor understands that whatever amounts Assignee does not collect from Obligor (whether it be all or part of what is due) shall be paid by Assignor as per the terms of the Agreement.

23. **Severability**:  *i*Brain and Parent(s)/Guardian(s) agree in the event any provision of this Enrollment Contract shall become invalid or unenforceable, in whole or in part, for any reason whatsoever, the remaining provisions shall, nevertheless, be valid and binding as if such invalid or unenforceable provision had not been contained in this Enrollment Contract.

24. **Governing Law**:  This Enrollment Contract shall be governed by, construed and enforced in accordance

E - 5

Document Ref: GNCRA-AOGAQ-FPDAH-QJOEX

with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. New York State shall be the jurisdiction and venue for any dispute involving this Enrollment Contract. The Enrollment Contract may be executed in counterpart with facsimile or electronic copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

25. **Notice**:  By executing this Enrollment Contract, each party agrees hereto to the terms set forth above and all notices required under this Enrollment Contract shall be delivered via the U.S. Postal Service via certified mail, return receipt, or Federal Express delivery service, or by courier to the following parties at the address set forth below:

International Academy for the Brain
ATTN: Mr. Kieran Lavin
55 West 116th Street, #159
New York, New York 10026

26. **Merger**:  This Enrollment Contract contains the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. The express terms herein control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Enrollment Contract may not be modified or amended other than by an agreement in writing, duly signed by all parties.

By signing below, Parent(s)/Guardians acknowledges that he/she/they have read this Enrollment Contract, understand(s) the terms and conditions, and agree(s) to the conditions outlined in this Enrollment Contract. It is further understood that any questions concerning these conditions have been discussed.

Parent(s)/Guardian(s) signature below signifies that he/she/they have read and understand all aspects of this Enrollment Contract and recognize the legal responsibilities in regard to this Enrollment Contract.

**International Academy for the Brain**

*Kieran Lavin*

X_____

By: Kieran Lavin

International Academy for the Brain

Date:_____2024-06-21_____

**Parent/Guardian**

*Patrick Donohue*

X_____

Name(s): _____Patrick Donohue_____

Parent(s)/Guardian(s) of:___█████████

Date:_____2024-06-17_____

E - 6

Document Ref: GNCRA-AOGAQ-FPDAH-QJOEX

# Signature Certificate

Reference number: GNCRA-AOGAQ-FPDAH-QJOEX

| Signer | Timestamp | Signature |
|--------|-----------|-----------|

**Patrick Donohue**
Email: patrick@pabilaw.com

| | | |
|--|--|--|
| Sent: | 17 Jun 2024 14:28:17 UTC | |
| Viewed: | 17 Jun 2024 22:22:08 UTC | |
| Signed: | 17 Jun 2024 22:22:34 UTC | |

**Recipient Verification:**
✔ Email verified          17 Jun 2024 22:22:08 UTC

IP address: 184.153.75.82
Location: New York, United States

**Kieran Lavin**
Email: kieran@kieranlavin.com

| | | |
|--|--|--|
| Sent: | 17 Jun 2024 14:28:17 UTC | |
| Viewed: | 21 Jun 2024 14:45:49 UTC | |
| Signed: | 21 Jun 2024 14:46:06 UTC | |

**Recipient Verification:**
✔ Email verified          21 Jun 2024 14:45:49 UTC

IP address: 163.116.135.119
Location: New York, United States

Document completed by all parties on:
21 Jun 2024 14:46:06 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.



E - 7

## SCHOOL TRANSPORTATION ANNUAL SERVICE AGREEMENT

This annual agreement, hereinafter referred to as "AGREEMENT", is made and entered into by and between PATRICK B. DONOHUE, hereinafter referred to as "CLIENT", Parent(s)/Guardian(s) of ███████████ ████████████ hereinafter referred to as "STUDENT" residing at ████████  ████  ████, hereinafter referred to as "HOME" and Sisters Travel and Transportation Services, LLC, a New York State limited liability corporation, hereinafter referred to as "PROVIDER", located at 2585 Broadway #240, New York, NY 10025.

### 1.  TERM

This annual AGREEMENT shall be effective from July 2, 2024, through June 27, 2025, hereinafter referred to as "TERM", and cannot be terminated except as provided in Section 7.

The STUDENT attends a private school, the International Academy for the Brain ("iBRAIN"), located at 403 East 91st Street, New York, NY 10128 (iBRAIN-Manhattan), or at 213 48th Street, Brooklyn, NY 11220 (iBRAIN-Brooklyn) hereinafter referred to as "SCHOOL".

STUDENT attends SCHOOL year-round for approximately 223 days based on SCHOOL's, 12-month 2024-2025 School Year calendar, hereinafter referred to as "SCHOOL DAYS."

### 2.  PURPOSE OF THIS AGREEMENT

The purpose of this AGREEMENT is to establish responsibilities between PROVIDER and CLIENT, hereinafter referred to as "PARTIES", related to the provision of special school transportation services, hereinafter referred to as "SERVICES", for STUDENT during the TERM from HOME to SCHOOL and SCHOOL to HOME during SCHOOL DAYS.

### 3.  SCHEDULE OF SERVICE

The pick-up location each SCHOOL DAY morning will be HOME and the drop-off location will be SCHOOL, hereinafter referred to as "AM TRIP."

The pick-up location each SCHOOL DAY in the afternoon will be SCHOOL and the drop-off location will be HOME, hereinafter referred to as "PM TRIP."

The AM TRIP and PM TRIP will be no more than 60 minutes each way.

The timing of the AM TRIP and PM TRIP will be determined at least seven (7) days prior to the first day of SCHOOL DAYS.  There will be a 15-minute grace period for STUDENT to be ready for AM TRIP and PM TRIP, hereinafter referred to as "FLEXIBLE PICK-UP / DROP-OFF TIMES."

In addition, the CLIENT has the right to change the AM TRIP or PM TRIP times or locations, within New York City, with 72 hours notification to PROVIDER, hereinafter referred to as "CHANGE TO TRIP."  The CLIENT must receive written email confirmation from PROVIDER of the request of CHANGE TO TRIP to guarantee modification to the AM TRIP or PM TRIP.

*INCLEMENT WEATHER*
PROVIDER will follow the decisions of the SCHOOL, for all Inclement Weather school delays or cancellations.  Transportation will be provided for delayed opening and early dismissals according to SCHOOL's weather-related changes.  PROVIDER reserves the right to make a decision to adjust pickup times as necessary when it is determined to be in the best interest of STUDENT, this information will be communicated to each CLIENT via email and/or phone call.

### 4.  PROVIDER RESPONSIBILITES

1

F - 1

PROVIDER shall provide the vehicles, drivers and dispatching necessary to provide the SERVICES in accordance with the terms of this AGREEMENT.

The PROVIDER agrees to use safe and clean equipment and properly trained and licensed drivers employed by or under contract with the PROVIDER.

The vehicle providing SERVICES for CLIENT shall meet any and all standards required by federal and state law. The vehicle will also maintain the following conditions: Air conditioning, regular-size wheelchair accessibility (e.g., lift-bus/wheelchair ramp), and sitting space to accommodate a person to travel with STUDENT, as needed. If STUDENT requires additional equipment for transportation (i.e., oxygen tanks), the vehicle will accommodate these additional needs of STUDENT

## 5.   INSURANCE

PROVIDER shall obtain and keep in force during the TERM of this AGREEMENT the following insurance coverages:

Workmen's Compensation Insurance in compliance with the laws of the State of New York covering all employees who perform for PROVIDER under this AGREEMENT.

Comprehensive Auto Liability Insurance on all vehicles used in connection with this AGREEMENT whether owned, non-owned, or hired; and

Comprehensive General Liability Insurance with limits for bodily injury or death.

## 6.   FEES and PAYMENT FOR SERVICES

The PARTIES agree all SERVICES will be billed at an annual rate of $127,333.00, hereinafter referred to as "FEES". CLIENT shall pay FEES with three payment installments: Payment 1: $21,222.25 due on July 2, 2024, Payment 2: $42,444.25 due on September 1, 2024, and a final payment, Payment 3 $63,666.50 due on January 1, 2025.

CLIENT understands and accepts FEES will be based on SCHOOL DAYS, whether STUDENT used SERVICES or not, unless PROVIDER was at fault for STUDENT not utilizing SERVICES. All of the FEES described above are considered "PROVIDED SERVICES". CLIENT warrants STUDENT will be enrolled in SCHOOL for the TERM and obligation to pay FEES is unconditional and cannot be apportioned or mitigated, except as explained above. PROVIDER will not take any deductions, omissions, or refunds for unexcused absences, withdrawal, suspension or for any other reason except as outlined in Section 7.

PROVIDER understands and accepts CLIENT will be seeking third party payments for SERVICES from the local school district (e.g., New York City Department of Education) ("THIRD PARTY") through either a Stipulation Agreement or through an impartial hearing process. PROVIDER agrees to suspend payment obligations until an interim or final administrative or judicial decision is made obligating THIRD PARTY to pay all or part of FEES and those payment obligations will become immediately due as per the terms of this AGREEMENT, and shall be paid within thirty (30) days of the interim or final decision or execution of a Stipulation Agreement. In the event an administrative or court decision is not in the CLIENT's favor for payment, payment will be suspended until the CLIENT has exhausted all legal remedies available to them to secure third party funding, when all payments will immediately become due.

Late Payment Penalty. Upon the failure to pay in full any payment obligation due based on the terms of this AGREEMENT ("Amount Outstanding") within seven (7) business days of the due date for such payment, a late payment penalty of ten percent (10.0%) of the Amount Outstanding (the "Late Payment Amount") shall immediately be added to the Amount Outstanding. The imposition of the Late Payment Amount shall be in addition to any other rights and remedies of PROVIDER under this AGREEMENT. Any balances of any

F - 2

Document ID: af00438e-af21-4233-8699-966c5e5cb62c

amount which remains unpaid, i.e., Amount Outstanding, including any Late Payment Amount, more than thirty (30) days after it is due shall accrue interest until paid at the rate equal to the lesser of two percent (2.0%) per calendar month or the maximum amount allowed under Applicable Law. However, in no event shall this interest provision be construed as a grant of permission for payment delays.

## 7.  TERMINATION

Termination for Cause.  If PROVIDER or CLIENT fails to perform in the manner called for in this AGREEMENT, or if PROVIDER or CLIENT fails to comply with any other provisions of the AGREEMENT and fails to correct such noncompliance within five (5) business days written notice thereof, CLIENT or PROVIDER may terminate this AGREEMENT for cause.

Termination shall be effected by serving a written notice of termination on PROVIDER or CLIENT setting forth the manner in which PROVIDER or CLIENT is in default.

The CLIENT may terminate the AGREEMENT if STUDENT relocates outside of local school district or due to health reasons STUDENT is no longer requiring special school transportation services.  Termination shall be effected by serving a written notice of termination on PROVIDER setting forth the conditions for termination.

In the event, CLIENT has exhausted all legal remedies available to them to secure third party funding, the CLIENT may terminate the AGREEMENT in writing, but will remain responsible for any balance due to PROVIDER on the date of such termination.

## 8.  INDEPENDENT CONTRACTOR RELATIONSHIP

The PARTIES acknowledge and agree the SERVICES performed by the PROVIDER, its employees, agents or sub-contractors shall be as an independent contractor and nothing in this AGREEMENT shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the PARTIES.

## 9.  COMPLIANCE WITH LAWS

PROVIDER, in the performance of this AGREEMENT, shall comply with all applicable federal, state and local laws and ordinances, including regulations for licensing, certification and operation of facilities, programs, accreditation, and licensing of individuals, and any other standards or criteria as described in this AGREEMENT to assure quality of services.

## 10.  NONDISCRIMINATION POLICY

PROVIDER is an equal opportunity employer.

Nondiscrimination in Employment.  In the performance of this AGREEMENT, PROVIDER will not discriminate against any employee or applicant for employment on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap; provided that the prohibition against discrimination in employment because of handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. PROVIDER shall ensure that applicants are employed, and that employees are treated during their employment, without regard to their race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following:  employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay, or other forms of compensation; and selection for training, including apprenticeships.

Nondiscrimination in Services.  PROVIDER will not discriminate against any recipient of any services or benefits provided for in this AGREEMENT on the grounds of race, creed, color, natural origin, sex, marital

F - 3

Document ID: af00438e-af21-4233-8699-966c5e5cb62c

status, age or the presence of any sensory, mental or physical handicap.

If any assignment and/or subcontracting by PROVIDER, said assignment or subcontract shall include appropriate safeguards against discrimination. PROVIDER shall take such action as may be required to ensure full compliance with the provisions in the immediately preceding paragraphs herein.

## 11. ASSIGNMENT/SUBCONTRACTING

PROVIDER may assign or subcontract its performance under this AGREEMENT or any portion of this AGREEMENT and it will be binding upon and inure to the benefit of the successors and assigns of PROVIDER.

In the event THIRD PARTY, or another entity ("Obligor"), is obligated by administrative or court order to make payment(s) to PROVIDER on behalf of CLIENT ("Assignor") under the terms of this AGREEMENT and fails to make such payment(s) within thirty-five (35) days upon becoming due ("Outstanding Financial Obligation"), at the written request of PROVIDER, CLIENT shall assign and transfer to PROVIDER ("Assignee") the title and ownership to such claim and cause of action that exists in CLIENT's favor against any such entity and thereby authorize PROVIDER to prosecute said action to resolve said claim at PROVIDER's discretion. Assignor understands that whatever amounts Assignee does not collect from Obligor (whether it be all or part of what is due) shall be paid by Assignor as per the terms of the AGREEMENT.

## 12. CONSENT TO COLLATERAL ASSIGNMENT

CLIENT hereby consents to the collateral assignment by the PROVIDER of all of its right, title and interest in, to and under this AGREEMENT to a collateral agent pursuant to any security agreement the PROVIDER may enter into. The PARTIES agree the collateral agent (or its designee or assignee) shall be entitled to enforce this AGREEMENT in its own name and to exercise any and all rights of the PROVIDER under this AGREEMENT in accordance with the terms hereof (either in its own name or in the name of the PROVIDER, as the collateral agent may elect), and the PARTIES agree to comply and cooperate in all respects with such exercise. Without limiting the generality of the foregoing, the collateral agent (or its designee or assignee), shall have the full right and power to enforce directly against the CLIENT all obligations of the CLIENT under this AGREEMENT and otherwise to exercise all remedies available to the PROVIDER hereunder, and to make all demands and give all notices and make all requests (either in its own name or in the name of the PROVIDER, as the collateral agent may elect) required or permitted to be made or given by the PROVIDER under this AGREEMENT, and the CLIENT acknowledges and agrees that any such action taken by the collateral agent shall be deemed effective for all purposes of this AGREEMENT to the same extent as if such action had been taken directly by the PROVIDER. If the CLIENT shall receive inconsistent directions under this AGREEMENT from the PROVIDER and the collateral agent, the directions of the collateral agent shall be deemed the superseding directions (so long as such directions are consistent with the provisions of this AGREEMENT) and the CLIENT shall accordingly comply with such directions of the collateral agent.

## 13. MODIFICATIONS

Either party may request modifications/amendments to this AGREEMENT, however, no change or addition to this AGREEMENT shall be valid or binding upon either party unless such change or addition be in writing and signed by both PARTIES. Such amendments shall be attached to and made a part of this AGREEMENT.

## 14. NOTICE

By executing the AGREEMENT, the PARTIES agree to the terms set forth above and all notices required for in the AGREEMENT shall be sent by certified mail, return receipt or overnight delivery with signature to the addresses designated for the PARTIES on the first page of this AGREEMENT.

F - 4

Document ID: af00438e-af21-4233-8699-966c5e5cb62c

### 15. **ATTORNEY'S FEES AND COSTS**

If any legal proceeding is brought for the enforcement of this AGREEMENT, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this AGREEMENT, the prevailing party shall be entitled to recover from the other party, in addition to any other relief to which such party may be entitled, reasonable attorney's fees and others costs incurred in such action or proceeding.

### 16. **JURISDICTION**

This AGREEMENT has been and shall be construed as having been made and delivered within New York State, and it is agreed by the PARTIES hereto this AGREEMENT shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. Any action of law, suit in equity, or judicial proceeding for the enforcement of this AGREEMENT or any provisions thereof, shall be instituted and maintained only in any of the courts of competent jurisdiction in New York County, New York State.

### 17. **SEVERABILITY**

It is understood and agreed by the parties hereto that if any part, term or provision of this AGREEMENT is held by the courts of the United States to be illegal, the validity of the remaining provisions shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the AGREEMENT did not contain the particular provision held to be invalid.

If it should appear that any provision hereof is in conflict with any statutory provision of New York State, said provision which may conflict therewith shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to such statutory provision.

### 18. **ENTIRE CONTRACT**

The PARTIES agree this AGREEMENT is the complete expression of the terms hereto and any oral representations or understandings not incorporated herein are excluded. Further, any modification of this AGREEMENT shall be in writing and signed by both PARTIES. Failure to comply with any of the provisions stated herein shall constitute material breach of contract and cause for termination. It is also agreed by the PARTIES the forgiveness of the nonperformance of any provision of this AGREEMENT does not constitute a waiver of the provisions of this AGREEMENT.

### 19. **EXECUTION OF AGREEMENT**

The AGREEMENT may be executed in counterpart with facsimile copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

F - 5

Document ID: af00438e-af21-4233-8699-966c5e5cb62c

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed.

*CLIENT:*

_____
DATE

████████████
STUDENT NAME

PATRICK B. DONOHUE
CLIENT NAME

*Patrick Donohue*
CLIENT SIGNATURE

*PROVIDER:*

*Peter Lam*
Account Manager/Authorized Signature

Peter Lam
Account Manager/Authorized Signatory Name
Sisters Travel and Transportation Services, LLC
2585 Broadway #240, New York, NY 10025

6

F - 6



## Completed Document Audit Report
Completed with SignWell.com

### Title: SJ DONOHUE 24-25 AGREEMENT

Document ID: af00438e-af21-4233-8699-966c5e5cb62c

Time Zone: (GMT+00:00) Coordinated Universal Time

---

### Files

SJ DONOHUE 24-25 AGREEMENT.docx                                      Jun 17, 2024 18:34:12 UTC

### Activity

| | | |
|---|---|---|
| **Sisters Travel and Transportation Services**<br>IP: 158.222.168.132 | created the document | Jun 17, 2024 18:34:27 UTC |
| **Sisters Travel and Transportation Services**<br>IP: 158.222.168.132 | sent the document to sisterstravellc@gmail.com and patrick@pabilaw.com | Jun 17, 2024 18:35:17 UTC |
| **Patrick Donohue**<br>IP: 184.153.75.82 | first viewed document | Jun 17, 2024 22:36:47 UTC |
| **Patrick Donohue**<br>IP: 184.153.75.82 | signed the document | Jun 17, 2024 22:37:04 UTC |
| **Sisters Travel and Transportation Services**<br>IP: 184.153.75.82 | first viewed document | Jun 18, 2024 14:23:25 UTC |
| **Sisters Travel and Transportation Services**<br>IP: 184.153.75.82 | signed the document | Jun 18, 2024 14:23:49 UTC |

F - 7

## NURSING SERVICE AGREEMENT

This agreement, hereinafter referred to as "AGREEMENT", is made and entered into by and between Patrick Donohue, hereinafter referred to as "CLIENT", Parent of █████████ ██████ hereinafter referred to as "STUDENT" residing at ████████ ███████████████████, hereinafter referred to as "HOME" and B&H Health Care Services, Inc.-DBA Park Avenue Home Care, a New York State limited liability corporation, hereinafter referred to as ''PROVIDER''  located at 175 South 9th Street, Brooklyn, NY 11211.

### 1.TERM

This annual AGREEMENT shall be effective from July 2, 2024, through June 27, 2025, hereinafter referred to as "TERM", and cannot be terminated except as provided in SECTION 7.

The STUDENT attends a private school, the International Academy for the Brain ("iBRAIN", "SCHOOL"), located at 403 East 91st Street, New York, NY 10128 (iBRAIN-Manhattan), or at 213 48th Street, Brooklyn, NY 11220 (iBRAIN-Brooklyn) hereinafter referred to as "SCHOOL".

STUDENT attends SCHOOL year-round for approximately 223 days based on the SCHOOL 12-month 2024-2025 School Year calendar, hereinafter referred to as "SCHOOL DAYS." The hours of operation for the STUDENT at the SCHOOL are typically 8:30AM to 4:30PM, with slight variations depending on the unique needs of the STUDENT, hereinafter referred to as "SCHOOL HOURS."

### 2. PURPOSE OF THIS AGREEMENT

The purpose of this AGREEMENT is to establish responsibilities between PROVIDER and CLIENT, hereinafter referred to as "PARTIES", related to the provision of 1:1 Private Duty Nursing services during the school day and/or a 1:1 Transportation Nurse, hereinafter referred to as "SERVICES", for STUDENT during the TERM during SCHOOL DAYS as outlined in section 3 below.

### 3. SCHEDULE OF SERVICE

TRANSPORTATION NURSE SCHEDULE
PROVIDER shall provide a 1:1 Transportation Nurse for STUDENT
- The pick-up location each SCHOOL DAY morning will be HOME and the drop-off location will be SCHOOL, hereinafter referred to as "AM TRIP."
- The pick-up location each SCHOOL DAY in the afternoon will be SCHOOL and the drop-off location will be HOME, hereinafter referred to as "PM TRIP."
- The AM TRIP and PM TRIP will be no more than 60 minutes each way.
- There will be a 15-minute grace period for STUDENT to be ready for AM TRIP and PM TRIP, hereinafter referred to as "FLEXIBLE PICK-UP / DROP-OFF TIMES."

G - 1

- In addition, the CLIENT has the right to change the AM TRIP or PM TRIP times or locations, within New York City, with 72 hours notification to PROVIDER, hereinafter referred to as "CHANGE TO TRIP." The CLIENT must receive written email confirmation from PROVIDER of the request of CHANGE TO TRIP to guarantee modification to the AM TRIP or PM TRIP.

SCHOOL NURSE
- PROVIDER shall provide a 1:1 Private Duty Nurse for STUDENT during the SCHOOL HOURS.

INCLEMENT WEATHER
- PROVIDER will follow the decisions of the SCHOOL, for all Inclement Weather school delays or cancellations.  SERVICES will be provided for delayed opening and early dismissals according to SCHOOL's weather-related changes.  PROVIDER reserves the right to make a decision to adjust pickup times as necessary when it is determined to be in the best interest of STUDENT, this information will be communicated to each CLIENT via email and/or phone call.

**4. PROVIDER RESPONSIBILITES**
PROVIDER shall provide the SERVICES in accordance with the terms of this AGREEMENT. The PROVIDER agrees to use properly trained and licensed nurses employed by or under contract with the PROVIDER.

PROVIDER is not responsible for providing additional medical or health equipment needed for STUDENT, such as, but not limited to, food, medicines, oxygen equipment, gastrostomy tube equipment, or tracheostomy tube equipment.

**5. INSURANCE**
PROVIDER shall obtain and keep in force during the TERM of this AGREEMENT proper insurance coverages for the SERVICES performed, including, but not limited to:
- Workmen's Compensation Insurance in compliance with the laws of the State of New York covering all employees who perform for PROVIDER under this AGREEMENT; and
- General Liability Insurance for all SERVICES in connection with this AGREEMENT.

**6. FEES and PAYMENT FOR SERVICES**
The PARTIES agree all SERVICES will be billed at an annual rate of $303,280, hereinafter referred to as "FEES". CLIENT shall pay FEES with three payment installments: Payment 1: $51,680.00 due on July 2, 2024, Payment 2: $96,560.00 due on September 5, 2024, and a final payment, Payment 3: $155,040.00 due on January 2, 2025.

CLIENT understands and accepts FEES will be based on SCHOOL DAYS, whether STUDENT used SERVICES or not, unless PROVIDER was at fault for STUDENT not utilizing SERVICES. CLIENT warrants STUDENT will be enrolled in SCHOOL for the TERM and obligation to pay FEES is unconditional and cannot be apportioned or mitigated, except as

G - 2

explained above. PROVIDER will not take any deductions, omissions, or refunds for unexcused absences, withdrawal, suspension or for any other reason except as outlined in Section 7. PROVIDER understands and accepts CLIENT will be seeking third party payments for SERVICES from the local school district (e.g., New York City Department of Education) through either an agreement or through an impartial hearing process. PROVIDER agrees to suspend payment obligations until either an agreement or a final administrative or judicial decision is made and then payment will become immediately due within thirty (30) days of the final adjudication or execution of an agreement with the local school district.

In the event Parent is denied all or part of the funding due under this Agreement by a final administrative or judicial decision, including all state and federal appeals resolving the claim for such funding, Parent will be permitted to immediately terminate this contract per Section 7 below. Upon termination, Parent will be required to execute a payment schedule to comply with the contractual obligations based upon the financial need of Parent for any balances due to PROVIDER on the date of withdrawal.

## 7. **TERMINATION**
<u>Termination for Cause.</u> If PROVIDER or CLIENT fails to perform in the manner called for in this AGREEMENT, or if PROVIDER or CLIENT fails to comply with any other provisions of the AGREEMENT and fails to correct such noncompliance within five (5) business days written notice thereof, CLIENT or PROVIDER may terminate this AGREEMENT for cause.

Termination shall be affected by serving a notice of termination on PROVIDER or CLIENT setting forth the manner in which PROVIDER or CLIENT is in default.

The CLIENT may terminate the AGREEMENT if STUDENT relocates outside of local school district or due to health reasons STUDENT is no longer requiring SERVICES.

In the event, CLIENT has exhausted all legal remedies available to them to secure third party funding, the CLIENT may terminate the AGREEMENT in writing, but will remain responsible for any balance due to PROVIDER on the date of such termination

## 8. **INDEPENDENT CONTRACTOR RELATIONSHIP**
The PARTIES acknowledge and agree the SERVICES performed by the PROVIDER, its employees, agents or sub-contractors shall be as an independent contractor and nothing in this AGREEMENT shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the PARTIES.

## 9. **COMPLIANCE WITH LAWS**
PROVIDER, in the performance of this AGREEMENT, shall comply with all applicable federal, state and local laws and ordinances, including regulations for licensing, certification and operation of facilities, programs, accreditation, and licensing of individuals, and any other standards or criteria as described in this AGREEMENT to assure quality of services.

## 10. **NONDISCRIMINATION POLICY**
PROVIDER is an equal opportunity employer.

Nondiscrimination in Employment. In the performance of this AGREEMENT, PROVIDER will not discriminate against any employee or applicant for employment on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap; provided that the prohibition against discrimination in employment because of handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. PROVIDER shall ensure that applicants are employed, and that employees are treated during their employment, without regard to their race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay, or other forms of compensation; and selection for training, including apprenticeships.

Nondiscrimination in Services. PROVIDER will not discriminate against any recipient of any services or benefits provided for in this AGREEMENT on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap.

If any assignment and/or subcontracting by PROVIDER, said assignment or subcontract shall include appropriate safeguards against discrimination. PROVIDER shall take such action as may be required to ensure full compliance with the provisions in the immediately preceding paragraphs herein.

## 11. ASSIGNMENT/SUBCONTRACTING

PROVIDER may assign or subcontract its performance under this AGREEMENT or any portion of this AGREEMENT and it will be binding upon and insure to the benefit of the successors and assigns of PROVIDER.

## 12. CONSENT TO COLLATERAL ASSIGNMENT

CLIENT hereby consents to the collateral assignment by the PROVIDER of all of its right, title and interest in, to and under this AGREEMENT to a collateral agent pursuant to any security agreement the PARTIES may enter into. The PARTIES agree the collateral agent (or its designee or assignee) shall be entitled to enforce this AGREEMENT in its own name and to exercise any and all rights of the PROVIDER under this AGREEMENT in accordance with the terms hereof (either in its own name or in the name of the PROVIDER, as the collateral agent may elect), and the PARTIES agree to comply and cooperate in all respects with such exercise. Without limiting the generality of the foregoing, the collateral agent (or its designee or assignee), shall have the full right and power to enforce directly against the CLIENT all obligations of the CLIENT under this AGREEMENT and otherwise to exercise all remedies available to the PROVIDER hereunder, and to make all demands and give all notices and make all requests (either in its own name or in the name of the PROVIDER, as the collateral agent may elect) required or permitted to be made or given by the PROVIDER under this AGREEMENT, and the CLIENT acknowledges and agrees that any such action taken by the collateral agent shall be deemed effective for all purposes of this AGREEMENT to the same extent as if such action had been taken directly by the PROVIDER. If the CLIENT shall receive inconsistent directions under this AGREEMENT from the PROVIDER and the collateral agent,

G - 4

the directions of the collateral agent shall be deemed the superseding directions (so long as such directions are consistent with the provisions of this AGREEMENT) and the CLIENT shall accordingly comply with such directions of the collateral agent.

## 13. MODIFICATIONS

Either party may request modifications/amendments to this AGREEMENT, however, no change or addition to this AGREEMENT shall be valid or binding upon either party unless such change or addition be in writing and signed by both PARTIES. Such amendments shall be attached to and made a part of this AGREEMENT.

## 14. NOTICE

By executing the AGREEMENT, the PARTIES agree to the terms set forth above and all notices required for in the AGREEMENT shall be sent by certified mail, return receipt or overnight delivery with signature to the addresses designated for the PARTIES on the first page of this AGREEMENT.

## 15. ATTORNEY'S FEES AND COSTS

If any legal proceeding is brought for the enforcement of this AGREEMENT, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this AGREEMENT, the prevailing party shall be entitled to recover from the other party, in addition to any other relief to which such party may be entitled, reasonable attorney's fees and others costs incurred in such action or proceeding.

## 16. JURISDICTION

This AGREEMENT has been and shall be construed as having been made and delivered within New York State, and it is agreed by the PARTIES hereto this AGREEMENT shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. Any action of law, suit in equity, or judicial proceeding for the enforcement of this AGREEMENT or any provisions thereof, shall be instituted and maintained only in any of the courts of competent jurisdiction in New York County, New York State.

## 17. SEVERABILITY

It is understood and agreed by the parties hereto that if any part, term or provision of this AGREEMENT is held by the courts of the United States to be illegal, the validity of the remaining provisions shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the AGREEMENT did not contain the particular provision held to be invalid.
If it should appear that any provision hereof is in conflict with any statutory provision of New York State, said provision which may conflict therewith shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to such statutory provision.

## 18. ENTIRE CONTRACT

The PARTIES agree this AGREEMENT is the complete expression of the terms hereto and

any oral representations or understandings not incorporated herein are excluded. Further, any modification of this AGREEMENT shall be in writing and signed by both PARTIES. Failure to comply with any of the provisions stated herein shall constitute material breach of contract and cause for termination. It is also agreed by the PARTIES the forgiveness of the nonperformance of any provision of this AGREEMENT does not constitute a waiver of the provisions of this AGREEMENT.

## 19. EXECUTION OF AGREEMENT

The AGREEMENT may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," "signed," "signature," and words of like import in this AGREEMENT or in any other certificate, agreement or document related to this AGREEMENT, shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed.

**STUDENT:** ███████████

**CLIENT: Patrick Donohue**

*Patrick Donohue*
_____
CLIENT SIGNATURE

**PROVIDER**:

_____
Account Manager/Authorized Signature
266 Broadway #302, Brooklyn, NY 11211

**DATE:** 6/17/24
_____
(or via Electronic Date Stamp)



Completed Document Audit Report
Completed with SignWell.com

**Title:** █████ 2024 Contract

Document ID: d4c3847f-5cb2-4ea7-8988-3187d2e98d6e

Time Zone: (GMT+00:00) Coordinated Universal Time

---

## Files

█████ 2024 Contract.pdf                                      Jun 17, 2024 18:17:26 UTC

## Activity

| | | |
|---|---|---|
| **Susan Friedman** <br> IP: 98.116.5.178 | created the document | Jun 17, 2024 18:17:50 UTC |
| **Susan Friedman** <br> IP: 98.116.5.178 | sent the document to patrick@pabilaw.com and cj@nursingpersonnel.com | Jun 17, 2024 18:18:27 UTC |
| **[Email ID]** <br> IP: 184.153.75.82 | **patrick@pabilaw.com** - first viewed document | Jun 17, 2024 22:20:51 UTC |
| **[Email ID]** <br> IP: 184.153.75.82 | **patrick@pabilaw.com** - signed the document | Jun 17, 2024 22:21:09 UTC |
| **[Email ID]** <br> IP: 2607:f0d0:3a01:ac::13 | **cj@nursingpersonnel.com** - first viewed document | Jun 17, 2024 23:01:54 UTC |
| **[Email ID]** <br> IP: 2607:f0d0:3a01:ac::13 | **cj@nursingpersonnel.com** - signed the document | Jun 17, 2024 23:02:26 UTC |

G - 8