# EXHIBIT B

O94RTHOc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARTINE THOMAS, *as Parent and
    Natural Guardian of A.T., et*
4   *al.,*

5              Plaintiffs,

6          v.                              24 Civ. 05138 (JLR)

7   DAVID C. BANKS, *in his
    official capacity as*
8   *Chancellor of the New York
    City Department of Education,*
9   *et al.,*

                                           OCS Hearing
10
               Defendants.
11
    ------------------------------x
12                                         New York, N.Y.
                                           September 4, 2024
13                                         3:00 p.m.

14  Before:

15                 HON. JENNIFER L. ROCHON,

16                                         District Judge

17                     APPEARANCES

18  BRAIN INJURY RIGHTS GROUP
         Attorneys for Plaintiffs
19  BY:  RORY J. BELLANTONI

20  NEW YORK CITY LAW DEPARTMENT
         Attorneys for Defendants
21  BY:  THOMAS LINDEMAN

22  Also Present:
    Alexandra Martinesi, Paralegal, Brain Injury Rights Group
23

24

25

O94RTHOc

```
1              (Case called)
2              MR. BELLANTONI:  Good afternoon, your Honor.  Rory
3    Bellantoni for the plaintiffs.  Your Honor, I have with me
4    Alexandra Martinesi.  She's not an attorney.  She's a
5    paralegal.  My associate was sick and couldn't make it.  So
6    she's here to help me if that's okay with your Honor?
7              THE COURT:  Absolutely.  Welcome to you both.
8              MR. LINDEMAN:  Good afternoon, your Honor.  Thomas
9    Lindeman for defendants.
10             THE COURT:  Hello, Mr. Lindeman.  I understand your
11   colleague might be joining.
12             MR. LINDEMAN:  I think he is having transportation
13   troubles, so he might not make it.
14             THE COURT:  He might not make it.
15             MR. LINDEMAN:  I suppose if we go long enough, your
16   Honor.
17             THE COURT:  Well, I won't base it on that.
18             So we are here on an order to show cause that was
19   filed by plaintiff for emergency relief.  There was a portion
20   that was filed earlier for emergency relief with respect to the
21   meetings, scheduled resolution meetings, and I denied that
22   earlier.  But now we've got another portion of an order to show
23   cause regarding the complaint filed in this action, and that
24   letter motion was filed, I believe, on August 20.  It is
25   seeking why an injunction should not be issued identifying the
```

O94RTHOc

1    plaintiffs' pendency programs, placements, and requiring

2    defendant to fund said programs and placements inclusive of

3    tuition-related services, special transportation, and nursing

4    or applicable, and directing the DOE to fund each student

5    plaintiffs' tuition and related services to the extent that

6    each parent plaintiff is obligated.

7        I did receive plaintiffs' memorandum of law in support

8    of their motion and declaration as well as exhibits.  I did get

9    defendants' opposition to that motion on August 29, and then I

10   got a reply from plaintiffs on September 4, today.  I have with

11   that another declaration and associated exhibits.

12       So why don't we start then with you Mr. Bellantoni

13   since it is your motion.  I don't know if there are any

14   updates; probably not since I got your reply as late as today,

15   so that should be as current as it comes.  But I'm happy to

16   hear any other argument or any other presentation you wish to

17   make with respect to your request for injunctive relief.

18       MR. BELLANTONI:  Thank you, your Honor.  Just to be

19   clear——and I'm not sure this was last night——I learned this

20   morning that there are three students that have pendency.

21   Well, for the record——we could always scrub it later——but A --

22       THE COURT:  Just give me the initials.

23       MR. BELLANTONI:  A.C. or A.C.T., M.B., and S.J.D.

24       THE COURT:  So M.B., as in boy?

25       MR. BELLANTONI:  Yes, your Honor.

O94RTHOc

| 1 | THE COURT:  So they have pendency orders?

| 2 | MR. BELLANTONI:  They have pendency orders now.

| 3 | THE COURT:  Okay.

| 4 | MR. BELLANTONI:  The DOE has made a tuition payment

| 5 | with respect to S.J.D.

| 6 | THE COURT:  Okay.

| 7 | MR. BELLANTONI:  The other three students:  A.T., L.C.

| 8 | and M.C., while pendency does lie at iBRAIN, based on an

| 9 | unappealed or final administrative order, they don't have a

| 10 | pendency order.  None of the students have pendency orders yet,

| 11 | and the DOE has contested pendency in the proceedings below.

| 12 | I know there's some discussion in the DOE's opposition

| 13 | brief that plaintiffs aren't entitled to an order because

| 14 | pendency shouldn't require one.  It's automatic.  Therein lies

| 15 | the problem, your Honor.  We filed ten-day notices mid June,

| 16 | due process complaints the beginning of July.  The DOE has not

| 17 | only not conceded pendency as in years past, but this year

| 18 | actively has opposed pendency at iBRAIN.

| 19 | In addition --

| 20 | THE COURT:  Let me pause you for a moment.

| 21 | MR. BELLANTONI:  Yes, your Honor.

| 22 | THE COURT:  So we have three of the plaintiffs.  And

| 23 | how many plaintiffs do we have here?  We have six plaintiffs.

| 24 | So three of them have pendency orders, and so now you are

| 25 | arguing about the other three who have pendency with iBRAIN but

O94RTHOc

1   not a pendency order?

2        MR. BELLANTONI:  Neither an order nor a concession

3   from the defendants, which last year arguably was what mooted

4   out many of the cases we filed.  By mid August or September,

5   the DOE conceded that pendency lied at iBRAIN and they would

6   fund pendency, which was the issue in *Mendez*.

7        THE COURT:  Okay.

8        MR. BELLANTONI:  Different this year, DOE has not

9   conceded that pendency lies in iBRAIN and that they will fund

10  pendency.  They've objected to the educational program.

11  They've objected to transportation.  They've offered to provide

12  transportation through the school system.  None of the IHOs

13  here ordered that as part of pendency.  It was ordered in

14  another case for two of the students; although, it hasn't been

15  provided yet.  So this isn't a situation, unfortunately as in

16  years past, where ultimately we can agree where pendency lies.

17  Even though it's automatic, at this point, the DOE has

18  contested --

19        THE COURT:  And how have they contested if it's

20  automatic?

21        MR. BELLANTONI:  Well, at the administrative

22  proceedings, they've actively submitted motions opposing

23  pendency with respect to the school.  I think one of the

24  arguments is that the tuition has gone up, and they don't

25  concede that iBRAIN is the appropriate placement but that if it

O94RTHOc

```
1   were, the tuition is too costly.  Which begs the question,

2   Judge --

3           THE COURT:  Go on.

4           MR. BELLANTONI:  I was going to say, your Honor—I

5   don't want to do the defense's job for them—but if it were my

6   client, I would advise them to then at least begin to fund what

7   they think they owe and we can fight about the difference.  The

8   problem here is that they are contesting pendency because

9   there's a difference in the tuition amount between last year

10  and this year.  As far as --

11          THE COURT:  Okay.  When you say they filed papers in

12  the administrative proceeding, so that administrative

13  proceeding is progressing with respect to those three?

14          MR. BELLANTONI:  Yes, your Honor.  I can -- for L.C.,

15  there's a hearing schedule for tomorrow on the final merits.

16  So student still hasn't gotten a pendency order or

17  determination.

18          THE COURT:  Okay.

19          MR. BELLANTONI:  For M.C., there's a hearing scheduled

20  for today.  I don't know that it's done.  I haven't gotten a

21  word, but it's a pendency hearing and a due process hearing.

22          THE COURT:  Okay.

23          MR. BELLANTONI:  And for...

24          THE COURT:  A.T.

25          MR. BELLANTONI:  If I could just go through my notes
```

O94RTHOc

1   briefly, your Honor?

2              THE COURT:  Sure.

3              MR. BELLANTONI:  There was a pendency hearing that

4   occurred on the 21st and 23rd of August.  Pendency disclosures

5   were filed on August 21.  No pendency order has issued yet, and

6   I don't have a date for that hearing, for the final

7   administrative hearing on the merits.

8              THE COURT:  Okay.  That gives me a good lay of the

9   land.

10             All right.  And so, with respect to the three who have

11  pendency orders, why is that not moot in terms of the

12  injunctive relief you are seeking with respect to them other

13  than the payments that you're seeking?

14             MR. BELLANTONI:  For those three, it may very well be,

15  your Honor --

16             THE COURT:  Okay.

17             MR. BELLANTONI:  -- at least at this point.  If

18  there's an acknowledgment from counsel today that DOE agrees

19  pendency lies there; they are not appealing the orders.  They

20  do have, I guess it's 45 days to appeal, 25 days to file a

21  notice of intent to seek review to the SRO.  So if the DOE

22  isn't appealing those and they concede that pendency lies at

23  iBRAIN, they have an obligation to fund, and in the underlying

24  proceedings, they want them to provide their own

25  transportation.  If they are now conceding that they have to

O94RTHOc

1    fund the private transportation, then those issues would be

2    moot, your Honor.

3            THE COURT:  So I guess a fundamental question that I

4    have, Mr. Bellantoni, is—let's focus on the latter three, the

5    three that are going through the administrative proceedings

6    right now—why is that ripe for my review when we haven't even

7    gotten through the administrative proceedings yet?

8            MR. BELLANTONI:  Well, this was discussed with Judge

9    Schofield yesterday.  I know Mr. Lindeman will address it, so

10   I'm not going to get ahead of him.  Judge Schofield took the

11   position that at this point, she wasn't acknowledging that she

12   had jurisdiction.  She wants to see a 12(b)(1) motion on the

13   facts to determine if she has jurisdiction.  I indicated I

14   would amend the complaint to include more recent facts.  So I

15   have until next week to amend the complaint.

16           She didn't get to the TRO because she was not

17   confident she had jurisdiction over the matter.  As far as

18   whether it's ripe or not, the idea that administrative remedies

19   are not exhausted doesn't apply here in cases related to

20   pendency.  I mean, the Second Circuit addresses this in a case

21   we lost in *Ventura de Paulino*.  I wasn't at the firm at the

22   time, but there was relief sought.  We didn't prevail, but the

23   Second Circuit said at least for jurisdictional purposes or

24   exhaustive purposes, any case that implicates pendency, there's

25   no need to exhaust administrative remedies.

O94RTHOc

1          So here if we're saying it's not ripe because we

2    haven't exhausted, we don't have to exhaust.  If there's a

3    different issue where it's not ripe because there may not be a

4    discernible controversy because the DOE hasn't yet said we're

5    not paying.  Again, unlike the facts of *Mendez*, which I was

6    part of below and in the Second Circuit, there the DOE conceded

7    pendency lied at iBRAIN, said they were processing payment,

8    said payment would be made.  Therefore, the implication in the

9    complaint that no it wouldn't despite statements it would be,

10   it wasn't right.

11         Also, that complaint was not pled properly.  I believe

12   we asked for tuition to be paid to the end of the school year

13   rather than throughout the entirety of the administrative

14   proceedings.  And one of the things Judge Nathan said, You

15   can't ask for relief to the end of the school year because

16   we're not at the end of the year yet.  So if you are asking

17   about current pendency, funding as the student is staying put,

18   if you will, that's ripe.  But the idea that we want payment

19   from now until the end of the school year isn't ripe because

20   she found that there was nothing in the papers that suggested

21   that the DOE wasn't going fund pendency through the end of the

22   school year.

23         Here, while the issue of funding, I would argue again

24   that the letter the school got about being behind in rent and

25   the landlord threatening to start an eviction process, with

O94RTHOc

1    respect to some of the iBRAIN offices, puts the students at

2    risk, or at least it did when I filed the motion.

3          If I may, Judge, one of the complications here for me

4    as an attorney is that this school will not disenroll

5    individual students that get behind in tuition.  So if I had a

6    letter from the school that said if tuition isn't paid by

7    Monday, your child is out, well, there's the irreparable harm.

8    But this school will not do that.  So what happens is when the

9    school gets behind in rent and cannot make payroll and is

10   facing actual closure payment and I start an action like this,

11   payment for one student may obviate the need for orders for all

12   the rest.

13         If they are behind $2- or $300,000 in rent and

14   pendency from July to December last year was like $4- or $5

15   million that hadn't been paid, $3-, $4-, $500,000 certainly

16   takes them out of that imminent risk category.  Now, the

17   school, if they were here, I am sure they would tell you, No,

18   no, they are in danger of closing.  I can't say that, but they

19   are not a foreclosure action if at least they are current and

20   more payments are coming.

21         THE COURT:  In fact, S.J.D. was just given tuition

22   payment.

23         MR. BELLANTONI:  Exactly.  So that would go towards

24   the back rent.  So the issue, Judge, with respect to ripeness

25   is the 10-day notices in June advised the DOE that students

O94RTHOc

1    would be staying at iBRAIN.  Remember, your Honor——and I

2    apologize for using "remember," your Honor——in order to have

3    pendency at iBRAIN, the students would have to have prevailed

4    last year.  So iBRAIN becomes their current educational

5    placement.  The DOE was put on notice, at least in mid June,

6    that the students would be staying here, again in July that the

7    students would be staying here, objected to pendency, moved to

8    dismiss some of the cases because the parents didn't attend the

9    resolution meetings.  Although, we're beyond the resolution

10   process, so I'm not going to discuss that, but there have been

11   objections below.

12          One of the issues that *Mendez* created is that the DOE

13   is given at least some latitude to pay pendency in its due

14   course.  But they don't -- won't discuss with us what their due

15   course is.  Some students have gotten pendency payments while

16   others they haven't conceded have pendency at iBRAIN.  If they

17   at least conceded iBRAIN was the pendency placement, then I

18   couldn't bring an action until there was some harm or at least

19   prospective harm to the students.  So it's ripe, right now,

20   your Honor if not the funding portion, at least the

21   determination.

22          As far as I can observe until there's a concession or

23   order establishing pendency, the DOE won't even start its due

24   course.  So if we don't have an order or concession now, there

25   may not be pendency payments until February or March.  And I'm

O94RTHOc

1   not saying that that is intentional.  I mean, I might another

2   day, but even if it's just, as Mr. Lindeman will advise the

3   Court, the DOE has thousands of students to deal with and

4   process and these cases fall off their radar if there isn't an

5   order, then these students can be harmed down the road when

6   there isn't an ability to fund the school.  The school has --

7        Your Honor, I'm not sure if Mr. Mielnik made it clear

8   in his declaration, but there are 200 employees in this school,

9   two campuses in the city, one on the Upper East Side and one in

10  Brooklyn.  The payroll alone, I think, is $600,000 every two

11  weeks for 200 employees.  So I understand it's not the DOE's

12  job to fund the private school unless it is, and for these 40

13  students—well, the six here and others that have pendency—it

14  is their obligation to continue funding these placements from

15  last year into this year.

16       These students, your Honor, started school in July.

17  They are on an extended school year program.  In fact, one of

18  the issues we went into is the DOE doesn't have witnesses to

19  appear at the hearings over the summer.  I know there are a lot

20  of students the DOE deals with.  I don't know that there are

21  20- or 30,000 in this category.  I know of two schools, iHOPE

22  and iBRAIN, that deal with students that have traumatic brain

23  injury.

24       Again, we've never had that conversation where the DOE

25  would sit down and say, Listen, we processed 10,000, 5,000,

O94RTHOc

```
1    4,000, 300 requests every year.  Here is how you can make it

2    easier for us.  We've tried that.  We forwarded the

3    administrative orders that formed the basis of pendency, but no

4    luck.  I think you are looking at the exhibit to my

5    declaration, in the administrative proceedings, the DOE moves

6    to dismiss the matters before the IHOs or at least opposes

7    pendency, arguing that because we started this action, the

8    administrative officers don't have jurisdiction.  And then,

9    they come here and argue, your Honor doesn't have jurisdiction

10   because we started the action in the administrative proceeding.

11   Yet no -- even as they say in their brief pendency automatic,

12   no concession that pendency lies at iBRAIN.

13         THE COURT:  Thank you, Mr. Bellantoni.  Let me ask a

14   couple of questions.  So the first one is on irreparable harm.

15   I know there's a dispute about whether you're saying you don't

16   have to do irreparable harm, and you have to meet the *Mendez*

17   standard that the placement is at risk or whatever the rule is.

18   You are essentially here for expedited injunctive relief out of

19   the normal course, and that is usually only given if there is

20   some impending irreparable harm.

21         What is that?  Because otherwise I have a motion to

22   dismiss that would address jurisdictional issues that I think

23   are probably important to address, and your clients are at

24   iBRAIN.  They are getting services.  They haven't been denied

25   services.  Payments are coming in.  They are not all in but
```

O94RTHOc

1    under *Mendez*, I can't order them to come in faster.  So what is

2    the irreparable harm that warrants an order of this Court now,

3    as opposed to briefing of the motion to dismiss, briefing of

4    the injunction request, the subject matter jurisdiction, et

5    cetera, in the normal course?

6         MR. BELLANTONI:  If I may just briefly, your Honor, in

7    *Mendez*, Judge Nathan recognized two of the three principles

8    that we argued, and that is pendency under 1514(j) is automatic

9    as to placement.  We don't have to show the four factors, and

10   automatic as to the responsibility to fund.  She never said

11   that the harm that has to be demonstrated is irreparable.

12        In fact, if you read her decision to the end, there's

13   a final section where she addresses notwithstanding the above,

14   let's talk about irreparable harm.  What she said was under

15   1415(j) the automatic injunction becomes automatic potentially

16   if you can show that the placement is in jeopardy or is at risk

17   of losing the program.  Now, I would argue it's synonymous.  In

18   *Honig*, the Supreme Court said that denial of services, harm is

19   presumed under 1415(j).  If you don't have a pendency

20   placement, harm is presumed.  So there's one argument, your

21   Honor, analogous to First Amendment cases.  If I'm deprived of

22   my right to speak tomorrow, while I may not have a catastrophic

23   injury, the denial of that right is irreparable.

24        THE COURT:  What is the right they are being denied?

25        MR. BELLANTONI:  One of the rights they are being

O94RTHOc

1   denied is part of the free appropriate public education.

2          THE COURT:  But they are in iBRAIN?

3          MR. BELLANTONI:  Yes, but the DOE makes this argument

4   that they are getting the services they are required to get but

5   only because the school goes into debt every pay period.  In

6   other words, they are not funding those services.  They are

7   getting them until they won't, and once they are out on that

8   sidewalk, once staff quits because they don't get paid and this

9   has happened.  Payment was delayed last year.  It was a week,

10  two weeks.  Once you lose personnel in the school, people are

11  not going to come and work at a place they think isn't solid.

12  So the harm right now, and more specifically in this case, was

13  the letter from the landlord that the school is behind in rent

14  and subject to eviction proceedings if they don't get their

15  rent money by the 28th.

16          I understand that Mr. Mielnik advised the landlord

17  they are in court and there could potentially be a remedy, so

18  they haven't started the eviction proceedings yet.  You take

19  the payment that was made for S.J.D., if rent was due or

20  outstanding three weeks ago in the amount of $150,000, it looks

21  like that payment is going to cover that.  But then you still

22  have $600,000 in payroll to cover for the past two weeks.  I

23  think Judge Failla, last year, asked about mismanagement.  How

24  do we know the school isn't mismanaging money rather than -- my

25  answer was, They are owed what they are owed.  Until they get

O94RTHOc

what they are owed, I don't think we get that far.

I think if anything may not be ripe right now, it may be the request for expedited funding. But as far as a pendency order, given that the DOE has contested pendency below, I think the issue -- and it may not necessarily require relief in the form of the TRO today. Expedited next week, maybe a week later, but we're talking about a school that walks a very fine line between trying to stay open and closed. And we don't get any of the, you know, discussion of what we're doing.

You know, the DOE complains that these students get lawyers and want to jump to the top of the pile of all the students. But if that's improper, maybe just tell me where I am in the pile. We don't know whether these students are three months from getting pendency, they are 5,000 on the list, whether they are third. Is there anything we can do to expedite their review of pendency? We provided the orders. We provided the final orders and -- not a convincing argument in some courtrooms, but pendency for these kids, your Honor, is established as soon as an underlying administrative order becomes final. It doesn't have to be July 5th.

For an example, I don't have the complaint, but hypothetically if S.J.D.'s final administrative order was issued last January, they knew last January that if the parent contests the IEP this year, pendency is at iBRAIN. It's not like we filed the DPC, ran to court and didn't give the DOE

O94RTHOc

1    time to determine where pendency lied.  They had seven months.

2    They knew if S.J.D. contests their IEP, it's going to be at a

3    Brian.

4           THE COURT:  Thank you, Mr. Bellantoni.  Let me hear

5    from your colleague, and then maybe we'll come back to you.  I

6    just need a little bit of balance there.

7           MR. BELLANTONI:  I'm sorry.  Thank you, Judge.

8           THE COURT:  Oh, no, and thank you for being such a

9    strong advocate for clients.

10          Mr. Lindeman, you can add to what is in your paper.

11   You can feel free to address anything you wish.  What I'm

12   struggling with right now is why we're here for expedited

13   relief, and why I shouldn't just be proceeding down to the

14   motion to dismiss route to see if there's jurisdiction at all

15   and then move from there.  But why don't you address the points

16   made by Mr. Bellantoni, if you could?

17          MR. LINDEMAN:  All of them, your Honor?

18          THE COURT:  Well, I guess one of them that I would

19   like you to address would be the individuals A.T., L.C. and

20   M.C. do not have pendency orders.  And so, is there some relief

21   that it is appropriate for this Court to grant at this point?

22          MR. LINDEMAN:  Your Honor, I don't believe that there

23   is.  To, I think, add some color to what plaintiffs' counsel

24   said, I don't actually believe that for most of these students

25   the specific placement at iBRAIN is being contested.  My

O94RTHOc

1   understanding is that most of what is being contested at the

2   administrative level is the cost of these services, what

3   services are covered by pendency, whether that means nursing

4   services, additional or related services and who provides

5   transportation services.

6           THE COURT:  So let me pause you for a moment.  So what

7   is being contested is the cost of iBRAIN or just the additional

8   services?

9           MR. LINDEMAN:  I want to say both.

10          THE COURT:  Okay.

11          MR. LINDEMAN:  The way that iBRAIN structures, as I

12  understand it -- my office doesn't handle the administrative

13  portions of these cases, so these come to me a little later in

14  the process.  But as I understand it, having seen iBRAIN

15  tuition payments in the past, they have a base tuition, which

16  is in-class services for the year, and then separately there

17  are costs for related services which can be occupational

18  therapy and --

19          THE COURT:  Nursing, transportation?

20          MR. LINDEMAN:  Nursing is handled by a separate

21  company──I apologize, your Honor──and transportation is handled

22  by yet another company.

23          THE COURT:  Okay.

24          MR. LINDEMAN:  But iBRAIN structures its portion of

25  those services as base level tuition and then additional

O94RTHOc

1    related services that this student might need.  My

2    understanding is that year to year the cost of those services

3    change.  Our argument has been that when the cost of those

4    services change or when the student is receiving services in

5    the current year that they did not receive in the previous

6    year, the DOE should only be obligated to pay for the cost of

7    services that they were ordered to pay for the previous year.

8    Whether an IHO agrees with that, that is up to the discretion

9    of an IHO.  It's probably related to how much those things

10   cost, whether the placement is based on additional metrics,

11   other things that could be briefed at the administrative level.

12          My understanding is for the students that do have

13   pendency orders, the DOE does not intend to appeal those.

14          THE COURT:  Who has pendency orders?

15          MR. LINDEMAN:  S.J.D., M.B., and A.C.

16          THE COURT:  Okay.

17          MR. LINDEMAN:  I believe that the DOE does not intend

18   to appeal any of those orders, and I will assume that we'll

19   abide by any decisions that are made for the outstanding

20   students at the admin level.  When those decisions are made, if

21   those decisions are adverse to the plaintiffs and there's some

22   risk then that an adverse decision would result in the student

23   losing placement, that decision might be ripe for this Court to

24   review.  That's what Judge Clarke decided last year in the

25   *Grullon* case.

O94RTHOc

1          THE COURT:  Or the Judge Englemayer case in --

2          MR. LINDEMAN:  *Moonsammy*.

3          THE COURT:  Yes.

4          MR. LINDEMAN:  Each case is a little bit complicated.

5    They are actually, as I understand it as of earlier this week,

6    four outstanding cases dealing with that student.  A lot went

7    on there, but that student did not previously have a pendency

8    determination.  Plaintiffs are contesting a portion of an SRO

9    decision that grants pendency, and the parties had a

10   disagreement on whether the uncontested portion of the SRO case

11   created pendency or not, which is what Judge Englemayer was

12   asked to decide in the second of the four related cases.

13         THE COURT:  Okay.

14         MR. LINDEMAN:  But, yes --

15         THE COURT:  When I read the *Moonsammy* cases, those

16   seem to be a different procedural posture than what we have

17   here.

18         MR. LINDEMAN:  Yes, your Honor.

19         THE COURT:  Let's go back to the procedural posture we

20   have here.  And just to oversimplify for myself, we've got

21   three of the plaintiffs A.C., M.B. and S.J.D. who have pendency

22   orders.  The DOE is not going to appeal those.  I can't imagine

23   what relief that I need to give with respect to that.  That

24   seems moot.

25         Now, there's three others, A.T., L.C. and M.C. who are

O94RTHOc

1    in the middle of their hearings.  It appears they are happening

2    today, have happened in the last few days, but they don't have

3    a pendency order.  Why should I not consider relief from them

4    as requested from Mr. Bellantoni?

5         MR. LINDEMAN:  Well, your Honor, it seems to me that

6    currently those students don't have a justiciable issue for

7    this Court to hear.  They are receiving relief through the

8    administrative proceedings.  They will receive a pendency

9    determination, and some of them will presumably receive final

10   determinations in the next two weeks.  My understanding is for

11   all of these students, the compliance period runs out on the

12   15th or the 16th of this month.  Some of the parties may,

13   of course, consent to extend that.  I don't know the exact

14   posture of all these cases, but they are receiving the relief

15   they want.

16        Until an adverse decision is reached for one of these

17   students, there's nothing to contest.  I would disagree with

18   Mr. Bellantoni's framing of the *Ventura de Paulino* case and the

19   *Mendez* case on these points.  Both of those cases were also at

20   very different procedural postures.  But what the Court said in

21   those moments were that if plaintiffs can show a harm, an

22   actual harm, a risk that the student is being taken out of

23   their pendency placement or a risk that the pendency -- or an

24   actual incidence where the student has been moved or is going

25   to be moved because the parties disagree on what pendency is,

O94RTHOc

1    that is a live dispute.  But there is no live dispute here

2    because the students are receiving their pendency placement

3    they are looking for, and they will receive an order in the

4    ordinary course of the administrative proceeding.

5           THE COURT:  And that is what you briefed in point two

6    of your motion to dismiss?

7           MR. LINDEMAN:  Yes, your Honor.

8           THE COURT:  Which I don't have full briefing on, but

9    we're here preemptively because of the order to show cause.

10          MR. LINDEMAN:  Yes.  As I think Mr. Bellantoni

11   mentioned briefly, the parties appeared yesterday in front of

12   Judge Schofield and we discussed similar issues.  We're going

13   to fully brief that case, I think, by the end of October.  And

14   I think fully briefing those issues before discussing whether

15   there's actual substantive relief to be offered to plaintiffs

16   is more important than skipping the jurisdictional issues.

17          THE COURT:  Right, which I, frankly, should not do

18   because I shouldn't be considering or granting or even

19   considering any relief if I don't have jurisdiction.

20          Okay.  Let's move a little bit into the -- and I'll

21   call it irreparable harm or the risk to their placement or

22   however we choose to characterize it.  What is the DOE's

23   position on that?  I know I'm hearing different things from

24   plaintiff sort of day by day, but can I hear your position,

25   please?

O94RTHOc

1      MR. LINDEMAN:  There's sort of a complicated backstory

2  to some of this, your Honor, that I don't necessarily know.  It

3  can be hard to get into because plaintiffs' counsel represents

4  a lot of these students but all at this one school, all

5  receiving services from the same third-party service providers.

6  And it's not entirely clear to me in this instance what the

7  harm would be to the students.

8      Roughly a year ago now, I received personally an email

9  containing a letter from a CPA who purported to work for iBRAIN

10  and some others.  I never heard from him again but that letter

11  claimed that we owed them an outstanding $3 or $4 million

12  dollars.  The math was wrong.  We had some concerns about that.

13  About a month later, Mr. Arthur Mielnik wrote in a declaration

14  to several judges in that district that that number had

15  ballooned to $7 million.  That was over Thanksgiving of 2023.

16      By Christmas of 2023, most of those amounts had been

17  paid in the ordinary case.  The harm had disappeared, and we

18  appeared in front of Judge Failla and addressed this issue,

19  what harm exists to the students if the school does shut down.

20  And the position that the court took in that matter, and which

21  I would repeat here, is that if these students are taken out of

22  their placement because the school shuts down, that is not

23  necessarily the obligation -- it's not necessarily the

24  obligation of the DOE to prevent that.  There are a lot of

25  things that can go wrong at a school, and if we pay the

O94RTHOc

1    taxpayers' money into a school and then it shuts down anyway,

2    that money doesn't come back.  The obligation to the taxpayers

3    has to be considered in that instance.

4                Here we need --

5                THE COURT:  I'm not sure we need to get there.

6                MR. LINDEMAN:  It's a big question.  I only bring it

7    up because here I'm not even sure that the risk that has been

8    raised is even equivalent to that one.  Supposedly, these

9    payments are going into the school.  Plaintiffs have informed

10   us that S.J.D. has received a payment.  In their complaint, I

11   think they requested an order requiring payment within 90 days.

12   If 90 days is the standard we're looking for, this case hasn't

13   been live on the docket for 90 days.  Most of these pendency

14   decisions have been issued within the last 30 days.  The

15   compliance period is now only 32 or 33 days old.  I don't know

16   that plaintiffs intend to stand on 90 days.

17               Honestly, I don't know what an appropriate timeline

18   looks like for IU, the implementation unit, to fully review a

19   series of payment documents, checking for errors if there are

20   errors, to get back to the parties who submitted them, receive

21   those documents, review them, approve them and mailing a check.

22   That is going to be case by case, which is part of the problem.

23   Here payments are happening.  The school doesn't appear to be

24   in any danger.  The students certainly aren't.  I don't know

25   that there is a harm here, much less an irreparable harm.

O94RTHOc

| | |
|---|---|
| 1 | THE COURT:  Anything else you would like to add to |
| 2 | what has been presented by Mr. Bellantoni or to your papers? |
| 3 | MR. LINDEMAN:  I don't believe so, your Honor. |
| 4 | THE COURT:  All right.  I may come back to you.  Let |
| 5 | me see. |
| 6 | Mr. Bellantoni, let's talk about appropriate next |
| 7 | steps here. |
| 8 | MR. BELLANTONI:  May I just, your Honor, just briefly? |
| 9 | THE COURT:  Sure. |
| 10 | MR. BELLANTONI:  In *Grullon*, this is, I guess, at West |
| 11 | Law's fifth, star five, Judge Clarke writes:  As in *Mendez*, |
| 12 | plaintiffs' claims here unripe unless and until DOE violates |
| 13 | its legal obligation.  For the Court to conclude that DOE has |
| 14 | violated the statement provision, DOE would first have to |
| 15 | dispute or deny the students' pendency determinations, which it |
| 16 | has yet to do with respect to C.B. in that case. |
| 17 | Here they are disputing.  They have disputed these |
| 18 | three students' right to pendency below.  While Mr. Lindeman |
| 19 | may say it's the extra cost they are contesting, they are not |
| 20 | funding anything based on that difference.  The other problem, |
| 21 | Mr. Lindeman will advise the Court that, you know, the final |
| 22 | hearings are coming up in the next couple of weeks, so there's |
| 23 | no harm here. |
| 24 | THE COURT:  You said the hearing is scheduled today. |
| 25 | MR. BELLANTONI:  One is today, yes, Judge. |

O94RTHOc

1          THE COURT:  One is tomorrow and one happened on

2     August 21 or 23.

3          MR. BELLANTONI:  Yes.  But as Judge Schofield

4     recognized in one of her *Araujo* opinions——and I think it's the

5     Second Circuit in *Mackey*——pendency is evaluated differently

6     than placement.  Pendency is paid without respect to the merits

7     of the case.  What the DOE does and has done is they are not

8     funding pendency.  And then when the parent loses in November

9     or December say, they don't say, Okay.  We lost.  We're still

10    going to give you the pendency money from July and November

11    that we should have paid all along.  We don't owe you anything,

12    Judge.  They come in and tell the court that that FOFD changes

13    the pendency placement, but it doesn't.  There's still an

14    obligation to fund under pendency even if there's no

15    reimbursement under the administrative hearing order.

16         THE COURT:  I hear you Mr. Bellantoni, but again,

17    that's a funding request made to me to expedite funding, which

18    I have constraints upon me based on *Mendez*.

19         MR. BELLANTONI:  And back to *Mendez* with respect to

20    the ripeness, remember, Judge, I just want to be clear that

21    what the Second Circuit discussed in *Mendez* was Judge

22    Vyskocil -- am I saying that right?

23         THE COURT:  Yes.

24         MR. BELLANTONI:  I say Vyskocil, but was told it's

25    Vyskocil.  Denied our preliminary injunction in the first

O94RTHOc

1  instance because she found there was no irreparable harm.  The

2  case was never dismissed.  That judge stayed on the docket from

3  when the Second Circuit rendered its opinion through

4  August/September the same year with a letter from Magistrate

5  Aaron every month to make sure the DOE was still fulfilling its

6  funding obligation.

7          It's not that the Second Circuit dismissed the case

8  because the issues were not ripe, which then goes back to the

9  jurisdictional issue of whether or not you can issue an order,

10  maybe a pendency order for now, and having the DOE start the

11  due course, which was the point of the 90 days in July.  Before

12  the letter went to iBRAIN that eviction was possible, we kind

13  of threw that out there.  Couldn't ask for three days, seven

14  days; 90 days should be reasonable.  The due course, where

15  pendency is to maintain a placement in a twelve-month period,

16  right?  So the 90 days, we're already at 60 of those 90 days

17  and still not even a pendency determination.

18          I think perhaps maybe even more important than the

19  funding at this point is at least with a pendency order or a

20  concession that pendency lies at iBRAIN based on the last

21  unappealed final FOFD, which is what existed in *Mendez*, then I

22  would have a much harder time arguing that the payment issues

23  are still ripe.  But absent that, there is harm again, and the

24  harm, your Honor, is that without this expedited order.  And

25  Judge Failla never said, by the way, that the kids being

1    removed from the school wouldn't be irreparable.

2            There are cases in the District of Columbia where the

3    D.C. court has held, yes, that's irreparable harm.  Every day

4    they're in a school that is not providing with a FAPE or

5    denying a pendency placement, it's a due process violation.

6    And any threat that the student is going to be kicked out on

7    the sidewalk say tomorrow or next week is irreparable harm that

8    doesn't need to actually happen before it's actionable.

9            THE COURT:  Okay.  It seems to me, Mr. Bellantoni, and

10   maybe this dovetails a little bit with your discussion

11   yesterday with Judge Schofield, although I don't know what that

12   was, I'm hearing a back and forth about how you believe that,

13   for example *Ventura* holds differently than your colleague

14   across the aisle represents that it holds, and sort of

15   back-and-forth about whether this is ripe or not ripe for me to

16   adjudicate.  Again, that has been teed up in the motion to

17   dismiss.  We haven't had your opposition yet.  I am sure you

18   will have a good opposition to that, and I'd get a reply and

19   then I could rule on whether I can provide relief in this case.

20           It seems to me that that is a good precursor to then

21   considering the relief that I can grant, whether it be an order

22   for pendency or something related to the monetary amounts,

23   although I'm not sure on that front.  And since your clients

24   are being served in the school, does it not make sense to

25   continue the briefing of this and then revisit this question?

O94RTHOc

1          I brought you in quickly because it was an order to

2     show cause, TRO.  I wanted to make sure that nothing was

3     happening.  These students were not getting kicked out of the

4     school.  We didn't have kids not being served.  It sounds like

5     we are not in that situation.

6          I am happy to address, if I needed to, irreparable

7     harm.  Although, I will tell you I'm hard pressed to find it

8     given this discussion.  And I can talk about an opinion on

9     that, but I am wondering whether it makes more sense to decide

10    the motion to dismiss first and then lead into that, or at

11    least decide the ripeness question and then lead into that.

12    But let me hear your thoughts, Mr. Bellantoni.

13          MR. BELLANTONI:  Judge, when the application was made

14    to this Court with the threat of an eviction on the 28th, to

15    me, that was irreparable.

16          THE COURT:  I hear you.

17          MR. BELLANTONI:  Has that happened?  No.  Have there

18    been payments?  Yes.  Can I stand here right now and say that

19    if I don't get an order, the kids are going to be kicked out of

20    the school tomorrow and suffer this irreparable harm?  I

21    cannot.  I cannot.

22          THE COURT:  I appreciate the forthrightness.

23          MR. BELLANTONI:  That doesn't mean that the next pay

24    period in two weeks is $600,000, and they can't cover the

25    payroll and half the kids walk out.  I would be back here on

O94RTHOc

1  different facts.  I'm not saying that the irreparable harm

2  continues.  I'm not saying there wouldn't be any now.  I don't

3  have access directly to iBRAIN's books.  I don't know how many

4  other payments have been made.

5        By the way, Judge, to complicate this, if they are

6  making payments, the DOE had other matters unrelated to

7  pendency.  $400,000 of tuition based on an FOFD from two years,

8  that then makes the harm less imminent.  So I can't say right

9  now that the same harm exists as when I was here two weeks ago,

10  Judge.  I just can't.

11        THE COURT:  Okay.  All right.  So it seems to me then

12  that I am going to deny the request for a TRO and preliminary

13  injunction at this point, and I'll give you my reasons for it.

14  And then, we will progress through the regular motion to

15  dismiss.

16        MR. BELLANTONI:  May I be seated, your Honor?

17        THE COURT:  Pardon?

18        MR. BELLANTONI:  May I be seated?

19        THE COURT:  Of course.  Thank you very much.

20        All right.  Let me just then address this.  It will

21  take just a few minutes.  I've got something written out so

22  I'll go through it right now.

23        Plaintiffs are parents and natural guardians of six

24  student-plaintiffs who each suffer from a brain injury or

25  brain-based disorder that adversely affects their educational

O94RTHOc

1    abilities and performance.  And that is in the amended

2    complaint, which is docket No. 4.

3        Plaintiffs now bring a motion for temporary

4    restraining order and/or preliminary injunction "granting each

5    plaintiff a pendency order as an automatic injunction under the

6    Individuals with Disabilities Education Act ('IDEA') against

7    Defendant[s]...and ordering them to directly fund each

8    student's pendency program/placement at their current

9    educational placement including tuition and related services,

10   special transportation, and nursing services where applicable."

11   Dkt. 29, which is the brief that was filed.  And we also have a

12   reply brief, as I mentioned, from Mr. Bellantoni at Dkt. 40,

13   that was filed this morning.

14       The defendants are the New York City Department of

15   Education ("DOE") and David Banks, the Chancellor of the DOE.

16   defendants oppose plaintiffs' motion for injunctive relief, and

17   also argue that the amended complaint should be dismissed at

18   Dkt. 38, which I'll call the opposition.

19       Plaintiffs have not yet had an opportunity to oppose

20   defendants' motion to dismiss.  And, therefore, I am not

21   addressing the topics in the motion to dismiss here today.  But

22   instead, I am addressing the request for preliminary injunctive

23   relief on a TRO, order to show cause, that was filed by the

24   plaintiff, and as I mentioned, I will deny that motion.

25       I am going to read my reasoning, but I would ask the

O94RTHOc

1    parties, if they would agree, that instead of reading the full

2    citations, if I could just say "citation included" and provide

3    those citations to the court reporter so that you don't have to

4    sit there while I read 5 F.3rd, et cetera.

5            Would that be okay with you, Mr. Bellantoni?

6            MR. BELLANTONI:  Yes, your Honor.

7            THE COURT:  And with you, Mr. Lindeman?

8            MR. LINDEMAN:  Yes, your Honor.

9            THE COURT:  Okay.  The transcript will read fine.  It

10   will save us all me speaking it.

11           Under the IDEA, states receiving federal special

12   education funding are required to provide a free appropriate

13   public education, or FAPE, to children with disabilities.  20

14   U.S.C. § 1400(d)(1)(A); see *T.M. ex rel. A.M. v. Cornwall Cent.*

15   *Sch. Dist.*, 752 F.3d 145, 151 (2d Cir. 2014).

16           To provide a FAPE to each student with a disability, a

17   school district must develop an individualized education

18   program ("IEP") that is "reasonably calculated to enable the

19   child to receive educational benefits." *Ventura de Paulino v.*

20   *N.Y.C. Dept of Educ.*, 959 F.3d 519, 525 (2d Cir. 2020) (quoting

21   T.M., 752 F.3d at 151).

22           "The IDEA also requires states to provide an

23   administrative procedure for parents to challenge the adequacy

24   of their children's IEPs." *Mendez v. Banks,* 65 F.4th 56, 59

25   (2d Cir. 2023) (citing 20 U.S.C. § 1415(b)(6)).

O94RTHOc

New York has implemented a two-tier system of administrative review. N.Y. Educ. Law § 4404; see *Ventura de Paulino,* 959 F.3d at 526.  In the first tier, a parent can file an administrative due process complaint challenging the IEP and requesting a hearing before an impartial hearing officer or an IHO. *Ventura de Paulino,* 959 F.3d at 526.

In the second tier, parties aggrieved by the IHO's decision can appeal the case to a state review officer or an SRO. Id.; see *R.E. v. N.Y.C. Dept of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012). "Once the state review officer makes a final decision, the aggrieved party may seek judicial review of that decision in a state or federal trial court."  *Ventura de Paulino*, 959 F.3d at 526.

Section 1415(j) of the IDEA, known as the "stay-put" or "pendency" provision, provides that "while the administrative and judicial proceedings are pending and unless the school district and the parents agree otherwise, a child must remain, at public expense, in his or her then-current educational placement." Id.

"The purpose of this provision is 'to maintain the [child's] educational status quo while the parties' dispute is being resolved."  *Abrams v. Porter*, No. 20-3899, 2021 WL 5829762, at *1 (2d Cir. Dec. 9, 2021) (summary order) (quoting *T.M.*, 752 F.3d at 152). "[A] school district is required 'to continue funding whatever educational placement was last agreed

O94RTHOc

upon for the child until the relevant administrative and
judicial proceedings are complete.'" *Doe v. E. Lyme Bd. of
Educ.*, 962 F.3d 649, 659 (2d Cir. 2020) (quoting *T.M.*, 752 F.3d
at 171).

The stay-put provision, however, "does not guarantee a
disabled child the right to remain in the exact same school
with the exact same service providers while his administrative
and judicial proceedings are pending.  Instead, it guarantees
only the same general level and type of services that the
disabled child was receiving." *T.M.*, 752 F.3d at 171.

Although parents "dissatisfied with their child's
education can unilaterally change their child's placement
during the pendency of review proceedings," *Ventura de Paulino*,
959 F.3d at 526.  (Quotation marks and citation omitted).  They
cannot unilaterally require the school district to pay for that
new school, see id. at 533 (DOE was not obligated to fund
students' placements where parents unilaterally enrolled
students in new schools without the DOE's approval).  Unless
the parents can "persuade the school district to pay for the
program's new services on a pendency basis," their only
recourse is to "enroll the child in a new school, and then seek
retroactive reimbursement from the school district after the
IEP dispute is resolved."  Id. at 534.

"Although the IDEA's stay-put provision generally does
not require the state to pay the costs of a new educational

O94RTHOc

placement during the pendency of proceedings, parents can

obtain funding for a new placement if an IHO or SRO finds it to

be appropriate and issues a pendency order and the school

district does not appeal the decision." *Mendez*, 65 F.4th at

59.  For children with a pendency order, "the IDEA's stay-put

provision does not create an entitlement to immediate payment

or reimbursement," but "[p]arents or guardians may still be

able to obtain such relief if they establish that a delay or

failure to pay has jeopardized their child's educational

placement."  Id. at 63.

The Court generally assumes familiarity with the facts

and background of this case, and recounts now only the key

details to the disposition of the present expedited motion.

There are six student-plaintiffs in this case.  Each filed a

due process complaint against the DOE on or around July 2,

2024. Am. Compl. ¶ 10.

Each student-plaintiff seeks pendency placement at the

International Academy of the Brain ("iBRAIN") for the 2024-2025

school year. Id. ¶ 21.  The six Student-Plaintiffs here fall

into two categories.  And I am updating this from what is set

forth in the present docket based on information related to me

here today.  First, for three students S.J.D. and M.B. and

A.C., have already received pendency orders in connection with

the 2024-2025 school year. See Dkts. 39-1 and 39-2 and the

representations made here at this hearing.  And the Department

O94RTHOc

1    of Education does not plan to appeal those pendency orders.

2              Second, three students, A.T., L.C., and M.C., have

3    invoked pendency but have not yet received a pendency order in

4    the administrative level.  Their hearings have taken place

5    either today, will take place tomorrow, or took place in late

6    August based on what has been represented here today in Court.

7              Plaintiffs seek a temporary restraining order and/or a

8    preliminary injunction "[d]eclaring iBRAIN to be each student's

9    pendency program/placement...for the 2024-2025 extended school

10   year, which includes each Student's related services" and

11   "[d]irecting DOE to expeditiously fund each student-plaintiff's

12   tuition and related services."  Br. at 25.  They seek this on

13   an expedited basis.

14             The Court first addresses the applicable legal

15   standard.  As a threshold matter, in the Second Circuit, the

16   standard for obtaining a temporary restraining order is the

17   same as for obtaining a preliminary injunction.  See, e.g.,

18   *Empire Trust, LLC v. Cellura,* No. 24-cv-00859 (KMK), 2024 WL

19   1216729, at *2 (S.D.N.Y. Mar. 21, 2024); *Free Country Ltd. v.*

20   *Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016).

21             The Court thus analyzes the plaintiffs' request for a

22   temporary restraining order and for a preliminary injunction

23   together.  Traditionally, a party seeking preliminary

24   injunctive relief "must demonstrate: (1) a likelihood of

25   success on the merits or sufficiently serious questions going

O94RTHOc

to the merits to make them a fair ground for litigation and a
balance of hardships tipping decidedly in the plaintiff's
favor; (2) a likelihood of irreparable injury in the absence of
an injunction; (3) that the balance of hardships tips in the
plaintiff's favor; and (4) that the public interest would not
be disserved by the issuance of an injunction." *Benihana, Inc.
v. Benihana of Tokyo,* 784 F.3d 887, 895 (2d Cir. 2015)
(quotation marks, citation, and ellipses omitted).

Preliminary injunctive relief "is an extraordinary and
drastic remedy, one that should not be granted unless the
movant, by a clear showing, carries the burden of persuasion."
*Moore v. Consol. Edison Co. of N.Y., Inc.,* 409 F.3d 506, 510
(2d Cir. 2005) (internal quotation marks and citation omitted).

Both parties assert that standards other than the
traditional standard applies here. Plaintiff argues that
because they ask the Court to "assess[] pendency claims under
20 U.S.C. § 1415(j)," "[t]he traditional preliminary injunction
standard does not apply." Br. at 22. They instead assert that
they are entitled to an "automatic pendency injunction" and
that the Court should not consider the factors of irreparable
harm and either a likelihood of success on the merits or a fair
ground for litigation and a balance of the hardships in
analyzing their request for relief. Id. at 12–13.

Plaintiffs are correct that the Second Circuit has
characterized Section 1415(j) of the IDEA as "an automatic

O94RTHOc

injunction designed to maintain the child's educational status

quo while the parties' IEP dispute is being resolved." *Ventura*

*de Paulino,* 959 F.3d at 529; *Zvi D. v. Ambach,* 694 F.2d 904,

906 (2d Cir. 1982) (Section 1415(j) "is, in effect, an

automatic preliminary injunction" which "substitutes an

absolute rule in favor of the status quo for the court's

discretionary consideration of the factors of irreparable harm

and either a likelihood of success on the merits or a fair

ground for litigation and a balance of hardships.")

However, plaintiffs are wrong as a matter of law as to

the applicable legal standard for this case.  "The automatic

injunctive effect of Section 1415(j) is a student's ability to

automatically remain in their current educational placement

during the pendency of their underlying [administrative]

proceedings." *Grullon v. Banks,* No. 23-cv-05797 (JGLC), 2023

WL 6929542, at *5 (S.D.N.Y. Oct. 19, 2023). "It is not, as

plaintiffs suggest, a mechanism through which plaintiffs can

seek a court order requiring DOE to acknowledge a pendency

determination." *Id.; see Mendez,* 65 F.4th at 62-63 (Plaintiffs

were "wrong as a matter of law" when they argued that "there is

no requirement to show irreparable harm in order to obtain an

order requiring the DOE to immediately fund the educational

placements for the 2022-2023 school year" (emphasis omitted)).

Defendants assert that a heightened standard for

obtaining a preliminary injunction should apply, because

O94RTHOc

1   plaintiffs seek a purportedly "mandatory" injunction.  Opp. at

2   11.  Defendants therefore argue that plaintiffs "must show a

3   clear or substantial likelihood of success on the merits, and

4   make a strong showing of irreparable harm, in addition to

5   showing that the preliminary injunction is in the public

6   interest."  Id. (quotation marks and citation omitted).

7         However, it seems to the Court that defendants are

8   incorrect that the "heightened" preliminary injunction standard

9   for mandatory injunctions should apply here.  The Second

10  Circuit has explained that a "mandatory" preliminary injunction

11  is one that "alters the status quo by commanding some positive

12  act, as opposed to a prohibitory injunction seeking only to

13  maintain the status quo."  *Cacchillo v. Insmed, Inc.*, 638 F.3d

14  401, 406 (2d Cir. 2011).

15        As the Court understands it, plaintiffs seek pendency

16  orders to maintain the status quo, as opposed to commanding

17  some positive act from defendants in this case.  See Br. at 3

18  (Each parent-plaintiff intends "to maintain their students

19  placement at iBRAIN for the...2024-2025 school year").

20        To the extent Plaintiffs seek any positive act, it is

21  their request that their pendency placements be funded

22  expeditiously, which, in this context, would also serve to

23  maintain the status quo because it would allow plaintiffs to

24  remain in their present placements.  Moreover, defendants have

25  not directed the Court to any cases, nor has the Court

O94RTHOc

independently located any cases, where a plaintiff seeking a

pendency order and related funding under Section 1415(j) was

subjected to a heightened "mandatory" injunction standard.  Cf.

*Mendez,* 65 F.4th at 62-64, where the Court applied traditional

preliminary injunction standard, rather than heightened

"mandatory" preliminary injunction standard, to claims for

funding during pendency under the IDEA); *Landsman v. Banks,* No.

23-cv-06404 (PAC), 2023 WL 4867399, at *1-2 (S.D.N.Y. July 31,

2023) (applying heightened mandatory preliminary injunction

standard where plaintiff sought pendency order for placement

that differed from determination from administrative

proceedings); *M.W. v. N.Y.C. Dep't of Educ.*, No. 15-cv-05029,

2015 WL 5025368, at *3 (S.D.N.Y. Aug. 25, 2015) (applying

heightened mandatory preliminary injunction standard where

plaintiff sought temporary, prospective equitable relief in the

form of "compensatory education," rather than relief designed

to maintain the status quo).

         However, the Court need not decide at all whether the

heightened "mandatory" injunction standard or the traditional

preliminary injunction standard applies here, and the Court

does not do so because defendants prevail even applying the

traditional standard for a preliminary injunction.

         The Court now proceeds to analyze the traditional

preliminary injunction factors, and we'll start with

irreparable harm.  The Court concludes that the plaintiffs have

O94RTHOc

```
 1   not met their burden there.

 2            "Irreparable harm is the single most important

 3   prerequisite for the issuance of a preliminary injunction."

 4   Sterling v. Deutsche Bank Nat'l Tr. Co. as Trustees for Femit

 5   Tr. 2006-FF6, 368 F. Supp. 3d 723, 727 (S.D.N.Y. 2019). "To

 6   show irreparable harm, the movant must demonstrate an injury

 7   that is neither remote nor speculative, but actual and imminent

 8   and that cannot be remedied by an award of monetary damages."

 9   Oliver v. N.Y. State Police, 812 F. App'x 61, 62 (2d Cir. 2020)

10   (summary order) (citation omitted).

11            Plaintiffs request an order that iBRAIN is their

12   pendency program or placement and directed the DOE to

13   expeditiously fund their pendency program or placement.

14   However, they have failed to show a likelihood of irreparable

15   harm in the absence of such an order.  As to the three

16   plaintiffs, they have already received pendency orders

17   establishing iBRAIN as their pendency regarding their program,

18   and plaintiffs have provided no evidence to the Court that the

19   DOE is contesting that pendency determination and the DOE has

20   confirmed that here.

21            As to the other student-plaintiffs, the evidence

22   before the Court shows that they are continuing through the

23   administrative process in the normal course to obtain pendency

24   orders through the administrative process.  In fact, those

25   hearings are taking place either now, have taken place
```

O94RTHOc

1    recently, or are taking place as late as tomorrow.

2            Plaintiffs have provided no evidence to the Court that

3    while that administrative process continues, the DOE has taken

4    any action to contest those student-plaintiffs' placements

5    while those proceedings continue.

6            As to plaintiffs' request for expeditious funding to

7    accompany their pendency placements, as plaintiffs acknowledge

8    in their brief, the Second Circuit has explained that Section

9    1415(j) "does not create a procedural right to immediate

10   payment, at least not absent a showing that a child's placement

11   will be put at risk." *Mendez*, 65 F.4th at 64.

12           Despite plaintiffs' assertions in their brief that

13   "the students" educational placements are at risk," Br. 18

14   (further capitalization and emphasis omitted), based on the

15   evidence before the Court and the discussion here during this

16   oral argument and preliminary injunction hearing, the Court

17   does not conclude that the student-plaintiffs' placements are

18   at risk without expedited funding at this time.

19           Much of the materials provided by plaintiffs in

20   support of their motion are not related to the plaintiffs

21   before the Court, but rather, seem to relate to other students

22   at iBRAIN.  For example, in the Declaration of Arthur Mielnik,

23   Dkt. 31, the Director of Strategic Planning for iBRAIN declared

24   that "another...iBRAIN student, L.M.," has not received

25   payments towards tuition or transportation services despite

O94RTHOc

receiving a pendency order on August 2, 2024, id. at ¶¶ 1,

13-16.  But L.M. is not a party to this lawsuit, so this

information is not relevant.

         The only possible evidence that the

student-plaintiffs' placements are at risk is a letter

addressed to iBRAIN from El-Kam Realty Co., stating that iBRAIN

is "indebted...in the total sum of $146,511.13 in rent and

additional rent...which you are required to pay, on or before

August 28, 2024." Dkt. 31-5 at 2.  The letter notes that if

iBRAIN fails to make the payment or surrender the premises, the

landlord "will commence summary proceedings or an appropriate

action."  Id.

         Per the declaration of Arthur Mielnik, this letter

relates to iBRAIN's Manhattan Upper East Side administration

office.  Dkt. 31 at ¶ 27.  Arthur Mielnik also declared that

iBRAIN "is over $1,000,000 behind in rent payments across both

its Upper East Side, Manhattan, and Sunset Park, Brooklyn,

locations" and "will not be able to fully cover its payroll

obligations as of September 1, 2024." Id. at ¶ 28-29.

         However, there are some additional new facts that have

come to light here at the hearing as well.  For example, S.J.D.

has now been paid in terms of a tuition payment, which would

affect the financial viability of the school.  In addition, it

may be the case that iBRAIN is experiencing financial distress,

but this financial distress seems to be due to factors other

O94RTHOc

1    than the timing of the pendency payments for the

2    student-plaintiffs here.  As just stated, S.J.D. already has a

3    tuition payment that has gone in.

4          Accordingly the commercial rent demand provided by

5    plaintiffs, at Dkt. 31-5, and the outstanding rent charges are

6    for rent payments for the iBRAIN's administrative office

7    building due from April 2024 through August 2024.  Dkt. 31-5 at

8    4.  But the student-plaintiffs here filed their due process

9    complaints only on July 2, 2024, see Dkts. 4-1 through 4-6

10   (student-plaintiff's due process complaints), and the

11   administrative process has been proceeding since that time.

12         It is unclear to the Court why iBRAIN's financial

13   distress and failure to make rent payments for its

14   administrative office building, which began well before the

15   student-plaintiffs even sought pendency placements at iBRAIN,

16   should be resolved by the Court ordering expedited payments for

17   these student-plaintiffs' placements for the 2024-2025 school

18   year.  Additionally, plaintiffs have not made clear to the

19   Court that the pendency payments sought now could even resolve

20   iBRAIN's purported financial difficulties.

21         In addition, at this hearing today, it has been

22   represented that the students will not be disenrolled from the

23   school, so they will continue to have their services provided

24   to them, and that the payments have been made such that there

25   hasn't been an additional proceeding brought with respect to

O94RTHOc

```
1   rent or anything regarding the school.

2           So put simply here, there's no evidence before the

3   Court that there is an "imminent threat to the educational

4   services themselves" for the student-plaintiffs at this time.

5   Abrams v. Carranza, No. 20-cv-05085 (JPO), 2020 WL 6048785, at

6   *2 (S.D.N.Y. Oct. 13, 2020); see id. at *1-2 (although other

7   iBRAIN plaintiffs asserted that they faced eviction for unpaid

8   rent, Court did not find that students were actually imminently

9   in danger of losing their placements) Mendez, 65 F.4th at 54

10  (the IDEA "does not create a procedural right to immediate

11  payment, at least not absent a showing that a child's placement

12  will be put at risk").  By all accounts, all student-plaintiffs

13  before the Court are continuing in their placements at iBRAIN

14  without disruption.

15          I will also note that in the reply brief filed this

16  morning, although again, although plaintiffs state that "there

17  is imminent risk to the students' educational placements,"

18  reply at 7 (further capitalization and emphasis omitted), they

19  make no mention of any specific facts that would establish such

20  risk and don't even mention the potential risk of eviction and

21  school closure.  That is in fact consistent with what has been

22  presented to me during this proceeding.  Given this, the Court

23  is left to conclude that there is no actual and imminent risk

24  that any student-plaintiff will lose their placement at this

25  time, and therefore, there's a failure to demonstrate
```

O94RTHOc

|  |  |
|---|---|
| 1 | irreparable harm (let alone a strong showing required for a |
| 2 | mandatory injunction) absent an injunction.  The Court need not |
| 3 | address the remaining elements of a preliminary injunction if a |
| 4 | plaintiff has failed to show irreparable harm.  See *Coscarelli* |
| 5 | *v. ESquared Hosp. LLC,* 364 F. Supp. 3d 207, 221 (S.D.N.Y. |
| 6 | 2019); *Lewis v. Government of England and United Kingdom,* No. |
| 7 | 22-cv-10792 (JLR), 2023 WL 2664081, at *2 n.1 (S.D.N.Y. Mar. |
| 8 | 28, 2023) |
| 9 |          I will note, though, that there are serious concerns |
| 10 | that the Court has as to whether plaintiff does have a |
| 11 | likelihood of success on the merits, given the issues that were |
| 12 | raised by defendants in the motion to dismiss.  And so, I won't |
| 13 | reach those right now until I have the full briefing on that. |
| 14 | But because there's no risk of irreparable harm, I'm going to |
| 15 | deny the expedited preliminary injunction/TRO that's sought |
| 16 | here, and the case will proceed on to address the motion to |
| 17 | dismiss. |
| 18 |          All right.  Is there anything further, Mr. Bellantoni, |
| 19 | that we should discuss here today? |
| 20 |          MR. BELLANTONI:  Other than the briefing schedule, |
| 21 | your Honor, no. |
| 22 |          THE COURT:  Okay.  And Mr. Lindeman, anything further? |
| 23 |          MR. LINDEMAN:  Nothing further from defendants, your |
| 24 | Honor. |
| 25 |          THE COURT:  Okay.  So I have defendants' motion to |

O94RTHOc

1   dismiss.  Do we not have a briefing schedule for that motion?

2              MR. LINDEMAN:  I don't believe we do, your Honor.

3              THE COURT:  That's fine.  It looks like it was filed

4   on August 29.

5              MR. LINDEMAN:  That's correct, your Honor.

6              THE COURT:  So what would you like, Mr. Bellantoni?

7              MR. BELLANTONI:  Your Honor, I'm trying to compute the

8   dates from now, but can we have four weeks from the 29th so

9   three weeks from this week?

10             THE COURT:  Sure.  Sure.  How about September 26?

11             MR. BELLANTONI:  That's fine, your Honor.  Thank you.

12             THE COURT:  Okay.  And then Mr. Lindeman, when would

13  you like your reply?

14             MR. LINDEMAN:  Two weeks after September 26 is

15  October 10.

16             THE COURT:  October 10, yes.

17             MR. LINDEMAN:  The only other request I would make,

18  your Honor, and I don't know if this is necessary or not, but

19  given the similarity in the cases in the two matters in front

20  of Judge Schofield, Mr. Bellantoni had indicated to the Court

21  that he may seek to amend parts of his complaint.  There are

22  some elements that at least I think the parties agree are moot

23  or would have to change to survive.

24             We set in that case a deadline of next Friday, I

25  believe, as the deadline to decide if an amendment was coming

O94RTHOc

| 1 | in.  I don't know if that's necessary here or not. |

THE COURT:  Let's talk about that.  Mr. Bellantoni,
what is your view on an amendment here?

MR. BELLANTONI:  Your Honor, an amendment might make
sense.  If I'm going to amend it and the matter is moot as to
the three plaintiffs that we discussed today, it may simplify
matters.  I mean, the need for the motion practice or different
motion practice.  If we're going to do that, I'd ask for two
weeks.  I asked for Friday the 13th and Judge Schofield made
it Thursday the 12th.  So maybe a week from the 12th, the 19th
to amend, or if not, reply by the 26th to oppose the motion.
I'm sorry.

THE COURT:  Let's get that clear.  I'm sorry.  You are
going to amend by September 19.  If you chose not to amend,
you'll put in your opposition by September 26 with a reply on
October 10; is that correct?

MR. BELLANTONI:  Yes, your Honor.

THE COURT:  All right.  If you do choose to amend on
September 19, I'm going to then moot out the earlier motion to
dismiss, and you will then move with respect to the
September 19.  Do you want to set down a briefing schedule for
that in the alternative?

MR. LINDEMAN:  I think a briefing schedule, the
necessity of that, would have to be determined by the scope of
the amendment, your Honor.

O94RTHOc

1        THE COURT:  Sure.  I mean, if I don't set down a

2    schedule, then you would file it within 30 days.

3        MR. LINDEMAN:  Yes, 21 days.

4        THE COURT:  Or however many days you normally -- 21

5    days; is that it?  And then, I think, Mr. Bellantoni gets

6    whatever period he gets under the rules.  So would you like to

7    go with the default rules or would you like to set a schedule?

8        MR. LINDEMAN:  I would be happy to have 30 days

9    instead of 21.  Certainly the additional time would be helpful,

10   but I just don't want this to sit on the Court's docket too

11   long.

12       THE COURT:  I don't either.  Mr. Bellantoni, what is

13   your position on the motion to dismiss?  I don't know if there

14   will be one, but it is what it is.

15       MR. BELLANTONI:  Your Honor, if I amend by the 19th,

16   if we could have -- give Mr. Lindeman 30 days to answer and/or

17   move.

18       THE COURT:  Sure.

19       MR. BELLANTONI:  And then, we could submit maybe a

20   status report two days before.  So we would let your Honor know

21   either the motion is coming or God forbid there's a request for

22   an extension, but at least it's not made on the 30th day.

23       THE COURT:  I'm not sure we need that.  Why don't we

24   just say September 19 is the deadline to amend, and then I'll

25   set down October 7 as the DOE's deadline to answer and/or move

O94RTHOc

1    to dismiss, either one.

2            If they answer, we're going forward.  If they should

3    move to dismiss and they have done that by October 16, when

4    would you like to oppose any motion, Mr. Bellantoni?

5            MR. BELLANTONI:  Thirty days, your Honor?

6            THE COURT:  Yes.  That would be November 14 for the

7    opposition.  And the reply, Mr. Lindeman?

8            MR. LINDEMAN:  Well, November 28 is Thanksgiving, your

9    Honor.

10           THE COURT:  Let's not do that.  That's in no one's

11   interest.

12           MR. LINDEMAN:  So if you have the Tuesday of the week

13   after maybe?

14           THE COURT:  Sure.  That would be December 3.

15           MR. LINDEMAN:  Yes.

16           THE COURT:  Okay.  So I have two briefing schedules.

17   I'll actually put those down in an order so that we're

18   perfectly clear and have them clear.  But essentially, it's a

19   briefing schedule that will flow from an amended complaint that

20   comes September 19 should the DOE decide to file a motion to

21   dismiss, or a briefing schedule to the current motion to

22   dismiss on the current complaint that is on file.

23           Okay.  Mr. Bellantoni, anything further?

24           MR. BELLANTONI:  No, your Honor.

25           THE COURT:  Okay.  Mr. Lindeman, anything further?

O94RTHOc

1          MR. LINDEMAN:  No.  Thank you, your Honor.

2          THE COURT:  Great.  Thank you very much and court is

3    adjourned in this case.  Take care.

4          (Adjourned)

5                              o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25